ALAN HOSTETTER
P.O. BOX 1477
SAN CLEMENTE, CA 92674

Pro Se Defendant

# UNITED STATES DISTRICT COURT

# DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) Case No.: 21CR00392-RCL |
| | ) |
| Plaintiff, | ) **(HEARING REQUESTED)** |
| | ) NOTICE OF *MOTION TO DISMISS* THE |
| vs. | ) INDICTMENT DUE TO OUTRAGEOUS |
| | ) GOVERNMENT CONDUCT |
| ALAN HOSTETTER, | ) |
| | ) |
| Defendant. | ) |
| | ) |
| | ) |
| | ) |

Please take notice that ALAN HOSTETTER, Pro Se Defendant, will move this Court for an order dismissing all allegations contained in the indictment based upon Outrageous Government Conduct. This motion is based upon the attached Memorandum of Points and Authorities, all files and records in the case, and such evidence and argument as may be presented at the hearing.

Respectfully submitted,

DATED:    12/6/2021          /s/ *Alan Hostetter*
ALAN HOSTETTER

## PROCEDURAL HISTORY

On <u>December 1, 2021</u> a superseding indictment was filed charging Alan Hostetter in counts 1,2,4 and 5. (Dkt. No 21-CR-392-RCL)

Hostetter now requests this court to dismiss all the allegations in the superseding indictment due to outrageous government conduct.

## MOTION TO DISMISS

The Defendant, Hostetter, hereby moves for an Order of the Court to dismiss all allegations contained in the superseding indictment as a result of outrageous government conduct in contravention of state and federal constitutional rights. This Motion is based on the accompanying Brief in Support of the Motion, any and all documents previously filed, and any documents or evidence to be presented at a hearing on the Motion.

Defendant will describe in this Motion to Dismiss, a classic FBI Counter Intelligence Program (COINTELPRO) operation targeting him from the beginning of the Covid-19 lockdowns and stay-at-home orders that were implemented in mid-March of 2020. Defendant will identify in this motion persons he believes worked at the behest of federal handlers from the FBI and/or U.S Intelligence Agencies. If the government denies these informants exist, it is due to either a). dishonesty and an attempt to further this governmental criminal conspiracy that has been waged against defendant since at least March of 2020 OR b). the informants identified are working through third party intermediaries thereby giving the government plausible deniability regarding the actions thus far taken against defendant.

These third-party intermediaries might include such organizations and "secret societies" such as Yale University's "Skull and Bones," Freemasonry, and specific

religious denominations known for secrecy such as Scientology and Mormonism, which will be expanded upon further into this motion.

In mid to late March 2020, defendant began to publicly express his disapproval for the Covid lock-downs and shelter-in-place orders, ultimately leading to defendant organizing protests against them. In organizing these protests and speaking out against what defendant believed to be the unconstitutional actions of the government, he was acting lawfully and his actions were protected under the 1st Amendment of the U.S. Constitution.

## CHARACTERISTICS OF A COINTELPRO OPERATION

https://allthatsinteresting.com/cointelpro-fbi/2

COINTELPRO began in 1956 as a program to deter and diminish communist activities within the United States. During the tumultuous 1960's, the FBI began to focus this program on what they perceived to be the "dangerous radicals" of the Civil Rights Movement at that time led primarily by people of color such as Malcolm X, the Original Black Panther Party, and most notably Martin Luther King, Jr.

COINTELPRO went on "officially" through 1971 until an activist group broke into FBI offices in Media, PA and stole thousands of pages of documents related to the program. The documents were distributed widely to numerous news media outlets, ultimately leading to a deeper investigation by a congressional committee called the Church Commission. The Church Commission identified much abuse of the constitutional rights of Americans targeted by this program and it was disbanded. Regardless of what the FBI might call such Counter Intelligence Operations Programs today, the program is very much alive and was used against defendant in this case.

COINTELPRO operations are divided into four distinct types of activities. They include the following, all of which were deployed against defendant:

1). _INFILTRATION_ of groups by FBI informants / agents, along with their partners in local law enforcement. This federal/local law enforcement partnership became much closer and more symbiotic post 9/11 and the Patriot Act. An important connection between federal and local law enforcement resulting from the Patriot Act are the many FUSION centers established across the country that link federal, state and local agencies under one roof. The local FUSION center used to target defendant is called the Orange County Intelligence Assessment Center (OCIAC, pronounced O-kayak).

2). _PSYCHOLOGICAL OPERATIONS_ (PsyOps) targeting individuals and groups. In the case of defendant, PsyOps are still ongoing and have occurred regularly over the course of the past roughly 20 months. Governmental echniques utilized in an attempt to harass, intimidate and silence defendant will be described in detail further into this motion.

3). _MANIPULATION OF THE LEGAL SYSTEM_. In defendant's case the FBI, in conjunction with their local partners, staged and dramatized arrests, including defendant's arrest on May 21, 2020, along with thte arrest of two women at a protest defendant organized for the purpose of creating a "radical domestic terrorist" aura around defendant.

4). _VIOLENCE, up to and including murder / assassinations._ See death threats and encouragement of suicide mentioned above. In one instance occurring on April 30, 2020 and described further into this motion, the FBI along with their local partners sent an operative into a gathering defendant had organized for the purpose of disrupting that gathering and provoking the defendant into violence.

**RELEVANT FACTS**

Defendant is listed as the most culpable of six defendants indicted in a conspiracy to attack the United States Capitol and disrupt the proceedings within on January 6, 2021 (See public indictment).

Of the other five co-defendants, this defendant has never knowingly met, nor has he ever knowingly communicated with, four of the co-defendants (Warner, Kinnison, Martinez and Mele). These four are identified in the indictment as belonging to the "Three Percenters" militia, a so-called right-wing para-military organization identified by the government and Main Stream Media as one of the "Big Three" militias involved in the "storming of the Capitol" on January 6, 2021.  The other two "militias" are identified as "Oath Keepers" and "Proud Boys," which are both led by known FBI informants Stewart Rhodes and Enrique Tarrio respectively.

The fifth co-defendant listed in this indictment is identified as Russell Taylor of Ladera Ranch, California. Russell Taylor is suspected to be an FBI informant or possibly working through one of these secret societies described above such as Freemasonry and Mormonism as he belongs to both organizations. This claim will be fully supported by evidence as discussed in the *Timeline and Description of Events* below.

As is often the case when the FBI and/or U.S. Intelligence Agencies use informants and/or agents to infiltrate groups they are targeting through these COINTELPRO operations, it is those agents and/or informants who become the most active in organizing, initiating and instigating the events the government later prosecutes as criminal conduct. This was most shockingly and recently exposed in the FBI led plot to kidnap Michigan governor Gretchen Whitmer and, not coincidentally, "storm" the Michigan State Capitol only a few months before January 6, 2021. The same supervising FBI agent overseeing the Michigan case, Stephen D'Antuano, was quietly promoted to FBI Assistant Director and moved to Washington DC shortly before January 6, 2021, where he now oversees the investigation into the 1/6/2021 Capitol "Riot."

When one examines all evidence and discovery in defendant's case and reviews the public indictment, it is clearly co-defendant Russell Taylor whom similarly engages in nearly all of the pre-planning, organizing and most egregious actions in this case, yet he is not identified as defendant #1. This is similar to the Michigan case in which the most active participants in the plot were found to be FBI agents and informants.

Defendant has never belonged to any militia group, nor has he ever organized any militia group. There is no evidence outlined in the indictment indicating otherwise, nor has the government provided any evidence to the contrary through the discovery process. American Phoenix Project, an organization defendant created to protect the constitutional rights of all Americans, is not a militia group. American Phoenix Project has not engaged in any criminal activity. The government has produced no evidence to the contrary.

## TIMELINE AND DESCRIPTION OF EVENTS

**March 13, 2020:** President Trump declares national emergency due to Covid-19 and encourages Americans to shelter-in-place for 15-days to "stop the spread / flatten the curve" related to Covid-19.

**March 19, 2020:** California Governor Gavin Newsom issues a stay-at-home order directing all CA residents to remain in their homes unless engaged in traveling for essential supplies.

**March 23, 2020:** Defendant authored a public letter via Facebook directed to the Mayor of San Clemente, CA Dan Bane. The purpose of this letter was to discourage Mayor Bane and the City Council from closing the beaches of San Clemente, CA, defendant's home town then and now.

**Late March – April 11, 2020:** As defendant began to observe the draconian, randomly applied, and ever more punitive Covid mitigation measures being taken against CA citizens and others across the country, he decided to organize a peaceful protest against the lock-down measures in his hometown of San Clemente, CA. Defendant let it be known he planned to continue organizing these protests weekly until the lockdown orders were lifted.

Defendant has reason to believe the FBI and Orange County Sheriff's Department, through the FBI-led Joint Terrorism Task Force (JTTF) which would include the Orange County, CA region and beyond, in conjunction with and operating through the "Fusion Center" known as the Orange County Intelligence Assessment Center (OCIAC), were already monitoring, surveilling, and tracking him by this time.

**April 12, 2020 [Easter Sunday]:** Defendant leads the first protest against Gavin Newsom and the shelter-in-place orders issued in CA. This protest occurs in defendant's hometown of San Clemente, CA and was one of the first of such protests in the nation.

**April 13, 2020:** The day following the first protest, defendant was contacted via cell phone by Sergeant Paul Ketchum of the Orange County Sheriff's Department. The City of San Clemente, where defendant lives and organized these first protests, is policed by the Orange County Sheriff's Department through a contract. It is one of several cities in south Orange County under such a contract. The city does not have its own dedicated police force.

Sergeant Ketchum identified himself as the "Administrative Sergeant" assigned to San Clemente. Sergeant Ketchum stated to defendant that the Sheriff's Department was aware of the April 12 protest and was curious what defendant's intentions were at this point. Defendant informed Sgt. Ketchum that his intention was to organize protests every week until the lockdowns ended. To the best of defendant's recollection, he would describe the entire conversation as very friendly and very cordial in which we discussed everything from defendant's prior law enforcement experience to what was going on in the world related to Covid-19 and law enforcement's response to it.

Defendant recalls vividly that Sgt. Ketchum's general attitude, and the attitude he was conveying on behalf of the sheriff's department generally, was very supportive of what defendant was trying to accomplish by organizing these protests.

Over the course of our several communications over the next month, Sgt. Ketchum stated on a few separate conversations, words to the effect of, "I could never state this publicly, but we support what you are doing. We want to see these lockdowns end too." Once defendant was arrested on May 21, 2020, for engaging in act of civil disobedience described in detail further into this motion, Sgt. Ketchum was never heard from again.

**April 16, 2020:** On April 16, 2020, defendant became aware for the first time of a talented street artist identified only by the moniker "Bandit." Bandit began to target defendant through his artwork by this date. On April 16, 2020 a flyer depicting defendant as a sheep leading other sheep began to appear throughout San Clemente in news racks and affixed to businesses and stationary objects throughout the city.



The night before, or morning of, the second protest occurring on April 19, 2020, "Bandit" had stenciled depictions of sheep onto the ground along the path protesters would walk, implying that those joining defendant's protests were sheep blindly following defendant.



        Defendant now believes Bandit may have been encouraged, supported and or created by the FBI, their local partners and/or U.S. Intel agencies as part of a Psychological Operations (PsyOp) campaign being waged against defendant by this time.

        Also, as part of what defendant believes was an organized PsyOp campaign being directed against him, defendant began receiving constant harassment and even death threats on a regular basis primarily through texts, phone calls and direct messages via Facebook and Instagram. Defendant also received encouragement for him to commit suicide as the protests continued. This encouragement to commit suicide is a well-known FBI technique that was infamously used against Martin Luther King, Jr. during his rise to prominence during the civil rights movement of the 1960's.

**April 19, 2020:** Defendant organized a second anti-lockdown / anti-Newsom protest that took place on this date. The crowd had grown exponentially from the first protest occurring the week before on 4/12/2020 to this second protest, with some news accounts reporting 500-1000 people attending on foot, compared to approximately 50 the previous week. Many others repeatedly drove past the protesters in vehicles while honking and waving American flags in support.

        It was during this protest that two very influential informants / operatives / actors came into defendant's life. The first was Morton Irvine Smith of the very wealthy and

influential Irvine family of California. The second was Leigh Taylor Dundas. She portrays herself as a "Human Rights Attorney" and has strong connections to Orange County law enforcement and Orange County government in general. April 19, 2020 was the first-time defendant had met either one of these individuals.



Photo taken 4/19/2020. Dundas (left) / Irvine Smith (center) / Defendant (right)

The morning of the April 19, 2020 protest, a local woman possibly from San Clemente, contacted defendant to let him know she was with Leigh Dundas, driving to the protest and Ms. Dundas would be agreeable to speaking at the protest if defendant would allow it. Defendant cannot recall the name of the "local woman," bringing Ms. Dundas to the protest. Defendant was overjoyed at this news and enthusiastically informed the local woman Ms. Dundas would be welcomed as a speaker at the protest. Ms. Dundas arrived just as the protest was about to begin. She is a gifted public speaker.



To the best of defendant's recollection, it was not until the initial speeches were made by defendant and Leigh Dundas during the protest of April 19, 2020, that the protest eventually moved up Avenida Del Mar and through the San Clemente business district. It was there that Morton Irvine Smith approached defendant and introduced himself. Irvine Smith was very outgoing and charismatic. He was also very supportive of what defendant was trying to accomplish by organizing the protests. When Irvine Smith introduced himself to defendant by saying, "Hi, I'm Morton… like the salt", two specific things have always stood out in defendant's mind related to this first encounter with Irvine Smith and that initial introduction:

1). Irvine Smith went out of his way to make sure defendant understood that Irvine Smith is a member of the wealthy and powerful Irvine family of Orange County, CA. This family has an entire city and a university named after them. These are the City of Irvine, CA and University of California at Irvine.

2). Irvine Smith also, during this very first conversation, informed defendant that he owned or had access to an Irvine family "beach house" that he may have actually referred to as a "compound" at the time. He described the beach house as being a "secure location" that outsiders could not eavesdrop on electronically such as monitoring cell phone communications, nor would anyone visiting the location be able to send or receive text messages or calls due to limited or non-existent cell phone coverage there. He invited me, if it

ever became necessary, to use this beach house to hold any meetings I might want to hold to grow the "freedom movement," which is what defendant often referred to it as.

              In hindsight, it is now obvious to defendant that Irvine Smith was/is a federal informant / operative / actor of some sort and his odd comments during our initial encounter should have tipped defendant off to something being amiss at the time. However, at that time defendant did not remotely consider the possibility that he was already the focus of a federal investigation.

**April 20, 2020:** San Clemente city officials encircle pier parking lots, the gathering and organizing location for protesters, in 6-foot chain link fence thereby preventing protesters from meeting there. This action had a dampening effect on crowd size leading to a noticeably smaller turnout for the next protest occurring on April 26, 2020. This fencing around the pier parking lots is the same location defendant was arrested at by Orange County Sheriff's Department on May 21, 2020, when he engaged in an act of civil disobedience by organizing a protest to peacefully dismantle this same fence.

**Late April into Early May:** Around this same time, defendant began to create the non-profit organization "American Phoenix Project." This resulted after seeing the tremendous increase in the number of people attending the protests. There appeared to be significant energy needing to be directed and channeled that could potentially lead to much positive change in the country in the opinion of defendant. Defendant "seeded" this organization with $75,000 out of his personal funds. The organization then immediately diverted $50,000 of those funds to a lawsuit against Gavin Newsom on behalf of six defendants negatively affected by the lockdowns. At this point defendant is still approximately $40,000 in debt as a result of creating American Phoenix Project.

**April 26, 2020:** Defendant organizes and leads third anti-lockdown protest in San Clemente. Street artist "Bandit" artwork appears again at this protest. Bandit mocks defendant by creating a caricature of defendant comparing him to the central character of the new Netflix series "Tiger King." Bandit calls this piece of artwork, "Sheep King." The piece is large

enough to entirely cover the back of a UHaul Trailer. The UHaul trailer is driven repeatedly around the protesters as they walk the protest route.



**April 30, 2020:**  As a result of Governor Gavin Newsom closing ONLY Orange County beaches on April 28, 2020 defendant organized a free "Yoga On the Beach" class on Saturday, April 30, 2020. The beaches had been closed and then reopened for "Active Use Only" activities by April 30, 2020. As a result of this order, a person could not simply sit on the beach in a beach chair and read a book, for example. Anyone on the beach at this time had to remain in motion such as walking or jogging. This applied to whether or not a person was within a mile of another human being while on the beach.

Prior to the class starting, defendant spoke to class about upcoming events to include a rally/protest the following day, May 1, 2020, which was being organized to encourage San Clemente small businesses to reopen in defiance of the lock-down orders. Defendant also mentioned during his comments that American Phoenix Project had been created and was about to be announced to the public.

Almost immediately upon defendant starting to teach the class after these brief comments, a man wearing a "skull and crossbones" hoodie came down into the middle of the class, started circling defendant while playing loud music and harassing defendant

during a period of class meditation. The man then assaulted defendant's wife in front of numerous witnesses as she tried to record his actions. Once the man assaulted defendant's wife, defendant immediately tackled and held defendant down until Orange County Sheriff's deputies arrived. Defendant's wife made a citizen's arrest for battery.

Defendant now believes this man was sent down into the yoga class for the purpose of harassment as part of the FBI's COINTELPRO PsyOp against defendant. The skull and crossbones design on the man's hoodie is THE symbol for Yale's Skull and Bones and one of the more popular and iconic symbols of Freemasonry. Rituals and ceremonies at the higher levels of Freemasonry involve the drinking of wine (simulating blood) from human skulls. This ritual goes all the way back to the days of the Knights Templar. https://www.abovetopsecret.com/forum/thread502711/pg1

Although this assault of defendant's wife took place in front of numerous witnesses who gave statements to deputies, no charges were ever filed against the man, indicating he was likely being protected from prosecution due to his informant/operative status.

Video showing the actual assault / citizen's arrest during the yoga class:

https://rumble.com/vk5pg9-what-is-yoga-what-is-the-connection-to-two-criminal-cases.html

**May 1, 2020:** Defendant organized a "Reopen San Clemente Businesses" Protest in which he encouraged protesters to support businesses were willing to re-open in violation of the Health Orders. These businesses are located in the city's downtown business district in what is known as the "Pier Bowl." Protesters held the usual march and rally. At the conclusion of the rally, protesters were encouraged to shop and give money to local small business owners who opened their businesses.

**May 2, 2020:** Defendant organized a "Re-Open the Beach" rally to protest against the Gavin-Newsom-Ordered beach lockdown. By this time, other anti-lock down rallies began to occur in Orange County, specifically Huntington Beach California, which is approximately 30 miles

north of defendant's home town of San Clemente where he organized the aforementioned protests.

[*From this point forward, defendant engaged in a variety of protest / public awareness actions throughout Orange County (CA) and beyond to include Sacramento, the capitol of California. These various actions included speaking at protests organized by other groups, speaking at Orange County Board of Supervisor Meetings and San Clemente City Council Meetings.*]

**May 13, 2020:** Morton Irvine Smith and his wife, Marianne Smith, organized a meeting of several very influential people in Orange County and surrounding locations to discuss how best to create a "Freedom Movement" that would sweep across the country from Orange County. This meeting was held at Irvine family "beach house" in Laguna Beach, CA.

Defendant believes it possible that the vast majority of those in attendance at this meeting worked, in some way, for the FBI and/or U.S. Intelligence Agencies, or indirectly through local law enforcement as operatives / informants or were operating at the behest of third parties / organizations such as secret societies.

Irvine Smith encouraged everyone in attendance to introduce themselves and discuss their hopes for the future as it related to furthering this freedom movement. At the conclusion of the meeting, informant Marianne Smith prepared a roster of attendees and emailed it to each of the attendees. Defendant has retained a copy of this email / roster. The following people were at this meeting:

- Defendant
- Morton Irvine Smith
- Marianne Campbell Smith
- Robert Schuller (nationally known pastor and son of the more famous televangelist Robert Schuller of the "Crystal Cathedral / Hour of Power" fame)

- Donna Schuller (wife of Robert Schuller)
- Russ Penniman (retired Navy Rear Admiral / half-brother of Morton Irvine Smith)
- Stephanie Fetzer (associated with the medical freedom group known as the Freedom Angels, based in Northern California.)
- Leigh Dundas (now nationally known "Human Rights Attorney" and activist against the lockdown, mandated vaccines and masking)
- Dr. Cordie Williams (became instantly famous and known as the "Megaphone Marine" in early May 2020 during a protest at the CA state capitol when he berated CHP officers over a bullhorn for their actions at that particular protest)
- Dr. Bob Shillman (multi-billionaire who made his fortune in the tech industry. He portrayed himself as someone who was always looking for worthy non-profits to support and could be helpful in funding efforts to resist the oppressive Covid lockdowns and other actions being take at the state and local level. Defendant's non-profit American Phoenix Project had just been formed at this time)

**May 16, 2020:** Defendant attended, but did not speak at, an anti-Governor Newsom / anti-lockdown protest in San Diego, CA. This event is notable as it directly relates to defendant organizing the protest that led to his first arrest in San Clemente, on May 21st only 5 days later.

During this San Diego rally/protest, a conservative, non-main stream media personality named Graham Ledger spoke. Mr. Ledger, at the time, worked for One America News Network (OANN). During his speech, Mr. Ledger mentioned that "Gavin Newsom is laughing at us as we walk up and down the street waving flags!" He went on to describe that people who were serious about protesting against and resisting the unconstitutional lockdown orders should seriously consider moving from simply protesting by engaging in "flag waving"

to engaging in acts of civil disobedience. Defendant completely agreed with this statement and decided immediately to announce and begin planning what later became known as the "Fencegate" protest in San Clemente that took place only five days later.

**May 16-19, 2020:** After being inspired by Mr. Ledger's comments, defendant returned home and began to immediately and publicly organize and promote the Fence protest. The protest was announced to take place on Thursday, May 21, 2020. The intent of this protest was to peacefully disassemble and remove the fencing the city of San Clemente had wrapped around the pier parking lots to prevent protesters from organizing there. Defendant requested that others join him with the tools necessary to disassemble the fence and trucks to cart the fence back to the City Yard where we would return the fencing to the city.

**Morning of May 20, 2020:** Orange County Sheriff's Department became aware of the pending Fencegate protest and requested to meet with defendant. The OCSD representatives were Lt. Ed Manhart and Sgt. Paul Ketchum of San Clemente Police Services. Defendant agrees to meeting, which then takes place at approximately 9:30 a.m. on May 20, 2020. This was approximately 24 hours before the scheduled protest. It was agreed upon that the meeting would take place at a restaurant on Avenida Del Mar Avenue in San Clemente and we would have this conversation over a cup of coffee.

Both sheriff's officials were already at the location parked in their unmarked police vehicle when defendant arrived on foot. Defendant greeted them, shook their hands and began to walk into the courtyard of the restaurant. The two men abruptly stopped defendant with a verbal command and redirected him to a location near a bus stop right at the edge of the street to have the conversation there. Defendant found this very strange at the time.

Lt. Manhart did most of the speaking. Sgt. Ketchum stood silently by and nodded occasionally. They encouraged defendant not to engage in the protest the following day. Defendant informed them the protest would go on as scheduled, however there was no intention to open the parking lot, but rather remove the unsightly fence which had been installed to prevent protesters from gathering there. Defendant encouraged these Orange

County Sheriff's officials to speak to their chain of command and encourage Sheriff Don Barnes to contact San Clemente officials to have them remove the fence prior to the protest occurring.

Defendant later attempted, through a Public Records Act request, to obtain any recordings Ketchum or Manhart made of our encounter and this conversation. Strangely, these two supervisory and management types about to speak with someone they believed to be about to admit to committing a criminal act the following day did not record this interview. Makes one wonder if possibly the conversation was being recorded, by federal agents outside the scope of a California Public Records Act request. This would also explain the odd repositioning of defendant near the street so that other law enforcement officials could have monitored and recorded from a distance.

After this morning meeting with sheriff's officials on 5/20/2020, two interesting occurrences take place that defendant does not believe were coincidental:

1). Orange County Sheriff Sgt. Paul Ketchum, a person defendant had grown to trust and believe was working cooperatively with defendant to ensure peaceful protesting could take place, texted defendant to find out whether or not defendant had any plans later that evening. Ketchum posed the question as though members of the San Clemente City Council were the ones curious and making the request to find this information out. It was an odd request and out of the blue. The court will notice the friendly tone of the relationship between defendant and Sgt. Ketchum.



2). After Sgt. Ketchum sent this text and posed this question, defendant was contacted by phone later in the day by a man named Michael Inzano, a person viewed then by defendant as a friend and fellow activist against the lockdowns. Defendant now believes Inzano is likely another informant / operative / actor.

Inzano encouraged defendant to meet him and another man identified as Inzano's brother-in-law at the chain link fence once it got dark later that evening. Inzano stated that he had power tools available and we could all meet and partially disassemble the fence by removing the connecting bolts the night before the protest so it would be easier and quicker to take the fence down once the protest took place the following morning.

**Evening of May 20, 2020:** Defendant thought this partial removal of the fence was a good idea and met with the two other men at approximately 9 p.m. This time was requested by Inzano but defendant thought it was too early due to the fact there is still so much pedestrian traffic in the area at that time. Inzano was somewhat insistent regarding the time and explained he went to bed early to the best of defendant's recollection.

It took roughly 60-90 minutes to remove the bolts. In another "coincidence," shortly after defendant, Inzano and Inzano's brother in law had removed the bolts and were standing around talking near the fence, a deputy sheriff came quickly down the street in a marked black and white police vehicle and stopped right in front of us. Only moments prior to this contact with the deputy, Inzano had requested a pedestrian passerby take a photograph of

us smiling and holding our tools. Although somewhat blurry, the court will notice our wet clothing is clearly visible in the photograph below as the sprinklers had come on while we were removing the bolts to the fence.  In addition to being wet at the time the deputy contacted us, we were also carrying tools in our pockets and Inzano's backpack.

Inzano (Left) Defendant (center) Inzano Brother In Law (Right)



The deputy, later identified as "AJ Jensen," exited his patrol vehicle, approached us and explained to us that someone had called the police regarding people tampering with the fence. Jensen asked us directly if we had seen anyone tampering with the fence – the same fence defendant was publicly stating he planned on removing the following morning. We were standing in a well-lit area speaking with the deputy. Defendant was surprised Deputy Jensen was not aware of him as defendant by this time had been organizing protests in the city for over a month, was known to be a retired police chief, had been covered in local news outlets and had unique physical characteristics such as long hair down to the middle of his back and a long beard down to the top of his chest.

As Deputy Jensen was acting like he had no idea who defendant was or what he was doing, defendant held out the possibility that Deputy Jensen was possibly sending defendant an unspoken message that, as Sergeant Ketchum had indicated numerous

-20-

times already, the Sheriff's Department was actually supporting defendant's efforts and was not going to interfere with his actions the following day, other than to possibly observe and discourage counter protesters from getting involved. With this in mind, when defendant was questioned by Deputy Jensen about tampering with the fence, defendant replied with something along the lines of, "No sir, not us. We're just standing here talking. Haven't seen a thing."

At that point, Deputy Jensen simply thanked us returned to his police vehicle and drove away. He never checked the fence to see if it had been tampered with. He never asked us any other question at all such as why we were soaking wet. He never asked for consent to search us for tools. He simply left.

Defendant then immediately said goodbye to Inzano and his brother-in-law who had helped us and walked home. Defendant now believes the call into Sheriff's dispatch reporting our activities at the fence, along with the contact by Deputy Jensen was simply one more staged aspect of the FBI / U.S. Intel Agencies ongoing COINTELPRO operation directed against defendant. Defendant believes in hindsight, Deputy Jensen was simply confirming defendant's identity at the fence that evening and preparing their case for the following day when defendant would hold the protest.

At a later date, defendant submitted a California Public Records Act request of the Orange County Sheriff's Department for their records of that evening to get more detailed information on the anonymous call that came into sheriff's dispatch reporting our actions removing the bolts connecting the fence.  The caller did not appear to be a local resident, using odd names of streets and parks to identify the location of the fence. Deputy Jensen, upon completing the call after speaking with us, updated the call card (dispatch record of call) via his mobile data terminal in his police vehicle. In his update, he never mentioned that he exited his vehicle and contacted three possible suspects matching the description the caller provided to dispatchers, which included one having "long hair." Deputy Jensen updated the call by stating that the suspects were "GOA" which is police jargon for "Gone on arrival"

indicating he did not see anyone matching the description, took no action and cleared the call. As a former 24-year law enforcement veteran, defendant knows this entire sequence of events makes no sense at all. This was not a routine "call for service."

**May 21, 2020 (#Fencegate):** In addition to the bizarre occurrences described above, the situation became even more bizarre during the actual protest as described below:

There were likely over 100 deputies, ultimately clad in riot gear, to deal with a relatively small crowd of normally cop-loving, patriotic Americans who were admittedly agitated about the illegality and unconstitutionality of all that was occurring around them, but were non-violent and supportive of law enforcement in general. In hindsight, defendant now knows many of these protesters were actually informants / operatives / actors to begin with.

Deputies allowed defendant to enter the restricted area and then allowed him to hang on to the fence for roughly 60-90 minutes as people in the crowd encouraged defendant and heckled the deputies. There is no legitimate explanation for why deputies allowed entry into the restricted area and did not immediately arrest defendant when he entered it.

Prior to the protest, defendant had informed people he trusted that he planned on hanging on to the fence if deputies attempted to arrest him in order to make it slightly more difficult to be arrested. These people defendant thought to be allies turned out in hindsight to be informants / operatives / actors and likely told the deputies this information before the protest occurred. Armed with that information, OCSD / FBI and their operatives decided to allow this to happen in order to then stage and amplify the arrest to create this "domestic terrorist / troublemaker" narrative they were creating, partially to justify the illegal and unconstitutional actions they had already taken against defendant.

One of defendant's most vocal supporters, and vocal hecklers of sheriff's deputies during the protest was Michael Inzano.

As part of that amplification and escalation of the protest, OCSD officials used California Highway Patrol officers to shut down all freeway offramps into the city heightening the tension and the drama. The protest was relatively small and still peaceful. The freeway off and on ramps in question are a couple of miles from the protest area. It was a completely unnecessary act and the intent was obvious.

Dozens of deputies clad in riot gear were used to "sweep" the streets of peaceful protesters. There were far more deputies than protesters by the time they took this action.

Rather than simply removing defendant's hands from the fence with a control hold and minimal amount of force, they very dramatically had a sheriff's lieutenant cut defendant's hands from the fence using bolt cutters.

Ultimately eight people including defendant were arrested that day for a variety of misdemeanor charges such as trespassing and failure to disperse. Defendant believes at least five of the eight arrested were / are federal or local law enforcement operatives or actors used to amplify the event.

Orange County Sheriff's Captain Puckett, the Public Information Officer, gave a media interview from the fence immediately after the arrests. During this interview he stated that an "act of violence" precipitated the overwhelming and out-of-proportion response by the OC Sheriff's Department. This was a complete lie.

Immediately upon defendant's arrest on 5/21/2020, OCSD Sergeant Paul Ketchum would no longer reply to or communicate with defendant for any reason. Prior to the arrest, Ketchum made comments to defendant to indicate he was a friend and ally as it related to the ongoing protests defendant had been organizing.

The day following the 5/21/2020 #fencegate incident, Sheriff Don Barnes threatened to unilaterally pull police services from San Clemente due to the bad situation his deputies were placed in on 5/21/2020 and the city of San Clemente's inability to resolve the fence issue before the protest took place. Ultimately, this public statement by Sherrif Barnes

also indirectly placed blamed on defendant for the city potentially having police services removed.

The fact that such a statement would ever be made publicly by an elected Sheriff is one more example of the script/narrative that was being created and playing out around defendant at this time. This type of a discussion would necessarily be dealt with privately through meetings with city officials for obvious reasons if any sheriff in the country were seriously considering immediately removing police services from a community for ANY reason.

A confidential reliable informant notified defendant that shortly after defendant's arrest, the reports related to defendant's arrest on 5/21/2020 were assigned to a named detective for follow up. This detective was assigned to the Orange County Intelligence Assessment Center (FUSION Center) at the time the case was assigned to him. There would be no reason for assigning misdemeanor cases related to public protests to this unit unless the FBI JTTF / OCIAC were already involved in monitoring and "working" defendant.

The Orange County District Attorney filed 3 misdemeanor charges against defendant. These misdemeanor charges were assigned to the OC District Attorney's "Special Prosecutions Unit." This becomes relevant further into the motion when discussing the corruption of Orange County law enforcement, to include the District Attorney's Office, in general. Please watch the following videos for further details on defendant's arrest:

(1/2) Videos describing the staged and amplified arrest of defendant in San Clemente, CA on May 21, 2020:

https://rumble.com/vktapk-san-clemente-let-the-corruption-begin-exposure-segment-13.html

(2/2) Videos describing the staged and amplified arrest of defendant in San Clemente, CA on May 21, 2020:

https://rumble.com/vlbtda-fencegate-fish-rot-from-the-head-down.-what-say-you-sheriff-don-barnes.html

**May 25, 2020:** George Floyd is killed by police in Minneapolis, Minnesota. Riots break out across the country within 24 hours. Pallets of bricks are being delivered into the inner cities to use as weapons and tools of destruction during the riots. "Protesters" are being bussed across state lines to participate in these riots.

      Anti-lockdown protests had been starting to blossom across the country by the time of Floyd's death. The George Floyd riots, lasting throughout the summer of 2020, put a damper on those "freedom protests" against the lockdowns and mask mandates.

**May 30, 2020:** Almost immediately after George Floyd's death, BLM / Antifa began to schedule a protest in San Clemente for 5/30/2021 in exactly the same location defendant was arrested at the fence protest nine days earlier. Defendant believes it possible, even likely, that the FBI JTTF / OCIAC was involved in advertising and placing the BLM / Antifa protest at this location to indirectly connect it to defendant and turn the community against him.

      Also on this day, a local San Clemente man identified as "Will Fisher" sent a threatening message to defendant via FB Direct Message. The message implied that the BLM / Antifa protest taking place in San Clemente was defendant's fault and in response to defendant organizing "freedom protests" at this location. Fisher threatened in this message that he and his friends would beat defendant "into a coma" if they ever saw defendant on the streets of San Clemente. Fisher also encouraged defendant to commit suicide. Defendant reported this threat to the Orange County Sheriff's Department.



    It should also be noted that defendant's best friend from childhood committed suicide six months after this threat from Fisher. Defendant posted an "In

Memoriam" type of a post regarding friend's suicide on Instagram shortly after the events of January 6, 2021. Defendant recalls an anonymous person commenting on this "In Memoriam" post with words similar to the following: "Such a shame about your friend. You really should join him." Defendant had received so many threats, taunts, and encouragement to commit suicide by this time, he was simply deleting them and blocking the senders so he no longer has access to this particular post.

Through defendant's own research, he has learned that this tactic of encouraging "Targeted Individuals" to commit suicide is a well-known PsyOp tactic of the FBI and was used against such high-profile targets as Dr. Martin Luther King, Jr. in the 1960's. The FBI employee who wrote the infamous letter to Dr. King encouraging him to commit suicide or risk having an adulterous affair revealed to the public was a high-ranking employee and worked within J. Edgar Hoover's inner circle. Defendant believes the FBI was directly involved in the sending of many of the death threats and encouragement to commit suicide that defendant received over the course of the past 20 months.

**May 30, 2020 – August 14, 2020:** Over the course of the next few months, defendant organized and/or attended a number of anti-lockdown, pro-law enforcement "Back the Blue" rallies, and rallies in defense of communities being threatened by BLM / Antifa during their protests. Defendant was often accompanied by Morton Irvine Smith during these events.

In another example of typical informant behavior, Irvine Smith always asked to ride as a passenger in defendant's vehicle whenever possible. Several times during these trips when Irvine Smith were sitting next to defendant in his vehicle, Irvine Smith would pull out his phone and ask defendant to look at it. Irvine Smith would then show defendant a picture on his phone of a beautiful young woman in the mid-twenties to mid-thirties age range, either naked or scantily clad in lingerie or a bikini.

Irvine Smith would then imply or state directly that he met them at a party or other some other gathering and was involved in a sexual relationship with them. Defendant has no doubt Irvine Smith was "grooming" defendant through this process. Had defendant

expressed an interest in an extra-marital affair after looking at these photos, Irvine Smith likely would have been able to arrange that.

**August 15, 2020:** Defendant organized a protest at the Mother's Market in Costa Mesa, CA on this date. The City of Costa Mesa, along with this particular market, had implemented very aggressive anti-mask policies and attitudes.

Approximately one week prior to the rally taking place, defendant was contacted by Lieutenant Clint Dieball of the Costa Mesa Police Department via Instagram (messages no longer accessible). Lt. Dieball had heard about the upcoming protest and contacted defendant in order to coordinate the police department's response to the protest. Defendant was fully cooperative with Lt. Dieball and recalls communicating with Lt. Dieball by phone, text and Instagram direct messaging on a few occasions leading up to the protest. Defendant expected to see some CMPD uniformed presence at the protest.

Approximately 75-100 people attended the rally. Defendant was surprised upon his arrival to find no law enforcement in the area and does not recall seeing any law enforcement patrolling the protest or general area of the market that day until staged arrests were made at the very end of the protest. Guest speakers (including defendant) spoke on a variety of issues related to Covid, masking, vaccines, medical freedom and constitutional rights.

It should be noted that protesters had been informed, both in the advertisements announcing the protest and in comments prior to the protest, that they were discouraged from entering Mother's Market to shop without a mask. The technique of "maskless shopping" in violation of a store's masking policies had been going on across the country for months by this time. Defendant had organized and attended a couple of these protests by the time Mother's Market protest took place on 8/15/2021.

As the protest was winding down, defendant was starting to pack up his protest signs. Suddenly some of the other protesters began to excitedly notify defendant that two women from the protest had been detained inside the store for shopping without masks.

Store security had detained them, locked all customers in the store with them and had called police. False imprisonment of multiple unrelated customers seemed like a bizarre and over-the-top reaction for store management to take in order to deal with two women who were trying to purchase some water and snacks while not wearing a mask.

Very quickly defendant was informed that the two women being detained for police inside the store were identified as Morton Irvine Smith's wife, Marianne Campbell Smith (informant / operative / actor) and Jennifer Sterling (another suspected informant / operative / actor and local Orange County political operative). Within moments the Costa Mesa Police Department arrived in force with what looked like a quasi-SWAT response, which included a Paddy Wagon to transport the women to jail. This equipment and large number of officers showed up after most people had left for the day and the protest was winding down. Police quickly entered the store and decided to accept store management's citizen's arrest.

The women were relatively small in stature and were being detained for politically charged infractions. As a retired police chief and 24-year veteran law enforcement officer, defendant knows from experience the likely police approach to this type of a call for service would be to attempt to simply counsel both parties, escort the women out of the store, and take no enforcement action if at all possible. Yet CMPD showed up from the beginning with a Paddy Wagon, several masked officers, some from their Gang Unit, and accepted a citizen's arrest for trespassing. Protesters had been peaceful all day and the size of the crowd had dwindled considerably as it was near the end. Costa Mesa Police Department's response to these arrests was clearly staged, just as defendant's May 21, 2020 arrest, to again inflame the situation and continue building the "Hostetter is a dangerous radical / domestic terrorist" narrative.

The remaining protesters at the time police arrived were largely pro-Trump, conservative, cop-supporting people and the officers, who were nowhere to be seen all day, would have known this based on my pre-protest conversations with Lt. Dieball to prepare for

the protest. As the two women were marched out of the store by police and into the Patty Wagon, these normally cop-loving protesters began to aggressively heckle the officers, just as they did in San Clemente on May 21, 2020.

Defendant was shocked at this. It should also be noted that Marianne Campbell-Smith was wearing both an "American Phoenix Project" shirt and hat at the time of her arrest. Her husband and fellow informant, Morton Irvine Smith was also wearing an "American Phoenix Project" shirt during this staged event. Defendant does not believe this was a coincidence. It connected defendant's non-profit to the chaos of the arrests at an event defendant organized.

Co-defendant (and informant / operative / agent) Russell Taylor was also present at this protest and wearing a loud "boom box" on his back as part of a backpack. He was playing music loudly as the women were being escorted out of the store by police.  To add drama to the scene, he played the Jimmy Hendrix version of the star-spangled banner and the song "We're not gonna take it anymore" by the heavy metal rock group, Twisted Sister.

Defendant believes the FBI JTTF was directly involved with Costa Mesa Police Department in the planning and organizing of these staged arrests on August 15, 2021. Defendant believes the Orange County Intelligence Assessment Center (OCIAC) / FUSION Center was also involved.

The two women arrested during the Mother's Market protests, along with local law enforcement and the Orange County District Attorney's Office led by elected District Attorney Todd Spitzer, continued to engage in suspicious and far too "coincidental" actions leading to the ultimate dispositions of the Mother's Market criminal cases. The fact that criminal charges were filed at all considering the political sensitivity and divisiveness of the masking issues was surprising to begin with. What occurred during the legal process to come to the conclusion of these cases reeks of deep political corruption within Orange County government and law enforcement.

Jennifer Sterling pled Nolo Contendre and was ordered to pay a $50 "donation" to a Covid-19 first responders' charity. Her attorney throughout the process was Dan Wagner. Dan Wagner is a former high-powered Orange County District Attorney and ally of elected OC District Attorney Todd Spitzer. Dan Wagner was forced to resign from the Orange County DA's office in disgrace due to a corruption scandal several years ago. Dan Wagner, at the time of his resignation, belonged to an elite homicide prosecution team that traveled all over the county prosecuting murders. Dan Wagner is the brother of Don Wagner, currently a member of the Orange County Board of Supervisors.

Don Wagner is the former mayor of the city of "Irvine," CA, which is named after informant / informant / actor, Morton Irvine Smith's family. The person holding this same Orange County Board of Supervisor's seat prior to Don Wagner was Todd Spitzer, the now elected District Attorney at the center of this corruption within Orange County. Defendant regularly spoke out against Supervisor Don Wagner during public comments at Board Meetings and other public events decrying Wagner's brand of fake conservatism and insisting he call for more aggressive action to stop the lockdowns and mandated masking policies taking place throughout Orange County. It is safe to say Don Wagner despises this defendant.

Informant / operative / actor Marianne Campbell Smith, wife of Morton Irvine Smith, took her Mother's Market case all the way to a jury trial that defendant believes was staged. Elected DA Todd Spitzer assigned Assistant District Attorney Suzie Price to prosecute Smith's case. Much like Dan Wagner, Suzie Price is a very high-level prosecutor. She ran the entire Fullerton DA's office, a large and busy office, and worked in the same elite homicide prosecutions unit that Dan Wagner worked in prior to his resignation in disgrace. It should also be noted that Ms. Price was also touched by a different scandal around the same time as Dan Wagner, but her involvement did not rise to the level of having to resign.

Defendant believes that both the elite county-wide "Homicide Prosecutions Unit" and the county-wide "Special Prosecutions Unit" are likely Todd Spitzer's praetorian

guard of sorts, protecting both Todd Spitzer personally along with the general corruption within Orange County government. Keep in mind that the prosecution of the Mother's Market cases was for a misdemeanor trespassing charge, or the equivalent of a littering citation. In the grand scheme of things, this was a very minor yet admittedly politically charged (mandated masking being the central issue) prosecution.

Due to the political sensitivities that would greatly concern most elected officials, the entire case could have been dropped and no one on either side of the masking debate would have cared.  But instead Todd Spitzer brings a former supervising district attorney and now elite homicide prosecutor into the Westminster Courthouse from outside the courthouse rather than simply having a local district attorney assigned to that courthouse handle this rather petty misdemeanor case.

During Marianne Campbell Smith's trial taking place approximately six weeks ago now, defendant entered the courtroom and requested to speak with the bailiff. Defendant then informed the bailiff that the trial taking place before him was staged and fraudulent. Defendant further stated that he was in possession of evidence contained in his briefcase that would support his claims. Defendant requested this bailiff examine the evidence at the next break in the trial. The bailiff refused and turned defendant over to his supervisor, a sheriff's sergeant. The sergeant also refused to look at defendant's evidence or take any action on the matter. Defendant identified himself as a former law enforcement officer during the discussion. The sergeant came off as hostile and completely disinterested in a possible fraud being committed inside one of the court rooms he was responsible for supervising.

The day the jury was returning their verdict in the case, Todd Spitzer personally entered the courtroom and sat in on the reading of the verdict. Marianne Campbell Smith was found guilty of the charge against her.  After the verdict, Spitzer made a very public and harsh statement against defendant and applauded the jury's verdict. This is another example of a piece of circumstantial evidence indicating the entire trial was staged.

It is not reasonable to believe that an elected District Attorney in a still fairly conservative county would elevate this case in such a way. First and foremost, Todd Spitzer is a political animal who wants to stay in power. Orange County was a hub of anti-lockdown, anti-masking, and anti-mandatory vaccine protests for over a year by the time this trial took place. Most Orange County voters had already forgotten about the Mother's Market arrests by the time of the trial. Spitzer's personal interest in attending the trial and his harsh comments against the defendant only served to raise the masking issue from the dead and bring it front and center back into Orange County political discussions and media focus.

It's almost as if Todd Spitzer did not have a care in the world about being reelected. It is very possible he did not have these concerns because he knows that Orange County elections, much like the 2020 presidential elections, were and are rigged. The court might recall back during the national 2018 elections, Orange County, CA saw six congressional seats flip from Republican to Democrat after roughly 10 days of "ballot harvesting."

The fact of the matter is that Todd Spitzer is aware of the corruption related to Orange County elections. Currently that corruption works to his benefit. The Occam's Razor theory being that the simplest and most obvious explanation is likely the correct explanation applies here. The fact that Spitzer has no concerns about being reelected is what led him to such a disastrous political decision to prosecute the Mother's Market case and to feel politically secure enough to personally attend the trial, speak publicly to the media about it and make harsh comments directed at the defendant. This sort of corruption at even the local level returns full circle back to the issue of fraudulent and stolen elections throughout our country which led to a million patriots gathering in Washington DC on January 6, 2021 to protest this sort of corruption at the national level.

Even more curious and shocking than these staged arrests and subsequent prosecutions of Jennifer Sterling and Marianne Campbell Smith was the FBI JTTF / OCIAC

attempt to connect defendant to the "Three Percenters" later that same evening only hours after the Mother's Market arrests occurred on August 15, 2020.

At 9:22 p.m. on August 15, 2021 defendant received an email into his "American Phoenix Project" email account. The email was from a woman identifying herself as "Fayth Bloomer" belonging to a group she referred to as "Three Percenters – Originals, here in Orange County." Defendant continues to retain this email in his possession. Bloomer added, "We are a patriot group that is dedicated to defending the constitution and the civil liberties that it protects. It appears that our causes have many values that are well-aligned and I'd like to explore our groups can work together to achieve better outcomes for Orange County and the patriotic citizens who live in it."

Defendant believes this was the first time in his life that he had ever heard of the group known as the "Three Percenters." Defendant found Ms. Bloomer's email to be somewhat vague and suspicious. Defendant replied briefly to her email thanking her for reaching out and expressing interest. Due to the vague nature of the email, defendant asked Ms. Bloomer if she had something specific in mind as far as her reference to "exploring" how her group and defendant's new non-profit, American Phoenix Project, could "work together."

In reply to defendant's request for specificity, Ms. Bloomer explained how upset she and the Three Percenters were about what happened to the women arrested at Mother's Market. Ms. Bloomer attached a lengthy, well written word document / letter she had written to the corporate offices of Mother's Market. She had somehow identified the store manager of Mother's Market, scanned his social media posts, and also identified by name exactly whom in the corporate offices to send this letter of complaint to. In defendant's opinion the letter was very well written and could have been written by an attorney. Defendant ignored this email and did not reply due to its suspicious nature.

(1/4) videos describing the August 15, 2020 staged arrests at the Mothers Market in Costa Mesa, CA. This video identifies two suspicious protesters defendant believes are federal agents / informants or their proxys:

https://rumble.com/vkg5yd-pops-and-junior-who-are-these-mystery-men.html

(2/4) Mothers Market, Costa Mesa CA, Staged Arrests:

https://rumble.com/vkl7g7-this-aint-yo-mamas-market-after-all-part-1-the-arrests-exposure-segment-11.html

(3/4) Mothers Market, Costa Mesa CA, Staged Arrests (Fayth Bloomer):

https://rumble.com/vknl0h-this-aint-yer-mothers-market-after-all-part-2-the-aftermath-exposure-segmen.html

(4/4) Corrupt local District Attorney staged a trial to wrap up the staged Mother's Market arrests:

https://rumble.com/vo1o9q-todd-spitzer-orange-county-d.a.-doubles-down-on-corruption.html

**September 11, 2020:** On this date, the FBI made their second attempt (at least) to connect defendant to the Three Percenter group. On this occasion they attempted to make this connection directly to the Three Percenters listed in defendant's indictment.

Sometime in early September 2020, informant Morton Irvine Smith invited defendant and defendant's wife to attend a fund raiser for a southern California pastor named Tim Thompson of the "412 Church" in Murrietta, CA. Defendant now believes Tim Thompson is also an informant / operative / actor. In addition to his own ministry, Thompson also serves as a pastor to the Riverside County Sheriff's Department, giving him a direct connection to law enforcement and likely to FBI JTTF Fusion Centers.

This fundraiser Irvine Smith invited defendant to was being held at a private and elite club in Newport Beach, California called the "Pacific Club." Defendant ended up purchasing the tickets Irvine Smith had set aside for him and attending the event. When the speakers, including Tim Thompson, had finished their presentations, guests were encouraged to donate to Pastor Tim Thompson's "412 Church." Defendant made a $1,000 donation to Thompson in the form of a written check, thereby creating a written record of a connection between defendant and pastor Tim Thompson.

Several months after this event, and after being indicted on federal conspiracy charges on 6/10/2021, defendant began spending much of his time researching issues that might help him in his defense. As a former police detective and retired police chief, defendant was particularly perplexed as to how he ended up being indicted in a "conspiracy" with four people (Kinnison, Mele, Warner and Martinez) he had never knowingly met or communicated with.

This research led to defendant coming across a "GoFundMe" account created by co-defendant Kinnison, only a week before the January 6th incident, to help support the family of a deceased friend of his whom he identifies as "Big Lou." In this GoFundMe account Kinnison mentions he belongs to Tim Thompson's "412 Church" in Murrieta, CA. It should also be noted that during a subsequent news article about Pastor Tim Thompson, the reporter refers to the fact that Thompson was wearing a jacket with a Three Percenters patch affixed to it at the time the reporter interviewed him.

https://www.mercurynews.com/2021/08/23/some-southern-california-church-leaders-pushing-political-extremes/

Photograph below depicts some in attendance at the Tim Thompson fundraiser. Thompson is bald man standing to right of defendant. Defendant is in white shirt. Defendant was placed/staged at center of photo, almost as if center of attention. MC Don Dix, far left.



Below is the GoFundMe page created by co-defendant Kinnison making the connection between the Three Percenters in defendant's indictment and Tim Thompson's "412 Church:"



**October 16-18, 2020 / "Q Conference," Scottsdale, Arizona:** Defendant accepted an invitation to speak at this conference regarding his involvement in the California Freedom Movement, his arrest in San Clemente, and the recall of governor Gavin Newsom. Defendant was never heavily involved in the Q movement so he was not asked to speak about Q specifically.

On October 17, at around 11 a.m., after defendant gave his speech at the "Q Conference," he was sitting in the audience listening to other speakers. Suddenly, in the middle of a presentation, the "Q Shaman" entered the conference room holding his infamous "Q Sent Me" sign and dressed in full regalia, including head gear with horns. There was a murmur and a buzz in the audience when this happened as one can imagine. Defendant had never seen or heard of the Q Shaman at this point and turned to someone nearby to inquire who this person was. The Q Shaman walked to the back of the conference room and stood against the wall. Defendant, along with many others in the room, took pictures of the QShaman due to his very odd appearance. In this photo taken by defendant, the Q Shaman appears to be "mugging" for the camera and looking directly at defendant.

1
2
3
4
5
6
7
8
9
10
11



12
13    Defendant was told the Q Shaman was well known in Arizona and
frequented pro-Trump, anti-lockdown protests as well as BLM / Antifa protests. Defendant
14 does not believe the Q Shaman's entry into this conference room where defendant was seated
to be just another "coincidence." After January 6th occurred and the main stream media was
15 running "hit pieces" on defendant, one journalist in particular named Donie O'Sullivan of
16 CNN did an entire segment where he stated words to the effect of, "Two of the more notable
17 figures of January 6th both attended the Q Conference in Scottsdale, Arizona." O'Sullivan
18 showed snippets of my speech and also showed snippets of the Q Shaman at the conference
19 thereby creating an illusion, in the public's mind, that defendant and the Q Shaman were
20 somehow connected.

21    CNN reporter O'Sullivan, unbeknownst to defendant, curiously was in
attendance at the Q Conference in Scottsdale doing a story on it. Also curiously, O'Sullivan
22 began attempting to contact defendant a few days PRIOR to the FBI raids occurring on
23 defendant's home, vehicle and person on 1/27/2021. O'Sullivan reached out through the
24 Instagram Direct Messaging service attempting to get the interview.
25

Defendant believes shortly before the search warrants were served on his home, vehicle and person the FBI and/or U.S. Intelligence agencies were, directly or indirectly coordinating with O'Sullivan and other reporters in order to get a statement from defendant via media interviews. Radley Balko of the Washington Post and David Corn of Mother Jones also contacted defendant for interviews prior to the raids taking place.

**October 17, 2020:** On the same day the "Q Shaman" entered the Scottsdale, AZ hotel conference room to later be connected to defendant, defendant was also contacted by Orange County Human Rights Attorney, Leigh Dundas in an attempt to get defendant to purchase property in Mexico.

There is a great deal of uncorroborated information online that Ms. Dundas is a Scientologist and has done legal work for the Church of Scientology. In what must be just one more coincidence, almost immediately upon defendant setting up his website and email for his non-profit group American Phoenix Project in May 2020, approximately one month after meeting Ms. Dundas for the first time, the website was attacked by thousands of bots over several days sending messages into the contact form of the website. Nearly every single one of these messages came from "scientology . com" email addresses.

The name of this complex being developed and pitched to defendant was called Ne'ek Luum and it was in the Yucatan Peninsula area of Mexico. Leigh Dundas introduced defendant to the persons selling these lots in Mexico via email, and then backed out of the conversation. The people selling the lots in Mexico were identified by Leigh Dundas as Stewart and Jacqui Sykes. Once the introduction was made via email the Sykes' continued to "cc" Leigh Dundas the the emails. Defendant thought the concept of this planned community was interesting and asked for more information. Defendant was provided some additional information in the form of a power point and short video. Ultimately defendant discontinued communication and decided not to purchase property.

Stewart Sykes, the man trying to sell defendant the property, made an odd and interesting statement to defendant during these brief email exchanges with him. Sykes

stated, "I have looked you and the American Phoenix Project up on Google and watched your video you made and posted on your site this year's Labor Day. You are definitely someone who we are interested in having a strong network connection with in helping each other spread the ideas of better solutions to the better planetary scenes and for our future." Defendant found Stuart Syke's email odd and ceased communication with him at this point.

On one occasion after January 6, Dundas contacted defendant by phone and, during that conversation, mentioned to defendant that she had the ability to obtain a boat and a boat captain from the Newport Beach harbor who could take people south to Mexico by sea while avoiding borders, checkpoints and Mexican military or law enforcement. Defendant found this interesting, but had no intention of fleeing the country or a need to skirt border checkpoints as defendant had done nothing wrong in Washington DC to cause him to want to flee or cross a border illegally.

Just imagine how it would have been perceived in defendant's indictment if defendant would have taken the step of actually contacting the Newport Beach boat captain mentioned to him by Ms. Dundas to get more details. Imagine even further how it would have looked in defendant's indictment if he had actually purchased property in Mexico less than three months prior to being accused of "storming the U.S. Capitol" and not only engaging in an "insurrection," but leading it.

**December 15 and 16, 2020:** Defendant believes that by December 15th he had become aware of the importance of January 6, 2021 and the Election Certification process to take place in Washington DC on that date. However, to the best of defendant's recollection, he had not made plans to attend by this time and was uncertain as to whether or not he would actually attend a protest in Washington DC on January 6.

On December 15, 2020, defendant and co-defendant Russell Taylor both spoke at an Orange County Board of Supervisor's Meeting. This was only three weeks prior to January 6th. As usual at the Board Meeting, the topics to be discussed related to Orange

County issues to include Covid-19 related issues, which is what we typically spoke out about. For some reason, while Taylor was speaking during this particular board meeting, he made the following comment to the Board which was completely unrelated to any of the topics on the agenda: *"Week after week, I and others are with thousands in the street all up and down the state of California. You know what they are saying? Revolution. Storm the Capitol."*

It wasn't until six months later, two days *after* being arraigned in the Central District of California and two days *before* being re-arraigned into Washington DC District Court that a newspaper article appeared focusing entirely on this comment. On June 12, 2021 the Orange County Register blared a front-page headline, stating: *Capitol suspect foretold 'revolution'.* The lengthy article discussed Taylor's comment, along with information on each defendant in this case.



On December 16th, the day following Taylor's comments to the Orange County Board of Supervisors, co-defendant Russell Taylor met defendant and "Person One" Morton Irvine Smith at a Mexican restaurant in San Clemente, CA called "El Ranchito." Taylor was the organizer of this meeting and had requested, planned and organized it a few days prior. While at the restaurant, Taylor told defendant and Irvine Smith that he had purchased gifts for them. Taylor reached under the table and pulled out two boxes and gave them to defendant and Irvine Smith.

Inside these boxes were the axes that have been referred to in the indictment as proof of defendant's nefarious intent to attack the Capitol using the axe as a weapon of some sort. Until receiving this "gift," defendant had never personally owned an axe in his life.

As he gifted it to us, Taylor described the axe metaphorically as a "battle axe" representing the battles we had already fought in support of freedom and the many battles yet to come.

Upon leaving the restaurant, either (informant) Taylor or (informant) Irvine Smith requested one of the restaurant employees take our photograph in front of the restaurant holding the axes.

Defendant liked the photograph and thought it looked quite masculine and "tough" so he posted the photograph to Instagram with a somewhat provocative comment attached to the photograph. Defendant's comment was, "The time has come when good people may have to act badly, but not wrongly." Defendant continued in this post with, "Thank you @russ.taylor for the gift of the #thebattleaxe representing the many battles yet to come."



Defendant had read this quote about good people possibly having to act "badly but not wrongly" in a meme very close in time to when Taylor gifted the axe to him. Defendant had no thought whatsoever about January 6 or the U.S. Capitol when creating this Instagram post. Defendant had been making public speeches regarding the fact that the U.S. was and had been "at war" with the Chinese Communist Party and domestic enemies for approximately 8 months prior to receiving this axe from Russell Taylor.

Oddly, the government declined to mention this photograph of the axe or the provocative statement that went along with it in defendant's indictment that immediately

became public record on June 10, 2021. Defendant found this strange at the time upon initially reading the indictment because the government had used other information from defendant's Instagram account to build their case. Defendant believes, now in hindsight, the the reason for this is because the government did not want defendant or the general public to come to realize that it was a government operative who purchased these axes and inserted them into the January 6th narrative involving defendant.

Keep in mind these two days were only a few days before President Trump tweeted out the infamous tweet requesting all patriots come to Washington DC for the Stop the Steal protest on January 6th and ended that tweet with, "It will be wild!" Defendant did not actually book his hotel room at the "Kimpton George" in Washington DC until Trump sent out this tweet on December 19th.

On a side note, it was co-defendant /informant Russell Taylor that had first recommended the Kimpton George Hotel when planning our first trip to Washington DC for the Stop the Steal Rally on November 14, 2020. Defendant believes the Kimpton George is likely a hotel the FBI / Intel Agencies use to surveil and monitor specific targets, of which defendant most certainly was by November of 2020.

Defendant believes it also likely the FBI / Intel Agencies, unbeknownst to defendant, searched his room during both visits to Washington DC. On one occasion while defendant was inside his room during his January 2021 visit, a male hotel employee entered the room and looked shocked when he saw defendant inside reclining on the bed watching television. Defendant does not recall the man knocking before entering. Defendant was very understanding as the man appeared upset and very apologetic for intruding. Defendant found the incident strange as he had been told when he checked in there was no service inside the rooms due to Covid and defendant had also placed a "Do Not Disturb" sign on the door knob the employee had to ignore to enter the room in the first place.

**January 5, 2021:** Defendant's non-profit organization, American Phoenix Project (APP), co-hosted a rally with a group called Virgina Women for Trump. The VWT group was headed by Alice Butler-Short, a well-known and well-connected woman in the DC area.

This event, and APP's ability to co-host it was brought to defendant's attention in mid-December after informant Morton Irvine Smith returned to California after attending the December 12, 2020 Stop the Steal rally in Washington DC. Defendant did not attend this event. Irvine Smith claimed to have met Ms. Butler-Short for the first time at this 12/12/2020 event and the two of them agreed to APP becoming involved in co-hosting the event together.

Irvine Smith arranged for defendant to participate in a conference call with Ms. Butler-Short and two members of another group identified as Jericho March as they were a nationally known group also supporting election integrity. Once this conference call was completed, defendant told Irvine Smith that he was not interested in having American Phoenix Project co-host the event as it was too far away from California to be able to properly assist in putting it together and defendant had also gotten a bad vibe / feeling from some of the other participants in the conference call.

Irvine Smith was highly disappointed and notified defendant that he, Irvine Smith, would then just continue to help Butler-Short on his own time as they had developed a good relationship and he wanted to be personally helpful to her. Within a week or two, Irvine Smith notified defendant that Butler-Short had lined up some very big-name and popular conservative speakers for the event to include Roger Stone, Alex Jones, General Michael Flynn's brother Joe Flynn, among several others. Irvine Smith notified defendant that Butler-Short was continuing to hold out the invitation for APP to co-host this event with her group, to include flying the APP banner at the event. Irvine Smith told defendant the only thing Butler-Short requested of APP was to help her with finding security staff to cordon off an area in front of the Supreme Court because it was a "first come, first served" policy as far as finding a location to set up a stage and microphone.

Irvine Smith informed defendant (conveniently and coincidentally) that he also just happened to have a connection with the man who would ultimately provide this security that Butler-Short was looking for. The man's name is Tom Speciale and he ran the nationally known group, Vets for Trump. Speciale had also recently and unsuccessfully run for a Virginia senate seat. Speciale has also recently written a book released in July of 2021 entitled, "Inside the FBI's Domestic Terrorism Strategy. Understanding the Threats to Our Republic." https://thomasspeciale.com/

After hearing from Irvine Smith about the high-quality speakers involved and the relative ease with which APP could co-host such a high-profile event, defendant agreed to co-host the event under the APP banner. Were it not for the individual efforts of Morton Irvine Smith, neither defendant nor APP would have been involved with this event at all.

A curious incident occurred as defendant and others were setting up and preparing for the rally on January 5th in front of the Supreme Court. There was a visible police presence in the area as this was occurring. There was a mixture of around 50-100 people, both rally organizers and people who were arriving early to attend the rally. Suddenly the police began to evacuate all of us to the other side of the street stating they had observed a suspicious package in our midst. A bomb squad was being requested and it would likely take a while to resolve the issue.

About an hour later, the "all clear" signal was given and everyone returned back to setting up and preparing for our event. Police stated the suspicious package turned out to be a "bag of salt" that some religious group was going to use to do some sort of "salting of the earth" ceremony.

Defendant had brought with him to Washington DC a gift to give to Alice Butler-Short when he met her. This gift consisted of a Buddha head planter, an APP hat and t-shirt along with a heartfelt handwritten card. This was placed in a gift bag approximately 1X1 ft in diameter.

The first-time defendant met Alice was in front of the Supreme Court on January 5th as they set the event up. Defendant gave the gift to Alice when he met her. She was unable to stop her work and open it so she asked defendant to place it under her chair, which had a bulky jacket hanging on it and was within the secured area taped off with yellow tape. Defendant felt this was a safe and secure area and placed the gift where Alice had directed. At the end of the day, Alice notified defendant after the event that the gift defendant brought for her was now missing. It was never found. Defendant now believes in hindsight it was likely there were several FBI agents and/or informants within the crowd that day monitoring defendant and others. It is highly likely it was the FBI "stealing" the gift and just as likely it occurred during the "bomb scare" when everyone's attention was diverted.

**January 6, 2021:** Defendant experienced what he would describe that day as one of the most intense adrenaline rushes he has ever experienced in his life at the time he stepped into the main body of the crowd at the Capitol building. The energy of the crowd and the significance of that day is difficult to describe in words. To the best of his memory and recollection, understanding it is likely colored slightly by that adrenaline rush, defendant shares the following recollections of that day and that event:

Once President Trump finished speaking at the Ellipse at approximately 1:10-1:15 p.m., defendant along with several others to include both Russell Taylor and Morton Irvine Smith walked directly to the Capitol building. Defendant estimates that he arrived at the U.S. Capitol roughly 45 minutes to an hour after the breaching of the Capitol had already begun. Defendant, at no time prior to arriving at the Capitol, had made any plans with anyone to commit an illegal act, nor did he have any intention of moving past any police perimeter lines or disrupting the proceeding inside the Capitol Building. The only plan or intention that day was to peacefully and lawfully protest a stolen election.

Defendant believed that any discussions or messages being circulated by others and about carrying "personal protective gear" that day had to do with being able to defend oneself against a possibly violent and large BLM / Antifa counterprotest that might

occur thereby placing Trump supporters in physical danger. Any discussion about inexpensive "walkie-talkies" or other such devices that were carried that day were due to the fact that all cell phone coverage and any ability to use cell phones had completely ceased during the prior Stop the Steal Rallies in November and December. Should there have been a large and violent BLM / Antifa counterprotest, which was highly anticipated, it would have been beneficial to be able to communicate with others you might get separated from, including defendant's wife who was also present that day.

       As defendant was approaching the Capitol after President Trump's speech, approximately ¼ mile away, he could hear what sounded like three to four flashbangs exploding. Defendant assumed it was likely due to a BLM / Antifa counter-protest now converging with Trump supporters. Defendant also recalls communicating with his daughter via text message in which she was watching some disturbances around the Capitol on television news channels as we were approaching and she was reporting this to defendant.

       Several minutes later at the time defendant arrived at the west side of the Capitol he could already see people who appeared to be scaling the walls of the Capitol grounds, he could begin to smell pepper spray and CS gas, and could hear additional flash bangs or possibly sting balls or gas cannisters detonating. The crowd was already massive, highly agitated, angry and inflamed by the time defendant arrived at the main body of the crowd. The crowd was building as more people arrived from the Ellipse and it extended westerly along the west lawn heading in the direction of the Washington monument. Defendant would estimate tens of thousands of people had already surrounded the Capitol building and surrounding streets on all sides by the time defendant arrived at the Capitol. Defendant recalls walking to Taylor's right side and slightly behind Taylor at the time we arrived at the Capitol grounds.

       Immediately upon stepping onto the Capitol lawn, before having any opportunity to survey the situation or try to determine where we should stand in or near the crowd to join the protest, a man at the edge of the main crowd yelled words to the effect of,

"You with the bullhorn!" (Pointing directly at defendant and then looking down at his phone as if he were reading a text or a news report). "Get on your bullhorn and let the people know… Pence just betrayed Trump. It's over. We're doomed!" or words to that effect.

Defendant believes it very likely this unknown man encouraging defendant's use of the bullhorn was likely working with Taylor and his handlers to initiate the sequence of events that led to defendant ultimately standing on the Capitol Plaza. Defendant did not do as the man requested. After the unknown man yelled at defendant, co-defendant Russ Taylor immediately looked over his shoulder at defendant and yelled, "Let's go!" Taylor then began moving quickly towards the Capitol building by ducking under a tarp and rapidly walking up some stairs.

Taylor was defendant's friend at the time so defendant joined his friend and followed him. Not having any idea where Taylor was headed, other than generally in the direction of the Capitol Building, defendant simply followed him. Defendant would describe this as akin to a halfback following a lead blocker on a football field. Taylor is so large that all defendant could initially see was Taylor's back. Defendant assumed that at some point they would arrive at a location where either a fence or a mass of protesters and police officers would likely prevent them from moving any further. In hindsight, the route Taylor was leading defendant along was suspiciously clear and with few people blocking the route. Defendant believes it likely this route was predetermined by Taylor and whoever was handling him before defendant arrived at the Capitol Building.

Eventually the stairs under the tarp we were walking up led us to what defendant would describe as a "chokepoint" where approximately 20-30 protesters had already arrived there before us. This location was elevated above the main body of the crowd below where protesters were visibly scuffling by pushing back and forth on three foot bike racks with officers beneath us. Several of these protesters at the choke point we arrived at were leaning into and pushing up against 8-10 police officers to the best of defendant's recollection.

Defendant would describe this as what looked like a "rugby scrum." Defendant observed something very odd taking place as he approached the "rugby scrum" of officers and protesters. It appeared to defendant that a shorter, Asian looking man approximately 50 years old was smiling and laughing and appeared to be speaking with the officer he was leaning into who was also smiling.

Defendant initially thought this observation to be surreal and wrote it off to a skewed observation due to the adrenaline rush of the event. In hindsight, and seeing all the news video segments since January 6th in which Capitol Police Officers were waving protesters into the restricted area and happily chatting with them inside the Capitol Rotunda, defendant now has two questions:

1). Were these officers at the chokepoint / "rugby scrum" legitimate police officers or were they actors staged there to play this scene out?

2). If legitimate police officers, were they "bad cops" working with the FBI to further this false-flag event and have these particular officers' body cam footage been given to defendant through discovery?

Defendant did not see any weapons being used or anyone punching or assaulting the officers at the chokepoint. Defendant then witnessed Taylor engaged in the acts described in the indictment and thought to himself how overly dramatic, aggressive and "out of character" Russell Taylor seemed to be as events unfolded. Eventually the crowd below the chokepoint where defendant was located broke through the police line below and moved closer to the Capitol Building.

When this perimeter breach had happened below where defendant was standing, the officers at the choke point near defendant simply turned around and walked away without any fanfare. Protesters then made their way up to the Capitol Plaza where we stood for the next couple of hours if defendant recalls correctly. In another subtle lie being perpetrated by the DOJ, whoever wrote the indictment in this case referred to defendant and Taylor on pg. 15, point 66 and stated the following: *"Taylor, followed closely by Hostetter,*

*then pushed through the area that law enforcement officers had been blocking, moved up the stairs onto a structure erected for the inauguration and continued moving on to the Upper West Terrace."*

   Defendant poses this question to the court: When police officers manning a perimeter post simply turn around and walk away from it, thereby abandoning it, and protesters then walk freely through the area the officers *used to be located at,* exactly what and whom would the protesters be "pushing through" at that point? The court will also notice the author mentioned this in the past tense stating defendant "pushed through" where the officers *"had been blocking."* While this description doesn't make any sense at all, it serves to make defendant and other protesters look aggressive and dangerous, which was the point of this line of the indictment. This is exactly the type of disingenuous legalese and judicial deception that angers most Americans.

   The court will notice that also on page 15 of the indictment that once defendant made it to the upper west terrace of the Capitol Plaza, he was quoted as saying, *"The people have taken back their house… Hundreds of thousands of patriots showed up today to take back their government."* Defendant stands by that statement today. The statement was not made in a spirit of violence. It was certainly not made in a spirit of "insurrection." It was awe inspiring to have been in that crowd of patriots and to have honorably and peacefully protested against this literal communist / globalist overthrow of the United States Government and the people of our great nation. Defendant did not personally witness any extreme act of violence being directed at law enforcement officers. If anything, law enforcement seemed to be acting much more provocatively and violently against the crowd for the purpose of provoking the crowd into violence against them rather than the other way around. The security perimeter fencing was intentionally, and by design lacking, in order to encourage and facilitate the breach and ultimately the entire "riotous" situation. Federal law enforcement, led by the FBI, completely owns this so-called "riot" for that reason alone.

People tend to forget that the election of 2020 was actually stolen from a duly elected President whom was elected in one of the biggest landslide victories in the history of our country. It was also stolen from We the People. This was obvious in November of 2020, regardless of how much the Main Stream Media pretends to say it isn't so. It has been proven even more obvious today as more and more has been learned about the massive amount of voter fraud, both organic and electronic, that occurred on November 3, 2020. Millions of Americans across the country, both at the Capitol and watching on their televisions at home, were likely making similar statements as defendant regarding "patriots taking back their house" on January 6, 2021. Defendant will never apologize for this or be anything but proud of his actions during the events of January 6th.

The court will also notice on Page 15 of the indictment, Russell Taylor, once on the Upper West Terrace, yelled "Inside!" The indictment then states, "Taylor and Hostetter then moved towards the Capitol Building." This particular statement in the indictment is another intentionally misleading statement.

There was only one time defendant heard Russell Taylor yell out to encourage others to enter the Capitol Building. That one time occurred, as the indictment stated while we were on the Upper West Terrace closer to the Capitol Building. Defendant and Taylor were standing approximately 30-50 yards from the actual building and noticed approximately 20-30 people standing around the main door entrance to the west side of the Capitol Building. Several of these people were banging on the door repeatedly and making a lot of noise near the door demanding entry. Defendant did not know these people and had nothing to do with them. Suddenly the doors popped open and a loud cheer went up from the crowd banging on the door and many entered the building. Defendant believes it is possible these doors may have been opened from the inside, either remotely by a control center or by Capitol Police Officers on the other side of the door. Defendant did not see any damage to the door once it opened causing him to believe it was forced open.

Once the doors opened and the people cheered and entered, Russell Taylor immediately yelled to defendant either, "Let's go!" as he pointed to the open door or he yelled "Inside," upon which time HE started to move towards the building and the open door. Defendant recalls grabbing Taylor by the wrist or arm and telling him that defendant was not going any further than where they were already located on the plaza and refused to enter the building. Taylor gave defendant an obviously disappointed look.

Up until the point of defendant ceasing communication with Taylor due to the indictment, Taylor had always held the position that he did not enter the building. Defendant disputes this and has a discovery request, so far ignored, into the government for additional information into a Twitter post Taylor posted days after the incident in which he felt it necessary to deny entering the building. The reason for his Tweet was because there was another man in similar clothing that looks like identical to Russell Taylor. This man is shown taking pictures inside the Capitol Building. The FBI had included this person in their initial "Wanted" flyers the evening of January 6th. Taylor tweeted proactively that he was not that man and included a side-by-side photo of him along with the FBI's "Wanted" flyer. Taylor did this, at least partially, because people on Twitter and elsewhere started to point out publicly that this man looked like Taylor. The following is the Tweet Taylor sent out. Notice he tells the FBI to "Do your homework before knocking on my door."

The court will also notice the oddity of Taylor comparing his physical appearance to the man inside the Capitol Building. How would Taylor know the man's ethnicity, height, and weight by looking at this picture? Why did Taylor refer to the man having a beard when the man clearly does not? The only thing that could pass for a beard in this photo resembles the same large scarf Taylor was wearing all day long on January 6th.



Defendant also notes here that Taylor hugged him several times over the next several months claiming these hugs were from his wife for defendant's act of stopping Taylor from entering the Capitol Building. Defendant met Taylor's mother and father one time on May 22, 2021 during Taylor's birthday party. They too thanked and hugged defendant for preventing Taylor from entering the Capitol Building.

While standing on the Capitol Plaza on January 6 for those couple of hours until Capitol Police moved us off the Plaza, defendant had not been able to relieve himself all day and had a very strong urge to urinate. Defendant had mentioned this to Taylor on at least a couple of occasions while on the plaza.

On two separate occasions individual's unknown to defendant came up to him on the Plaza and began conversing with him and pointing out another nearby open door at the corner of the Capitol Building we were standing close to. These individuals were claiming that there was a restroom right around the corner from that open door and it looked like it was right out of a castle due to how lavish it was inside. One of these individuals went so far as to encourage defendant to at least enter the bathroom to get a picture of it. On a third occasion a man dressed in semi-tactical gear and either camouflage or khaki clothing approached

defendant and encouraged defendant to use his bull horn to announce to the people in the area to "hold our ground" and let them know that if we were to do that, we could delay the proceedings inside. The man went on describing that the constitution would mandate that the certification process would have to be halted for a period of time if it wasn't certified by midnight.

Defendant ignored the man but in hindsight, both defendant and the court can imagine how that would have been portrayed in the government's indictment if defendant had used his bullhorn to encourage those in the nearby area to hold their ground so as to "delay or obstruct the proceedings."

After a couple of hours of being on the Capitol Plaza, defendant could see that Capitol Police Officers were starting to call in reinforcements and form a larger skirmish line. It was apparent to defendant, based on the police formation, that at some point in the near future, they would likely begin to move the crowd northward and off the Capitol Plaza. Defendant began to mention this to people around him encouraging them to pay attention and be ready to move away from police if they started attempting to move the crowd. Defendant had already come to the conclusion that as soon as law enforcement decided to move the crowd away from the building, defendant intended to cooperate immediately.

At the point where Capitol Police decided to move the crowd off of the Plaza, defendant does not ever recall hearing an "Unlawful Assembly" announcement or being given direction to move north off of the Capitol Plaza. To the best of defendant's recollection Capitol Police began moving immediately and very aggressively by deploying flash bangs, sting balls and gas cannisters against a relatively peaceful crowd. By this time, the crowd had simply been standing around the outside of the building, occasionally chanting things such as "Stop the Steal" or singing the National Anthem.

Defendant began moving away from the officers in the direction the officers wanted us to move. Defendant was encouraging others around him to do the same. Defendant was alternately looking northward in the direction he was walking and back over his shoulder

to keep track of what was happening with Russell Taylor. Defendant was shocked watching Taylor as he was refusing to move until the police officers smashed him in the back with their shields.

Taylor appeared to be in a trance of some sort. Taylor is a huge man, likely at or over 300 pounds and very tall. Defendant observed Taylor taking a couple of steps forward, holding his arms outward slightly and then planting his feet firmly. Taylor would not move until a police officer smashed him on his back with a shield. Defendant would notice Taylor's body convulsing/recoiling as he was struck with the shield. Taylor would take a few more steps, plant his feet, hold his arms out and be struck again causing him to move a few more steps. This process went on until Taylor finally ended up at the same location defendant ended up at north of the Capitol Plaza and at the edge of the Capitol complex.

Defendant did not see this when it occurred, but shortly after being moved to this location north of the Plaza, Taylor very dramatically flipped his middle finger towards the Capitol Police. A nationally known news photographer just "coincidentally" was in the area and snapped a picture of this that went viral and ended up in newspapers. The photo is now stored in "Getty Images."



Defendant found it curious that Taylor had changed his appearance a few times during the incident, as he was photographed donning a gas mask in a crowd of people in

which no one else was wearing a mask or appeared to be in any distress from tear gas.  Taylor had also removed his hat and glasses at times, such as when this photo of him flipping his middle finger towards police was taken.

Much like the actions of the numerous FBI informants involved in the staging of the plot to kidnap Governor Whitmer of Michigan and storm the Michigan State Capitol only a few months before January 6th, it was Russell Taylor who was the one primarily engaged in making extreme comments and taking extreme actions at the U.S. Capitol on January 6th. It was Russell Taylor who was organizing "fighters" in chat rooms leading up to the event and it was Russell Taylor who was visibly, and for effect, displaying weapons, body armor, a kevlar helmet and a gas mask, even when not necessary, for all the world to see.

The court will notice defendant has not mentioned anything about the actions of Morton Irvine Smith since the arrival at the Capitol complex. Irvine Smith stayed with us about half way up the steps underneath the tarp as we approached the Capitol Plaza. He then fell behind and never rejoined defendant and Taylor. Defendant found it curious however that Irvine Smith must have waited approximately 50 yards behind and below defendant and Taylor once we arrived at the location of the police "choke point." He waited just long enough to take a video of us moving beyond the chokepoint and moving up the stairs towards the upper west terrace.This video taken by Irvine Smith showed defendant walking up the stairs to the Capitol Plaza. Defendant now believes this video was taken as "evidence" to be given later to Irvine Smith's federal handlers.

Eventually after police had cleared the Capitol grounds of all protesters, Irvine Smith rejoined Taylor and defendant near the Capitol Complex and they all walked back to the Kimpton George Hotel together. During the walk to the Kimpton, Irvine Smith very excitedly told defendant and Taylor that he had made it to a location even higher and more restricted than the location defendant ended up at.

Irvine Smith further stated he witnessed horrific scenes of police officers being beaten within an inch of their lives, and one being disarmed of his firearm. This officer was "crowd surfed" in a crucifixion position as the officer begged for his life, according to Irvine Smith. Nearly everyone at the protest on January 6th had a personal cell phone camera. There were professional photographers everywhere around the building and scattered throughout the crowd. If the scenes Irvine Smith described actually occurred, there is no doubt someone would have captured this on video and the main stream media would have replayed these videos non-stop.

Curiously, Irvine Smith was never indicted and, to this day, is listed only as "Person One" in the indictment. On 1/27/2021 when Taylor and defendant had search warrants served on them, Irvine Smith did not. It wasn't until nearly five months later, on June 9, 2021 that Irvine Smith finally had a search warrant served on him. This was one day before defendant's indictment was unsealed. The timing of Irvine Smith's "raid" is transparently obvious and laughable. It was intended to "clean him up" as an informant.

Journalist Darren Beattie of Revolver News has written a number of stunning articles detailing the FBI's involvement in staging the January 6th false flag "insurrection" event. These articles are lengthy, comprehensive and shocking. They can be compared to the articles written by Woodward and Bernstein in the 1970's exposing the Watergate Scandal. They are that important, yet completely ignored by the Operation Mockingbird Main Stream Media. They are provided below:

(1/4) Revolver News articles exposing FBI informants being used to instigate and initiate the events of January 6th at U.S. Capitol:

https://www.revolver.news/2021/06/federal-foreknowledge-jan-6-unindicted-co-conspirators-raise-disturbing-questions/

(2/4) Revolver News exposes leader of Oath Keepers, Stewart Rhodes as an informant:

https://www.revolver.news/2021/06/stewart-rhodes-oath-keepers-missing-link-fbi-unindicted-co-conspirator/

(3/4) Revolver News Exposes More Corruption via Green Beret the FBI tried to recruit as an informant:

https://www.revolver.news/2021/10/arrest-of-green-beret-oath-keeper-threatens-to-expose-fbis-darkest-1-6-secrets/

(4/4) Revolver News Exposes Ray Epps as FBI Informant and Instigator:

https://www.revolver.news/2021/10/meet-ray-epps-the-fed-protected-provocateur-who-appears-to-have-led-the-very-first-1-6-attack-on-the-u-s-capitol/

**On or about March 25, 2021:** Defendant was asked to participate in a documentary regarding his actions / observations on January 6th. The person first bringing this documentary to defendant's attention was Russell Taylor. Taylor "vouched" for the documentary film makers, stated they were very conservative, pro-Trump, and were definitely going to make a documentary favorable to January 6 protesters. Taylor stated that, due to the FBI interest in him, his wife was very concerned about him appearing in the documentary and she was very much against it. Taylor said he was honoring her wishes and would not be participating in it. Defendant was willing to participate in the documentary so he contacted the documentary filmmaker Chris Burgard at the "WhatsApp" number Russell Taylor gave him to contact Burgard.

Burgard struck defendant as genuine so defendant agreed to meet with Chris Burgard, Nick Searcy and their film crew at a home studio in Burbank, California to share his story. On April 26, 2021 at 11 a.m. PST, defendant sat with the film crew for about 3 hours freely explaining most of what he did and saw on January 6, 2021.

Defendant had shared with Chris Burgard the fact that FBI agents had engaged in some highly unprofessional conduct while searching defendant's home on January 27, 2021. They did this by placing an "evil clown" mask over the head of a Buddha statue located in defendant's home office.  This clown mask was purchased earlier in the year as a joke. Defendant took some pictures of himself wearing it to use in possible memes and/or social media posts related to the issue of being mandated to wear a mask as a Covid-19 mitigation measure. At the time the search warrant was served on defendant's home, this mask had been stored in the closet inside of his home office. Defendant thought to himself that one day his grandkids might find it humorous to wear it during Halloween so he kept it stored in the closet with that in mind.

One of the agents searching defendant's home on January 27, 2021 apparently thought it would be humorous to place this mask over the head of the approximately three-foot-tall Buddha statue in the corner of defendant's home office. When defendant initially saw this, he was shocked, could not believe the unprofessionalism of the FBI and quickly removed it from the statue. Defendant re-created this scene a few weeks later and took the pictures below showing the statue without and with the mask just so he would have it on the record exactly what the FBI did during their search warrant service.





During his documentary interview on April 26, 2021 defendant mentioned the clown mask incident to Chris Burgard but said he thought it might be so unbelievable to the public he did not think it necessary to speak about it during the interview for the documentary. Burgard was not shocked to hear about what the FBI did and was quite adamant that he wanted defendant to speak about the clown mask incident because it tied in with another story that a January 6 defendant from Lake Elsinore, CA had shared with him during his interview. The Lake Elsinore incident involved FBI agents playing with Star Wars light

saber toys in a child's bedroom as they were searching the home. Defendant recalls Burgard telling him that the actions of the agents playing with these light sabers was extremely creepy and frightened the entire family as they sat in the home waiting for the search to be completed.

Approximately a month and a half after sitting for the documentary interview, defendant was indicted. Defendant was still trusting of Chris Burgard and Nick Searcy at this point and was continuing to have regular phone conversations with Burgard about the progress of the documentary and life in general. The relationship had become very friendly with much in common between defendant and Burgard. Not long after the indictment, Burgard happened to mention during one of these phone conversations that two of the people they interviewed for the documentary were the "Three Percenters" defendant had been indicted with. They were from the Lake Elsinore / Murietta, CA area and defendant believes one of them may have been the person relating the Star Wars light saber story to Burgard and Searcy.

After hanging up from this conversation defendant began thinking about how unbelievably coincidental this was that, of over 600 defendants across the country, this documentary film crew just happened to find two people listed in his indictment to interview. The fact that these two people from the "Three Percenters" were completely unknown to defendant, and also knowing the government would be corruptly attempting to create connections between them and defendant, made this coincidence even more unbelievable. Defendant immediately called Burgard back to discuss this coincidence and find out how he had come across these two people to be interviewed for his documentary.

To the best of defendant's recollection, Burgard stated that someone in their crew, possibly named Liz, is the person who actually found and booked the two "Three Percenters" in defendant's indictment. Keep in mind that at this point defendant had no idea the level of illegality, treachery, deception, and betrayal he would soon discover the government had deployed against him as part of this grand frame-up of not only defendant but

also the entire conservative, MAGA movement across the country. For that reason, defendant continued to give Burgard and Searcy the benefit of the doubt and maintained the relationship with them.

However, over the course of the next month or so, defendant grew more suspicious of Burgard and Searcy as additional oddities surrounding the documentary came into focus, along with the fact that by this time defendant had also come to realize that both Morton Irvine Smith and Russell Taylor turned out to be informants / operatives / actors in his life. For this reason, on July 21, 2021 defendant contacted Chris Burgard by phone and followed up with the email below insisting he remove all video footage of defendant from the documentary and that defendant believed he had signed their "waiver" to allow his footage to be used under false pretenses.



Since this experience with this documentary, defendant has come across materials and information indicating that FBI and/or U.S. Intelligence Assets regularly operate under the guise of journalists or documentary film makers in order to penetrate, infiltrate, surveil and otherwise gather information on their targets. Research key phrase "CIA Operation Mockingbird" for further details.

Lastly, defendant has mentioned a Freemasonic component to the FBI investigation in general and his case in particular. Defendant offers the two photographs below as just one example of this. The photo showing Chris Burgard and Nick Searcy

standing under the "Ebenezer Baptist Church" sign is the photograph Chris Burgard uses as his profile photo on his "WhatsApp" social media platform.

The court will notice that Burgard and Searcy, the subjects being photographed, are standing off to an extreme angle in the picture with Searcy actually having a portion of his body cropped from the picture to be photographed at this angle. This wide angle allows the viewer to also notice the street lamp or traffic signal that is slightly behind them. Those initiated into Freemasonry would appreciate the angle of the street lamp being related to the shape of their logo being the "Square and Compass." The thin, solid dark colored post rising from the sidewalk slightly closer to the two men might be considered an obelisk type structure, also very meaningful to Freemasons. The fact that this church is located in "Mason, TN" is the "icing on the cake" of defendant's theory related to this picture.



The picture below is of Russell Taylor. Defendant took this photograph of Taylor at Taylor's request in front of the Supreme Court in Washington DC while the two of them were visiting Washington DC for the November 14, 2020 Stop the Steal rally. Taylor, or someone he knows, took this photograph and used a filter to create a somewhat animated, cartoonish look and then layered all sorts of Masonic imagery throughout the photograph.

As it relates to Taylor, here are two specific examples related to him as the subject of the alterations in the photo. First, defendant draws the viewers' attention to Taylor's left arm directly under where his short shirt sleeve ends. You will clearly see the top

of the Masonic "Square and Compass" logo, which is the primary symbol of Freemasonry. Looking closer you will see a possible "G" within the Square and Compass symbol. This is fuzzy and not easy to see but the Square and Compass is quite visible and jumps out at the viewer when one knows what to look for.

       Looking further down in the photo, defendant now points out the attachment to Taylor's backpack that hangs beneath Taylor's left armpit. This area is clearly altered considerably. It resembles the paw of an animal. When one considers the color of the backpack and the shape of this paw, one might entertain the possibility that it looks like a lion's paw. Defendant encourages the court and readers of this Motion to research online "Masonic lion's paw" and they will have pages and pages of information returned to them on exactly what this symbolizes. There are dozens of other Masonic symbols within this photograph that other Masons would see and appreciate. Defendant recalls Taylor posting this photograph to his social media accounts after these alterations were made. At the time, defendant had not yet learned or understood the symbols of Freemasonry and had no idea how it permeates this photograph or the investigation into him.



       As a side note, J. Edgar Hoover, the FBI director for 47 years was a 33rd degree Freemason in his 20's. He was appointed director of the Bureau of Investigation

(forerunner to FBI) at age 29, which is shocking in and of itself that someone of this age and limited experience would be appointed to such a lofty position. One could safely assume that over the course of his 47-year run as FBI Director he hired and placed thousands of high-level Freemasons throughout the organization in both field and key leadership positions. Undoubtedly that practice continued long after Hoover died in his sleep, while still the FBI Director, in 1972.

**Early to Mid-May, 2021:**  Defendant does not recall the exact date, but he was invited to attend a party being organized by Morton Irvine Smith at the Irvine family beach house in Laguna Beach. It was described as a gentleman's gathering for drinking and smoking cigars. There was nothing in particular being celebrated, but simply a party / gathering. Both Russell Taylor and defendant attended the party. Due to the recommendations of our attorneys, Taylor and defendant had not seen each other since early February so we were happy to get together finally. At this point both defendant and Taylor were wondering whether we would even be indicted and had not heard from the FBI. At this time defendant still had no idea Taylor was / is an informant / operative / actor.

Defendant estimates that approximately 30-40 people attended this party. Several of the attendees defendant had seen at prior gatherings at the beach house and several of them defendant had not yet met. About an hour into the party, Irvine Smith stood on a chair to be higher than the rest of the crowd. He started excitedly asking people to be quiet so he could speak. Once the crowd had quieted down, Irvine Smith started waving over his head a copy of the Los Angeles Times. In this particular edition, there was a lengthy article about defendant, Taylor and Irvine Smith's involvement at the Capitol and leading the "freedom movement" in Orange County. Irvine Smith particularly loved this article because it included a photograph of him standing in Taylor's red Corvette waving an American flag during a Trump car rally a few months before.

Irvine Smith began immediately talking about the article, how it related to the three of us and ultimately the events that transpired on January 6th. Irvine Smith then,

without defendant having any idea this was going to happen, turned the entire party into a celebration of his heroic friends, Taylor and defendant. As he concluded his comments, Irvine Smith encouraged every person at that party to approach us, shake our hands, thank us and talk to us about what happened on January 6th. Defendant was shocked and, at the time, flattered that Irvine Smith had turned this into what Irvine Smith described as a celebration of defendant and Taylor's heroism in resisting tyranny for over a year by that time.

Before long, most of the party goers were coming up to defendant and Taylor separately, praising us and speaking with us about January 6th. One man in particular, approached defendant on two separate occasions shook defendant's hand, leaned in close and spoke softly, saying "You're my hero… just let me know what you need. Money, guns… anything at all. Just let me know." The first time this occurred defendant just laughed and assumed the man was kidding. The second time it happened defendant ignored it and became suspicious and irritated by the man. Defendant believes, in hindsight that there were likely several FBI agents / informants present at that party who spoke with defendant about January 6th including this particular man.

**June 9, 2021:** Morton Irvine Smith's home was "raided" by the FBI with local agencies assisting to include the Orange County Sheriff's Department. Defendant still had no idea that he was about to be indicted the following day. As the raid on Irvine Smith's home was occurring, Irvine Smith's wife Marianne Smith called defendant on the phone to tell defendant about the raid. She left a voice mail and started off by giggling, which defendant found odd but wrote it off to nervous laughter. Defendant has kept the voicemail.

Defendant called Marianne Smith back as soon as he listened to her voice mail. Marianne Smith mentioned that she was unsure if the "raid" was still going on as the FBI let her leave the residence so she could go to work. Marianne asked if defendant could drive by their house in San Juan Capistrano where the raid occurred and talk to Morton and help him out with any questions he might have about the raid since defendant had already

-65-

experienced it. Defendant drove to the Smith residence shortly after speaking with Marianne Smith.

As defendant pulled up to their residence, he noticed Irvine Smith's vehicle was not in the driveway as it normally was. Defendant parked in front of their home, exited his truck and walked up to the front door and knocked. Defendant immediately noticed that Irvine Smith's front door had not been kicked in and damaged as defendant's door had. There was no answer at the door so defendant started walking back to his truck to leave. As defendant was walking back to his truck, he saw Irvine Smith slowly driving up the street towards him.

Defendant greeted Irvine Smith when he exited his vehicle. Irvine Smith pulled out what looked like a brand-new phone and showed it to defendant. He said that since the FBI had just taken his phone, he had to go purchase a new one and he was just returning from that purchase. Defendant asked Irvine Smith if he wanted to take a drive to the nearby Dana Point Harbor, grab a cup of coffee and talk about what happened. Irvine Smith insisted that he show defendant around his house first so defendant could see what happened during the raid.

Irvine Smith took defendant through nearly every room in his house excitedly showing him things and explaining what happened. Two specific things stand out in defendant's mind during this conversation with Irvine Smith. First was that Irvine Smith claimed to have given the FBI agents an approximately one-hour long statement explaining his actions and observations on January 6th. Defendant and Irvine Smith agreed, going all the way back to immediately following January 6, that it would be silly for anyone to give a statement to the FBI about being at the Capitol that day. It was obvious the investigation was corrupt from the beginning and the FBI was using the incident to target and destroy conservatives, especially Trump supporting conservatives. Yet after all those conversations Irvine Smith spoke for over an hour with them.

-66-

The second thing that stood out in defendant's mind was that as he and Irvine Smith were walking through his living room, he pointed out with great surprise and curiosity that the FBI had not taken his computer that was on the desk in the living room. He wondered why. So did defendant. Defendant stated to him that it was possible the FBI might have imaged the hard drive right on the spot. However, this would have been highly unusual because the FBI not only took defendant's computer during his raid, they took every single electronic device he owned whether it was operable or not. They continue to hold defendant's devices to this day, nearly a year later.

Suddenly Irvine Smith looked down at his desk near the computer and looked surprised. He picked up two thumb drives next to his computer and informed defendant the FBI must have left those thumb drives behind by mistake. He then attempted to hand the thumb drives to defendant. Defendant wanted nothing to do with the FBI's thumb drives and asked Morton if we could leave to have coffee at the harbor. He agreed and defendant drove Irvine Smith to the harbor at that point.

Defendant has assumed that since January 6, he has been under constant surveillance by the FBI, both inside and outside his home. Defendant assumes there is a tracking device on his vehicle and lives his life as if always under a constant state of surveillance. For this reason, before defendant and Irvine Smith exited defendant's truck at the harbor, defendant asked Irvine Smith to please turn his phone off prior to exiting. Irvine Smith took out his new phone and fiddled with it for several minutes before telling defendant that he did not know how to turn it off. Defendant then asked him to leave it in the truck, which he did. Defendant and Morton spent approximately an hour at the harbor discussing January 6th and Morton's "raid." Unbeknownst to defendant he would be arrested, indicted and arraigned for federal felonies in less than 24 hours. Defendant assumes this conversation at the harbor was monitored and likely recorded by the FBI.

**June 10, 2021:** Defendant's indictment is unsealed, he is arrested and brought before Judge Spaeth in the Central District of California. Defendant pleads not guilty.

**June 16, 2021:** Street artist "Bandit" places this life-sized depiction of defendant in downtown San Clemente, defendant's hometown. Twitter users and others opposed to defendant begin to discuss the artwork and point out where they can find it:



### Capitol Security Lacking, Intentionally So

Defendant is a retired police chief with 24 years of law enforcement experience. In the mid and late 1990's defendant supervised the Fontana Police Department Traffic Unit for a three-year period. One of the ancillary responsibilities of this assignment was to act as the "Special Events Coordinator" for the police department. One of the duties related to this assignment was to work with several other surrounding law enforcement agencies twice a year to ensure that 120,000 (peak) race fans could enter and remain at the California Speedway in the unincorporated area of Fontana for up to 4 days during the festivities. This assignment required specialized training which included a three-day training course in San Diego. Defendant believes he might likely qualify as a court-qualified "expert" in special events management and crowd control were he to be placed under voir dire for this purpose.

With that said, defendant produced a video explaining what appeared to be intentional failures in security that are hard to explain or justify without coming to the

-68-

conclusion that security, particular the perimeter fencing was staged in a way to encourage the breaching and the riot that occurred on January 6th. Please watch this video for details:

https://rumble.com/vgifu1-episode-2b-phoenix-rising-podcast-the-root-cause-of-the-capitol-riot.html

**FBI Agent / Case Agent Jessica Salo's "Lie of Omission"**

Within the discovery material the government has provided defendant thus far, there is a folder entitled "Sensitive Discovery Materials 7-7-21." Within this folder is a file entitled: "SA21MJ00038DUTY – Application" (this is the search warrant prepared for my home, vehicle and person. It was prepared by Special Agent and Case Agent Jessica Salo.

Defendant directs the court to point #38 of the warrant. SA Salo writes the following regarding what she discovered while reviewing defendant's American Phoenix Project (APP) website as she was preparing the warrant: [*"According to its website, 'the goal of the American Phoenix Project is nothing less than a second American revolution'."*] Of course, this would make most federal judges reviewing this warrant view defendant as a potentially violent, radicalized "domestic terrorist" itching to launch a violent revolution.

Shockingly, SA Salo left out three sentences of an entire paragraph that followed that one line she included in the search warrant application. Those missing sentences provide quite a different perspective on both defendant and American Phoenix Project when the paragraph is viewed in its entirety. Here are the three sentences Salo left out: [*"Only this time this revolution will be a peaceful one. Our brilliant Founding Fathers provided a mechanism for this in our existing constitution. It is called Convention of States. It is offered under Article V."*]

This was no accident or oversight. It was not carelessness. This statement in Salo's search warrant application is a lie of omission. It is unprofessional and shows extreme bias.

-69-



**Attorney Client Privilege Violated**

Within the government provided discovery material provided to defendant, an entire email between defendant and his non-profit attorney, Tyler Hochstetler, was included. This was distributed to all co-defendants also. This violates attorney-client privilege.

**FBI Allows "Officer Brian Sicknick Murdered" Lie to Stand for a Month**

https://www.msn.com/en-us/news/us/new-york-times-quietly-updates-report-on-fire-extinguisher-striking-capitol-police-officer/ar-BB1dG92n

Defendant includes this section not only as an example of outrageous government conduct in his case, but an act of egregious misconduct related to all J6 defendants. It is such an obvious and extreme example of the government itself employing and deploying lies and deceptions to attack a group of people who subscribe to a different (non-globalist) ideology than the FBI, CIA and other institutions of the U.S. federal government that it should be considered as part of the general "outrageous government conduct" in this case and all others.

On January 8, 2021 the NY Times reported that Officer Brian Sicknick was bludgeoned to death with a fire extinguisher by a "pro-Trump mob." All of federal law enforcement allowed this lie to stand for over a month until the NYT finally, and very quietly,

corrected it. As a former detective who worked everything from homicides to misdemeanors, there is no excuse or explanation for allowing this completely untrue media report to stand without correcting it. All of federal law enforcement would have known immediately that Sicknick died a day after the riot from natural causes. Autopsy reports showed that not only did he die from natural causes (double stroke into base of brain stem), there was not one single observable bruise on his entire body according to the autopsy. This was known from the time he was discovered unconscious in his own police station hours after the Capitol Riot occurred.

The only explanation for the FBI and other federal law enforcement agencies not correcting the record in Sicknick's case is because the narrative of the police officer being murdered by Trump supporters was very helpful to their cause. Their cause was not justice. Their cause was the demonizing of political opponents and silencing of dissenting political viewpoints in this country.

### Russell Taylor "Smokes" Himself Out as an Informant / Actor

Within the discovery material provided to defendant in the "Sensitive Discovery Materials," there is a file entitled, "ARA Staff Chat Signal." This file contains a collection of comments amongst a group of people who called themselves a variety of names under the "ARA" banner to include "American Republic Alliance," "American Revolutionary Alliance," and "American Republic Army." Defendant does not have any knowledge of this group. Defendant does not ever recall being invited into this group. Defendant does not appear to have made any communications into this group based on his review of the discovery materials provided to him.

The group appears to have been created by Russ Taylor under the moniker, "Porter Porter." In a subsequent message "Porter Porter" identifies himself further as "Porter RockQwell" (spelling with a "Q" in honor of what is incorrectly but commonly known now as "Qanon.") Porter Rockwell is an alias Taylor used regularly. Taylor explained this to defendant for the first time in November of 2020 just prior to the Stop the Steal Rally in

Washington DC. Porter Rockwell was Joseph Smith's bodyguard. Joseph Smith was the founder of the Mormon religion, of which Taylor is a devout member. Taylor views Porter Rockwell as a Mormon icon and a personal hero.

Within the "ARA" Chatroom, the originator of the group, "Porter Porter" (Russ Taylor) posts into a green background whenever he posts a message. This green background is unique to the originator of the thread as is typical of most social media group threads. All others in the group post into a blue background whenever they post.

This particular ARA chatroom begins with someone identified by the anonymous moniker of "Smoke" posting into a blue background indicating he is not the originator of the chatroom. However, "Smoke" apparently gets confused and identifies himself as "Porter" in the very first post of this thread as he states, "This is Porter, our state leader for California." "Smoke" is using an "810" area code out of Flint, Michigan for these communications in this thread. This particular chat thread created by "Porter Porter" contains many subtly violent, provocative and "revolutionary" comments going back and forth between mostly anonymous people using clever monikers. They are engaged in this chat on or around January 6, 2021.  It appears through this first post as "Smoke," that Taylor is communicating with himself while posing under a second alias in the thread.





       Defendant believes it possible Taylor may have used even more aliases within these chats. Defendant further believes it is likely that many of the more aggressive, revolutionary commenters in these threads are likely FBI and/or U.S. Intelligence agents and/or informants creating the aura of Trump supporters being a revolutionary threat to the country.

       It should also be noted here that Joseph Smith, the founder of Mormonism, and his brother Hiram Smith were both high level Freemasons at the time of the founding of the Mormon Church. The Mormon religion has strong connections to Freemasonry for that reason. Many of the Mormon "Temple Ceremonies," mimic Freemason rituals and ceremonies. With all due respect to our Mormon friends, Mormonism is its own "secret society" within religious communities. Defendant has reason to believe that both Russell Taylor and his attorney, Dyke Huish are high level Freemasons. They are both graduates of Brigham Young University and both devout Mormons.

The court and those "legitimately" investigating the events of January 6, 2021 must also take into account that in addition to informants and agents working directly for the FBI and U.S. Intelligence Agencies, there were also likely "actors" (sometimes literally iMDB actors) coming from the ranks of Freemasonry, Skull and Bones, Scientology, Mormonism and other similar "secret society" organizations working cooperatively with rogue elements of the federal government from the outside.

This gives the government the ability to deny the fact that specific people such as Russell Taylor and his attorney are "informants/operatives" even though, de facto, they are. The only difference is that they are working for an outside 3rd party organization that couldn't be more perfectly suited for this endeavor due to their rules of secrecy, which include swearing to their own deaths as punishment for revealing secrets entrusted to them.

On January 6, 2021 defendant did not commit one act of violence. Defendant did not commit one act of vandalism. Defendant never entered the U.S. Capitol Building. Defendant never conspired with anyone to do anything illegal, immoral or unethical. The government has not provided anything, that defendant has yet seen in discovery, that contradicts these claims by defendant. Yet, defendant is charged with federal felonies that could result in his imprisonment for up to twenty years.

**Additional Links Showing the General Corruption of the Investigation and Indictment Related to ALL "legitimate" J6 Defendants:**

1). Video explaining Pelosi family involvement and other suspicious occurrences taking place in the middle of the so-called "insurrection:

https://rumble.com/vhspf5-episode-7-phoenix-rising-podcast-deep-state-narrative-control-and-treasonou.html

2). Video raising questions about Ashli Babbitt's shooting:

https://www.bitchute.com/video/DYlb92zMkj41/

3). USCP Chief Steven Sund After-Action Report written to Nancy Pelosi on 2/1/2021. In this report, he fails to even mention Ashli Babbitt's shooting. As a retired police chief having written many after-action reports, there is only one explanation for this. There is something very serious and corrupt about Babbitt's shooting that is being hidden from the public.

https://www.documentcloud.org/documents/20473583-letter-to-congressional-leaders

4). "Primary Informant" in this video refers to Morton Irvine Smith intentionally having defendant handle a firearm for the purpose of placing fingerprints on it:

https://rumble.com/vjdt3j-things-are-heating-up.-its-not-my-gun-please-take-a-listen....html

5). CNN Donie O'Sullivan segment on defendant and how he falsely attempts to connect defendant to the "Q Shaman:"

https://rumble.com/vjz3pn-the-only-way-forward-is-through-the-media-and-deep-state-lies-part-1-exposu.html

6). NY Times National Security Correspondent Matthew Rosenberg article on defendant / defendant's wife and how it connects to an "actor" of January 6th, Richard Barnett:

https://rumble.com/vjz5nd-the-only-way-forward-is-through-the-media-and-deep-state-lies-part-2-exposu.html

7). Defendant was targeted for what is commonly known as an "Organized Community Stalking" or "Organized Vigilante Stalking" campaign as he began to identify and "out" informants and the corruption of the Jan. 6 investigation and local investigations. These are often run through FBI FUSION Centers. Please read the show notes attached to the video:

https://rumble.com/vmgyzc-have-you-heard-of-organized-community-stalking-its-real-and-im-their-latest.html

8). Additional information RE: Organized Community Stalking campaigns

https://rumble.com/vn9z8y-the-feds-stalking-people-they-want-to-silence-is-not-a-new-phenomenon-expos.html

9). Video offering information related to Secret Society involvement and corruption of FBI:

https://rumble.com/vmynr8-are-you-prepared-for-what-is-coming-it-cant-be-stopped-exposure-segment-17.html

10). Video detailing gifts given to defendant by Russell Taylor that indicates Taylor is likely a member of a secret society:

https://rumble.com/vobza4-the-freeman-hat-are-the-illuminati-behind-the-the-madness-we-are-living-thr.html

## ARGUMENT

### A. The indictment must be dismissed because the tactics used by the government violated Hostetter's right to due process.

There comes a point where law enforcement techniques are so repugnant that it violates due process. Here, that point was not only reached it was surpassed. The government used a technique to choose who they wanted to target and then manipulated the target using shocking, frightening and unconstitutional techniques and methods. This was not an equal opportunity offer to the public at large.  Nor did this technique fully examine or investigate those who originated the claim, who may bear the most liability.  Additionally, unconstrained by reality, acting on behalf of government agents, fashioned the lure to be as attractive as possible. In effect, the government's tactics, by and through its use of informants and/or connections to "secret societies" doing their bidding, resulted in defendant literally being walked up the steps of the U.S. Capitol led by said agents or operatives.

And, finally, the technique places all of the power squarely in the hands of the prosecution to decide how serious of a crime will be committed. The net effect is a profoundly unfair prosecution that simply cannot be countenanced by the court. This is a case in which the government simply went too far. The government not only went too far in defendant's

case, but through defendant's timeline and story, coupled with the reference material it is obvious the government went too far in the case of ALL "legitimate" January 6 defendants.

In order to show outrageous government conduct, defendant must show conduct that violates due process in such a way that it is "so grossly shocking and so outrageous as to violate the universal sense of justice." *Restrepo at* 712, quoting *United States v. O'Connor,* 737 F.2d 814, 817 (9th Cir.1984). The defense is therefore "limited to extreme cases in which the government's conduct violates fundamental fairness." *Stinson* at 1209, quoting *Gurolla,* 333 F.3d at 950. The dismissal of an indictment because of outrageous government conduct may be predicated on alternative grounds: a violation of due process or the court's supervisory powers. *United States v. Luttrell,* 889 F.2d 806, 811 (9th Cir.1989). Here, the court abused its supervisory powers in failing to dismiss the case due to outrageous government conduct and in so doing, appellant's due process rights were violated by being forced to a trial based upon such conduct.

The argument that an indictment must be dismissed because of outrageous government conduct is derived from a comment by the Supreme Court in *United States v. Russell,* 411 U.S. 423, 93 S.Ct. 1637, 36 L.Ed.2d 366 (1973). In *Russell*, the Court stated that there may be situations "in which the conduct of law enforcement officials is so outrageous that due process principles would absolutely bar the Government from invoking judicial process to obtain a conviction." *Id.* at 431-32, 93 S.Ct. at 1642-43. The court may exercise its inherent, supervisory powers to dismiss an indictment because of outrageous government conduct. *Simpson,* 813 F.2d at 1465 n. 2. *See also Hampton v. United States,* 425 U.S. 484, 96 S.Ct. 1646, 48 L.Ed.2d 113 (1975) (Powell, J. concurring).

A claim of outrageous government conduct differs from the defense of entrapment. The issue of entrapment "focus[es] on the intent or predisposition of the defendant to commit the crime." *Russell,* 411 U.S. at 429, 93 S.Ct. at 1641.  The concept of outrageous government conduct focuses on the Government's actions. An indictment may be set aside because of outrageous government conduct whether or not the defendant was predisposed to engage in criminal activity. *United States v. Gonzalez,* 539 F.2d 1238, 1239-40 (9th Cir.1976)

"'Outrageous government conduct is not a defense, but rather a claim that government conduct in securing an indictment was so shocking to due process values that the indictment must be dismissed.' " *United States v. Holler,* 411 F.3d 1061, 1065 (9th Cir.2005), quoting *United States v. Montoya,* 45 F.3d 1286, 1300 (9th Cir.1995). This claim requires meeting a "high standard," *id.* at 1066, with a showing that "the government's conduct violates fundamental fairness and is 'shocking to the universal sense of justice mandated by the Due Process Clause of the Fifth Amendment.' " *Gurolla* at 950, quoting *Russell,* 411 U.S. at 431-32, 93 S.Ct. 1637). This Ninth Circuit explained in *Gurolla* that "[t]his standard is met when the government engineers and directs a criminal enterprise from start to finish," but "is not met when the government merely infiltrates an existing organization, approaches persons it believes to be already engaged in or planning to participate in the conspiracy, or provides valuable and necessary items to the venture." *Id.* (internal quotation marks and citations omitted).

Since there is "no bright line dictating when law enforcement conduct crosses the line between acceptable and outrageous," it is essential that every case be analyzed on its own particular facts. *U.S. v. Black,* 733 F.3d 294, 302 (9th Cir. 2013); *United States v. Bogart,* 783 F.2d 1428, 1438 (9th Cir.1986), *vacated in part on other grounds sub nom. United States v.*

*Wingender,* 790 F.2d 802 (9th Cir.1986) (order). The Ninth Circuit has set forth rule to guide court in determining whether the reasonable of the government's tactics. For example, it is outrageous for government agents to "engineer [ ] and direct [ ] a criminal enterprise from start to finish," *United States v. Williams,* 547 F.3d 1187, 1199 (9th Cir.2008) (internal quotation marks omitted), or for the government to use "excessive physical or mental coercion" to convince an individual to commit a crime, *United States v. McClelland,* 72 F.3d 717, 721 (9th Cir.1995). "It is also outrageous for the government to 'generat[e] ... new crimes merely for the sake of pressing criminal charges.' " Black, 733 F.3d at 302 quoting *United States v. Emmert,* 829 F.2d 805, 812 (9th Cir.1987). However, the Ninth Circuit found it is not outrageous to infiltrate a criminal organization, to approach individuals who are already involved in or contemplating a criminal act, or to provide necessary items to a conspiracy, none of which describes defendant in this case. *See United States v. So,* 755 F.2d 1350, 1353 (9th Cir.1985). Nor is it outrageous for the government to "use 'artifice and stratagem to ferret out criminal activity.' " *Bogart,* 783 F.2d at 1438 (quoting *Sorrells v. United States,* 287 U.S. 435, 441, 53 S.Ct. 210, 77 L.Ed. 413 (1932))

In *United States v. Williams*, 547 F.3d 1187 (9th Cir. 2008), the Ninth Circuit approved the government's use of a fictional stash house robbery in fighting crime, however, it also noted that in *United States v. Bonanno,* 852 F.2d 434 (9th Cir.1988), the Court set forth five factors that, when satisfied, indicate that the governmental conduct was acceptable. The five factors are:

"(1) the defendant was already involved in a continuing series of similar crimes, or the charged criminal enterprise was already in process at the time the government agent became involved; (2) the agent's participation was not necessary to enable the defendants to continue

the criminal activity; (3) the agent used artifice and stratagem to ferret out criminal activity; (4) the agent infiltrated a criminal organization; (5) the agent approached persons already contemplating or engaged in criminal activity."  *Williams* at 1199-1200, quoting *Bonanno* at 437-438.

Here, the government cannot even get past the first factor, let alone all five.

Rather, the government attempted to concoct, direct and supervise the enterprise from start to finish. And even through their incessant efforts to direct defendant into criminal activity, he never engaged in criminal activity. The conduct falls within the prohibition on outrageous government conduct imposed by the Due Process Clause of the Fifth Amendment. *See United States v. Russell,* 411 U.S. 423, 431-32, 93 S.Ct. 1637, 36 L.Ed.2d 366 (1973). Thus, the indictment must be dismissed.

The tactics employed by law enforcement in this case have unintended consequences that this court ought to examine very closely. How easy it is to profess one's disgust for "insurrectionists" or any other sort of criminal and, consequently, any plan designed to remove them from society may, at first blush, seem like a good plan. But the founding fathers correctly observed that the greatest danger we face is the concentration of governmental power in any one agency.

> [W]e . . . have recognized Madison's teaching that the greatest security against tyranny -- the accumulation of excessive authority in a single Branch -- lies not in a hermetic division among the Branches, but in a carefully crafted system of checked and balanced power within each Branch. "[T]he greatest security," wrote Madison, "against a gradual concentration of the several powers in the same department, consists in giving to those who administer each department, the necessary constitutional means, and personal motives, to resist encroachments of the others." The Federalist No. 51, p. 349 (J. Cooke ed. 1961). Accordingly, as we have noted many times, the Framers "built into the tripartite Federal Government . . . a self- executing safeguard against the encroachment or

aggrandizement of one branch at the expense of the other." *Buckley v. Valeo*, 424 U.S., at 122. See also INS v. Chadha, 462 U.S. 919, 951 (1983).

*Mistretta v. United States*, 488 U.S. 361, 381-382 (1989).

If this Court approves of the law enforcement technique employed in this case then the balance of power falls squarely into the hands of the prosecutors. The prosecution will go from prosecuting crimes (of whatever severity) that a defendant decided to commit to *deciding* the seriousness of the crime that will be pitched to any given defendant. In this way the Department of Justice decides what the potential penalty will be for any given defendant.

This Court should be skeptical of this expansion of governmental power given the ease of prosecuting persons for this type of crime when those persons are coerced and mistakenly believe their actions are sanctioned by the very people in of their criminal fate.

## CONCLUSION

For all the reasons described herein clearly showing not only "Outrageous Government Conduct," but also "Criminal Government Conduct," defendant moves to have all charges dismissed against him.

**DECLARATION OF ALAN HOSTETTER**

1). I am Pro Se defendant in this matter.

2). On pages 6 through 76 of the motion I lay out a "TIMELINE AND DESCRIPTION OF EVENTS" that are hereby incorporated by reference and attested to in this Declaration.

3). I have personal knowledge of all of the events referenced in the above TIMELINE AND DESCRIPTION OF EVENTS, except for those based upon information and belief.


I declare under penalty of perjury under the laws of the United States, the foregoing is true and correct to the best of my knowledge

DATED:  12-6-21

Signature: /s/Alan Hostetter