# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **CRIMINAL NO.: 21-CR-392-RCL** |
| | : | |
| **v.** | : | |
| | : | |
| **ALAN HOSTETTER,** | : | |
| | : | |
| | : | |
| **Defendant.** | : | |

## UNITED STATES' OPPOSITION TO DEFENDANT HOSTETTER'S MOTION TO DISMISS THE INDICTMENT DUE TO OUTRAGEOUS GOVERNMENT CONDUCT

The United States of America, by and through its undersigned attorneys, respectfully opposes defendant Hostetter's Motion to Dismiss the Indictment Due to Outrageous Government Conduct (ECF 99). While maintaining innocence of any crime, the defendant contends that, starting in March 2020, the government engaged in a counter-intelligence program that amounted to "incessant efforts to direct [the] defendant into criminal activity," in violation of his rights under the Fifth Amendment's Due Process Clause. Mot. at 80. The defendant further contends that the Federal Bureau of Investigation (FBI)'s search warrant for his residence, vehicles, and person was defective due to a material omission from the search warrant affidavit.[1] Those contentions are entirely inaccurate. In any event, because they fail to clear the high bar required for dismissal for outrageous government conduct or establish a viable suppression claim, the motion should be denied.

---

[1] The defendant asserts that this, too, provides a basis for dismissal of the indictment for outrageous government conduct. However, because the defendant is proceeding *pro se*, the government will address this argument separately as a motion for an evidentiary hearing under *Franks v. Delaware*, 438 U.S. 154 (1978).

I.   **BACKGROUND**

   **A.  Factual Background**

On June 9, 2021, the defendant was indicted by a federal grand jury in the District of

Columbia for conspiring with five co-defendants to obstruct an official proceeding in violation of

18 U.S.C. § 1512(k), obstruction of an official proceeding, in violation of 18 U.S.C. §

1512(c)(2), entering and remaining in a restricted building or grounds, in violation of 18 U.S.C. §

1752(a)(1), and engaging in disorderly conduct in a restricted building or grounds, in violation of

18 U.S.C. § 1752(a)(2).  These charges arise from the defendant's participation in the riot at the

U.S. Capitol on January 6, 2021.  In the weeks afterward, the FBI identified the defendant as one

of the rioters through examination of tips sent to the FBI from the public, publicly available news

sources,  social media postings, and U.S. Capitol surveillance footage from January 6.

Subsequent investigation by the FBI determined that, starting in November 2020, the

defendant had used the American Phoenix Project (APP), a nonprofit organization he had

founded in the spring of 2020 to advocate against COVID-19 restrictions, as a platform to

advocate for violence against certain groups and individuals who supported the 2020 presidential

election results.  For instance, on November 27, 2020, the defendant posted a video of himself on

the APP YouTube channel, which he had filmed while driving from California to Washington,

D.C. to attend the "Million MAGA March" in support of former President Trump on November

14, 2020.  In the video, the defendant asserted his belief that the election had been "stolen," that

votes for Trump had been "switched" to votes for Biden, and stated that:

> … some people at the highest levels need to be made an example of with an execution or
> two or three.  Because when you commit treason against this country and you
> disenfranchise the voters of this country and you take away their ability to make
> decisions for themselves, you strip them of their Constitution rights.  That's not
> hyperbole when we call it tyranny, that's fucking tyranny.  And tyrants and traitors need

2

to be executed as an example. . . . I'm going to D.C.  I'm going to be there on Saturday for this march.  I hope there are a million Patriots there.  Between that, that's going to be a shot across the bow of the dep state when they see a million Patriots surrounding that shit hole of a city—the swamp.  Because it's gonna make all those swamp creatures know that at any time we want we'll come back with a million Patriots and we'll surround that city. . . . There's gonna be a million of us showing up to make this statement here in Washington, D.C., and I'm telling the swamp right now, that we will be back if this doesn't get resolved peacefully and soon . . . .

Several weeks later, on December 12, 2020, APP hosted a "Stop the Steal" rally in Huntington

Beach, California.  The defendant spoke at that rally, and stated:

[w]e're gonna fix this before this is all over.  There must, absolutely must, be a reckoning.  There must be justice.  President Trump must be inaugurated on January 20th. And he must be allowed to finish this historic job of cleaning out the corruption in the cesspool known as Washington, D.C.  The enemies and traitors of America both foreign and domestic must be held accountable.  And they will.  There must be long prison terms, while execution is the just punishment for the ringleaders of this group.

The defendant later posted a video of this speech to the APP YouTube channel.

The FBI's investigation also determined that, starting on December 19, 2020, the

defendant began planning and organizing with others to travel to Washington, D.C. for January

6, 2021.  In a December 19, 2020 post to APP's Instagram account, the defendant explained that

January 6 "is the date of the Joint Session of Congress in which they will either accept or reject

the fake/phony/stolen electoral college votes," noted that former President Trump had "tweeted

that all patriots should descend on Washington DC," and asked his followers to join him in D.C.

on January 6 "to let the swamp dwellers know we will not let them steal our country from us."

That same day, the defendant and his co-defendant Russell Taylor reserved rooms at a hotel in

D.C. for January 6, 2021 and several days before and after.  Until December 30, 2020, planning

for the trip occurred in part in a chat group on the encrypted social media platform Telegram.

The chat group was owned by the defendant; co-defendants Russell Taylor, Derek Kinnison, and

Felipe Martinez also participated in this chat.

On January 1, 2021, co-defendant Russell Taylor started a Telegram chat group called "California Patriots- DC Brigade," which the defendant and all five of his co-defendants joined. In the "about" section of the chat, Taylor explained,

> This group will serve as the Comms for able bodied individuals that are going to DC on Jan 6.  Many of use have not met before and we are all ready and willing to fight.  We will come together for this moment that we are called upon.

The initial messages posted by Taylor to the chat group further explained the group's purpose. In one message, Taylor wrote, "This thread is exclusive to be utilized to organize a group of fighters to have each other's backs and ensure that no one will trample on our rights.  Also if there is key intel that we need to be aware of tor [sic] possible threats."  He then added, "I am assuming that you have some type of weaponry that you are bringing with you and plates as well."  Following the initiation of this group, members (including defendant Hostetter's five co-defendants) used the chat to identify themselves, relay their travel plans, discuss the gear they were bringing (including weapons), coordinate a group radio channel to use while on the ground in D.C., and periodically relay their location and movements in D.C.

The defendant drove from California to Washington, D.C., leaving on December 31, 2020 and arriving on January 3, 2021.  Prior to his departure, the defendant exchanged text messages with Taylor about bringing weapons to D.C. and agreed to transport Taylor's bag in his vehicle.  On January 3, 2021, the day the defendant arrived in D.C., the defendant posted to APP's Instagram account:

> Only 3% of Americans actually fought in our War of Independence.  There will likely be 3% of us again that will commit fully to this battle but, just as in 1776 patriots will prevail.  Things are going to come to a head in the U.S. in the next several days.  Stay tuned!

In the early morning hours of January 6, 2021, the defendant, Taylor, and others met in downtown Washington, D.C. to walk to the Ellipse for a rally featuring a speech by former President Trump.  In a "selfie" video Hostetter recorded as they walked toward the Ellipse, Hostetter stated that he would remain outside of the secure area of the Ellipse where President Trump would be positioned because he was carrying "personal protective gear" that was not allowed inside under Secret Service regulations.  He also described plans to "move back to the Capitol" after the events at the Ellipse.  In the video, Taylor can be seen wearing a plate carrier vest with a knife protruding from the chest pocket.  Later that day, the defendant, Taylor, and another associate walked together down Pennsylvania Avenue to the Capitol building.  Taylor was still visibly armed with the knife in his plate carrier vest and a stun baton that was sticking out of a backpack on his back.

At approximately 2:30 pm, the defendant and Taylor joined rioters on the lower West Terrace of the Capitol who were pushing through a line of law enforcement officers.  The officers were blocking the rioters from accessing the inauguration stage and a set of stairs that led to up the Upper West Terrace and the Capitol building itself.  Video footage shows Taylor ordering the officers to stand down.  When they did not comply, Taylor joined a scrum of rioters in pushing the officers back, causing them to retreat.  The officers continued to fight this group with pepper spray, but these efforts were unsuccessful, and shortly thereafter both Taylor and the defendant walked through this breach in the police line and up the stairs beyond, which led up to the Upper West Terrace.  When Taylor stopped mid-way up the stairs to wave to the rioters below, the defendant, who had walked ahead of Taylor toward the Upper West Terrace, used a bullhorn apparently to get Taylor's attention.  The two men then walked up to the Upper West Terrace.

In a video filmed on the Upper West Terrace, the defendant stated, "The people have taken back their house. . . . Hundreds of thousands of patriots showed up today to take back their government!"  Taylor then yelled to other rioters, "Inside!" and Taylor and the defendant moved toward the Capitol Building.  Security camera footage from inside the Upper West Terrace Door shows the defendant standing immediately outside at or about 2:40 pm.

At or about 4:10 pm, the defendant and Taylor met with co-defendants Derek Kinnison and Felipe Martinez on the Upper West Terrace, where Taylor, Kinnison, and Martinez posed for photographs together.  U.S. Capitol CCTV footage shows that the defendant was the person who took these photographs.

The defendant posted a photo to APP's Instagram account that showed him and Taylor on the Upper West Terrace of the Capitol building on January 6, 2021, with a crowd of rioters in the background.  Accompanying the photo was the message, "This was the 'shot heard round the world!'. . . the 2021 version of 1776.  That war lasted 8 years.  We are just getting warmed up."

### B.  Search of Hostetter's Residence, Vehicles, and Person

On January 26, 2021, the FBI obtained a warrant in the Central District of California pursuant to Fed. R. Crim. P. 41 to search the defendant's residence, vehicles, and person for violations of 18 U.S.C. § 1752.  The FBI executed the warrant on January 27, 2021.

The affidavit supporting the warrant outlined the FBI's investigation into the defendant's involvement in the January 6, 2021 riot up through that time.  It explained that, following January 6, the FBI had received information from several sources identifying the defendant as one of the individuals present on the Capitol grounds during the riot.  Affidavit ¶¶ 37-46, attached as Ex. 1.  This included telephone and online tips from the public, as well as information provided by another law enforcement agency, the Orange County Intelligence

Assessment Center (OCIAC"), which sent the FBI screenshots from APP's then-publicly-available Instagram account.  This included several Instagram posts from the APP account that appeared to be from January 6, 2021 and were tagged with "United States Capitol."  Affidavit ¶ 39.  The photos in the screenshots showed the Capitol building and appeared to have been taken from within the restricted area of the Capitol grounds.  *Id*.  In addition, the screenshots provided by OCIAC included the December 16, 2021 APP Instagram post showing the defendant posing with Taylor and another associate as they held axes, with the caption stating, "the time has come when good people may have to act badly. . . but not wrongly," and noting "#the battleaxe representing the many battles yet to come."  Affidavit ¶ 41.  These screenshots also included other APP Instagram posts in which the defendant is shown in the restricted area of the U.S. Capitol with Taylor during the riot, including one photograph where the defendant is standing on the Upper West Terrace, directly in front of the Capitol building, waving an American flag.  The captions for two of these photographs stated,

> Thank you for your prayers and concern.  Myself, @russ.taylor, and . . . are safe.  We did our part.  We are proud of our fellow patriots, our President, and our great country.  This was the 'shot heard 'round the word!''. . . the 2021 version of 1776.  That war lasted 8 years.  We are just getting warmed up.  Much like FAUX News reporting tonight, the British journalists and the Redcoats of the 1770s claimed the Tea Party was a mob. Patriots will prevail!

Affidavit ¶ 43.  In another APP Instagram post provided to the FBI by OCIAC, the defendant posted, "When the MSM tells you a 'few hundred wing nuts' stormed the Capitol while 10,000 looked on… it's bullshit!  The reality is thousands proudly stormed that cess pool of corruption while hundreds of thousands cheered them on. #onlythebeginning."  Affidavit ¶ 45.

The affidavit also identified evidence from license plate readers located near major U.S. highways and roadways showing that the defendant's registered vehicle drove from California to D.C. before January 6, 2021, and returned to California afterward.

The affidavit also provided some background information on APP, including the fact that the display name for APP's Instagram account was "Alan Hostetter," that the profile description for "Alan Hostetter" stated "Founder of American Phoenix Project, Grandpa, Retired Police Chief and former Army Infantryman.  Sound Therapist/MPA americanphoenix.org," and contained several photographs of defendant Hostetter.  Affidavit ¶ 38.  The affidavit further explained that the publicly available website for APP stated that the organization's goal "is nothing less than a second American revolution," that the group sought to enact a Convention of States under Article V of the U.S. Constitution, and that APP had formed in opposition to the governmental responses to the COVID-19 pandemic.  Affidavit ¶ 38.  The affidavit also made clear that it was "intended to show merely that there is sufficient probable cause for the requested warrant and does not purport to set forth all of [the affiant's] knowledge of or investigation into this matter."  Affidavit ¶ 3.

### C.  Procedural Posture and the Defendant's Claims

Following his indictment, the defendant was represented by counsel.  On October 11, 2021, the defendant moved to proceed *pro se* for the remainder of the case.  The Court held a *Faretta* hearing on October 14, 2021, and granted the motion on October 28, 2021.

On December 6, 2021, the defendant filed the instant motion to dismiss the indictment due to outrageous government conduct.  The defendant seeks dismissal because he believes he has been the target of a long-term undercover FBI operation against him that violates his Fifth Amendment Due Process Rights.  The defendant also contends that the search warrant affidavit

8

used to secure warrants for his person, residence, and vehicles contains material omissions that render the warrant defective.

### i. Defendant Hostetter's Claims Concerning the FBI's Investigation of His Involvement in the Riot at the U.S. Capitol

In the motion, the defendant contends that the case against him should be dismissed because "the tactics used by the government violated [his] right to due process." Mot. at 76. Over the course of 74 pages, most of which the defendant attested to be true in a declaration attached to the motion,[2] the defendant claims that he has been the target of "a classic FBI Counter Intelligence Program (COINTELPRO) operation targeting him from the beginning of the COVID-19 lockdowns and stay-at-home orders that were implemented in mid-March of 2020," (Mot. at 2), when the defendant started engaging in protest activity against pandemic-related restrictions. The defendant asserts that, since that time, a series of "persons [the defendant] believes worked at the behest of federal handlers from the FBI and/or U.S. Intelligence Agencies" (Mot. at 2), posing as his friends and political allies, have "initiat[ed] and instigat[ed] the events the government later prosecute[d] as criminal conduct." Mot. at 5. These alleged "informants" include at least ten specifically identified individuals the defendant encountered in the months prior to January 6, co-defendant Russell Taylor among them, and myriad unnamed alleged operatives. The defendant further believes that these informants may be "working through third party intermediaries" that include "such organizations and 'secret societies' such as Yale University's 'Skull and Bones,' Freemasonry, and specific religious denominations known for secrecy such as Scientology and Mormonism." Mot. at 2-3. The

---

[2] The defendant's Motion to Dismiss includes a declaration, under penalty of perjury, that he has "personal knowledge of all of the events referenced [on pages 6 through 76], except for those based upon information and belief." Mot. at 82.

defendant believes that the government has employed such "third party intermediaries" in order to "give[] the government plausible deniability regarding the actions thus far taken against [the] defendant."  Mot. at 2.

The defendant further asserts that, since March 2020, various law enforcement agencies (including the FBI, "U.S. Intelligence Agencies," various state and local police agencies in California, and OCIAC) have engaged in "a Psychological Operations (PsyOps) campaign waged against the defendant."  Mot. at 9.  The defendant provides a detailed, 73-page timeline of his activities, from March 13, 2020 through June 16, 2021 in which he describes his own protest activities against COVID-19 restrictions and the individuals with whom he associated and organized those activities; communications he received from others who purported to be his friends and political allies; certain street graffiti by someone known as "Bandit" that he believes contained coded messages against him; meetings he attended concerning anti-COVID lockdown activism and the effort to recall California governor Gavin Newsome; a confrontation with local law enforcement in San Clemente, California for which the defendant was arrested and charged with three misdemeanors after chaining himself to a fenced-off public area during an anti-lockdown protest; threatening messages he received through social media from unknown persons; his attendance at a Q-Anon conference in Scottsdale, Arizona; his decision to travel to Washington, D.C. for January 6, 2021; an account of his time in Washington, D.C. (including portions of January 6); the search of his residence by the FBI on January 27, 2021; his participation in the Spring of 2021 in "a documentary favorable to January 6 protestors"; and certain meetings he had with co-defendant Russell Taylor and another associate in May and June 2021.  The defendant accuses nearly all of the individuals he interacted with during this timeline

of being "informants" who participated in the alleged FBI "PsyOp" against him.  At no point does the defendant claim that anyone used any coercion or physical violence against him.

With regard to his involvement in the January 6, 2021 riot at the U.S. Capitol, the defendant admits to the following facts in his timeline under penalty of perjury:

- By December 15, 2021 he "had become aware of the importance of January 6, 2021 and the Election Certification process to take place in Washington DC on that date." Mot. at 39.

- On December 15, 2021, the defendant attended an Orange County Board of Supervisors meeting, at which he and Taylor spoke, and during which Taylor told the Board, "Week after week, I and others are with thousands in the streets all up and down the state of California.  You know what they are saying?  Revolution.  Storm the Capitol." Mot. at 40.

- The next day, December 16, 2021, the defendant ate lunch with Taylor and another associate.  During the lunch, Taylor gave the defendant an axe which Taylor described "metaphorically as a 'battle axe' representing the battles we had already fought in support of freedom and the many battles yet to come." Mot. at 41.  The defendant posted a photograph of himself, Taylor, and their other associate posing with the axes on social media with the caption, "The time has come when good people may have to act badly, but not wrongly."  Mot. at 41.

- The defendant was present in Washington D.C. on January 5 and 6, 2021.  Mot. at 42-57.  On January 6, 2021, "[o]nce President Trump finished speaking at the Ellipse at approximately 1:10 to 1:15 pm, defendant [Hostetter] along with several

others to include both Russell Taylor and [another individual] walked directly to the Capitol building."  Mot. at 45.[3]

- When the defendant, a retired police officer who also served as the Chief of Police in La Habra, California, arrived at the Capitol plaza, he "could already see people who appeared to be scaling the walls of the Capitol grounds, he could begin to smell pepper spray and CS gas, and could hear additional flash bangs or possibly sting balls or gas cannisters detonating.  The crowd was already massive, highly agitated, angry and inflamed by the time defendant arrived at the main body of the crowd."  Mot. at 46.  The defendant further recounted that the crowd continued to grow, and he estimated "tens of thousands of people had already surrounded the Capitol building and surrounding streets on all sides."  *Id.*

- Upon arrival at the Capitol plaza, Taylor said, "Let's go!" and "began moving quickly towards the Capitol building by ducking under a tarp and rapidly walking up some stairs."  Mot. at 47.  The defendant "joined his friend and followed him" as Taylor moved toward the Capitol building.  *Id.*

- The defendant and Taylor arrived at "what defendant would describe as a 'chokepoint' where approximately 20-30 protestors had already arrived . . . . Several of these protestors at the choke point . . . were leaning into and pushing up against 8-10 police officers."  Mot. at 47.[4]  The defendant "then witnessed

---

[3] The defendant further stated that "[t]he only plan or intention that day was to peacefully and lawfully protest a stolen election."  Mot. at 45.

[4] While describing this portion of the events, the defendant questioned whether these officers were "legitimate police officers" or "actors staged there to play this scene out."  Mot. at 48.  The

Taylor engaged in the acts described in the indictment" as Taylor joined a scrum of rioters pushing against the officers. *Id*. "Eventually the crowd below the chokepoint where defendant [Hostetter] was located broke through the police line below and moved closer to the Capitol Building." *Id*. "Protestors then made their way up to the Capitol Plaza where we stood for the next couple of hours." *Id*.

- While on the Upper West Terrace, "as the indictment stated," defendant Hostetter heard  Taylor "yell out to encourage others to enter the Capitol Building." Mot. at 50.  This occurred while the defendant and Taylor were standing "approximately 30 to 50 yards from the actual building." Mot. at 50.

- The defendant was present on the Upper West Terrace when he "noticed approximately 20-30 people standing around the main door entrance to the west side of the Capitol Building.  Several of these people were banging on the door repeatedly and making a lot of noise near the door demanding entry.  Suddenly the doors popped open and a loud cheer went up from the crowd banging on the door and many entered the building." Mot. at 50.  The defendant saw Taylor moving forward to enter the Capitol building at this point, but "defendant [Hostetter] recalls grabbing Taylor by the wrist or arm and telling him that defendant was not going any further than where they were already located on the plaza and refused to enter the building." Mot. at 51.

---

defendant further questioned whether, "[i]f legitimate officers, were they 'bad cops' working with the FBI to further this false-flag event." *Id*.

- After remaining for "a couple of hours" on the Upper West Terrace, "defendant could see that Capitol Police Officers were starting to call in reinforcements and form a larger skirmish line.  It was apparent to defendant, based on the police formation, that at some point in the near future, they would likely begin to move the crowd northward and off the Capitol Plaza."  Mot. at 53.  The defendant then noted that "Capitol Police began moving immediately and very aggressively by deploying flash bangs, sting balls and gas cannisters against a relatively peaceful crowd.  By this time, the crowd had simply been standing around the outside of the building, occasionally chanting things such as 'Stop the Steal' or singing the National Anthem."  Mot. at 53.

- "It was Russell Taylor who was organizing 'fighters' in chat rooms leading up to the event and it was Russell Taylor who was visibly, and for effect, displaying weapons, body armor, a Kevlar helmet and a gas mask, even when not necessary, for all the world to see."  Mot. at 55.

- After leaving the Capitol grounds, the defendant, Taylor, and another associate "all walked back to the Kimpton George Hotel together."  Mot. at 55.

In addition, the defendant also made several statements in his Motion (also under penalty of perjury) concerning his state of mind at the time of the charged crimes:

- "People tend to forget that the election of 2020 was actually stolen from a duly elected President whom [sic] was elected in one of the biggest landslide victories in the history of our country.  It was also stolen from We the People. . . . **Defendant will**

14

**never apologize for this or be anything but proud of his actions during the events of January 6th.**" Mot. at 50 (emphasis added).

- With regard to his social media post that, on January 6, 2021, "'The people have taken back their house . . . Hundreds of thousands of patriots showed up today to take back their government," defendant Hostetter wrote: "Defendant stands by that statement today." Mot. at 49. Despite claiming that this statement was "not made in a spirit of violence," or "insurrection," the defendant further states, "[i]t was awe inspiring to have been in that crowd of patriots and to have honorably and peacefully protested against this literal communist/globalist overthrow of the United States Government and the people of our great nation." Mot. at 49.

- With regard to the violence against numerous law enforcement officers (including the "rugby scrum" he saw clashing with Capitol police officers, causing the police line to retreat, as he described on pages 47 to 49 of his Motion), the defendant further stated, "Defendant did not personally witness any extreme act of violence being directed at law enforcement officers. If anything, law enforcement seemed to be acting much more provocatively and violently against the crowd for the purpose of provoking the crowd into violence against them rather than the other way around. The security perimeter was intentionally, and by design lacking, in order to encourage and facilitate the breach and ultimately the entire 'riotous' situation. Federal law enforcement, led by the FBI, completely owns this so-called 'riot' for that reason alone." Mot. at 49.

    ii.    **Defendant Hostetter's Claims Concerning the Search Warrant Affidavit for His Residence, Vehicles, and Person**

The defendant also contends that the search warrant affidavit used to establish probable cause to search his residence, vehicles, and person for evidence of his involvement in the riot contains a material omission that renders the affidavit false.[5]  Specifically, the defendant cites paragraph 38 of the warrant, which reads:

> On January 11, 2021, the Orange County Intelligence Assessment Center ("OCIAC") provided me several screenshots from HOSTETTER's then-publicly available Instagram account, "@amercianphoenixproject."  The display name for @americanphoenixproject is "ALAN HOSTETTER."  The profile description reads, "Founder of American Phoenix Project, Grandpa, Retired Police Chief and former Army Infantryman.  Sound Therapist/ MPA americanphoenix.org."  The profile is public and contains several pictures of HOSTETTER, which I confirmed match his California Department of Motor Vehicle photograph.  According to its website, the goal of the American Phoenix Project "is nothing less than a second American revolution."  The American Phoenix Project seeks to enact a "Convention of States" under Article V of the U.S. Constitution.  The group formed following the emergence of COVID-10 in the United States and governmental responses to the COVID-19 pandemic in 2020.

Affidavit, ¶ 38.  The defendant takes issue with this paragraph because, he asserts, it did not contain the full description of APP from its website.  According to the defendant, the affidavit left out the following three sentences: "Only this time the revolution will be a peaceful one.  Our

---

[5] Defendant specifically cites and discusses the Affidavit in his Motion at page 69, and additional materials on pages 71-73, despite the fact that they were designated "Sensitive" under the Protective Order issued by the Court in this case. ECF No. 45.  According to paragraph 4(b) and (d) of the Protective Order, materials designated as Sensitive shall not be disclosed in court filings absent agreement of the United States or with prior authorization of the Court.  Defendant did not contact the government to discuss citing this material prior to filing his Motion, and the government is not aware that this disclosure was otherwise authorized by the Court.  The Affidavit contains personal identity information and, at the time that the defendant filed his Motion, was subject to restrictions on disclosure under a sealing order in the Central District of California.  Because his Motion only discusses a portion of the Affidavit and the other materials, and because a magistrate in the Central District of California has now granted a motion by the government to unseal the Affidavit, the government does not request that the Motion be removed and redacted or re-filed under seal.  However, the government asks the Court to admonish the defendant to comply with the Protective Order and confer with the government or the Court prior to filing any discovery material designated as "Sensitive" or "Highly Sensitive."

brilliant Founding Fathers provided a mechanism for this in our existing constitution.  It is called Convention of States.  It is offered under Article V."  Mot. at 69.  Without these sentences, the defendant argues, the affidavit contains "a lie of omission" that "would make most federal judges reviewing this warrant view defendant as a potentially violent, radicalized 'domestic terrorist' itching to launch a violent revolution."  Mot. at 69.  The defendant claims this omission shows "extreme bias" that further supports dismissal of the case against him.  *Id.*

## II.    LEGAL STANDARD

### A. Fifth Amendment Due Process Standard for Outrageous Government Conduct

The Fifth Amendment guarantees due process to all criminal defendants.  U.S. Const. Amend. V.  The Supreme Court has indicated that, in extremely rare cases, the government's conduct could become "so outrageous that due process principles would absolutely bar the government from invoking judicial processes to obtain a conviction."  *United States v. Russell*, 411 U.S. 423, 431-32 (1973) (finding that federal agents' provision of a key chemical to methamphetamine manufacturing drug defendants "stops far short" of satisfying this standard).  To warrant a dismissal based upon due process grounds, the conduct of law enforcement must violate "'fundamental fairness'" and be "'shocking to the universal sense of justice.'"  *Id*. at 432 (quoting *Kinsella v. United States ex rel. Singleton*, 361 U.S. 234, 246 (1960)).  Significantly, "[p]olice overinvolvement in crime would have to reach a demonstrable level of outrageousness before it could bar conviction," and "the cases, if any, in which proof of predisposition is not dispositive will be rare."  *Hampton v. United States*, 484, 495 n.7 (1976) (Powell, J. concurring).

Law enforcement conduct will not clear this high bar absent extreme circumstances:

> The requisite level of outrageousness, the Supreme Court has indicated, is not established merely upon a showing of obnoxious behavior or even flagrant misconduct on the part of

the police; the broad "fundamental fairness" guarantee, it appears from High Court decisions, is not transgressed absent 'coercion, violence or brutality to the person.'

*United States v. Kelly*, 707 F.2d 1460, 1476 (D.C. Cir. 1983) (citing *Irvine v. California*, 347 U.S. 128, 132–33 (1954)).  When assessing alleged outrageous governmental conduct, "[t]he character and not the amount of the alleged misconduct is determinative in assessing the fundamental fairness of the investigation."  *United States v. Jenrette*, 744 F.2d 817, 824 (D.C. Cir. 1984).  That standard is not satisfied unless the law enforcement conduct "involve[d] the infliction of pain or physical or psychological coercion."  *Kelly*, 707 F.2d at 1476; *see also Jenrette*, 744 F.2d at 824 ("Because none of these claimed instances of misconduct involve the type of coercion, violence, or brutality described in *Kelly*, they do not rise to the level of a due process violation.").  Thus, where a government agent "simply provides the opportunity to commit a crime, prosecution of a defendant does not violate principles of due process."  *Kelly*, 707 F.2d at 1471 (finding elaborate FBI sting operation known as "Abscam," designed to catch corrupt politicians who took bribes from undercover agents, to be within the boundaries of due process).

Finally, just as the remedy for outrageous government conduct—dismissal— is far harsher than the remedy for entrapment—a jury instruction—the bar for establishing outrageous government conduct is far higher.[6]  *See Jenrette*, 744 F.2d at 821-22 (discussing entrapment defense); *id*. at 824-24 (discussing requirements for finding of outrageous government conduct).

---

[6] The defendant specifically notes this distinction in his Motion:

> A claim of outrageous government conduct differs from the defense of entrapment.  The issue of entrapment 'focus[es] on the intent or predisposition of the defendant to commit the crime.'  *Russell*, 411 U.S. at 429, 93 S. Ct. at 1641.  The concept of outrageous government conduct focuses on the Government's actions.  An indictment may be set aside because of outrageous government conduct whether or not the defendant was

18

### B. *Franks* Challenge to a Search Warrant Affidavit

Under *Franks v. Delaware*, a defendant who challenges the veracity of a search warrant affidavit is entitled to an evidentiary hearing if he can establish "allegations of deliberate falsehood or of reckless disregard for the truth . . . accompanied by an offer of proof." 438 U.S. 154, 171 (1978). A defendant seeking a *Franks* hearing must show that (1) the affidavit contained false statements or material omissions; (2) the statements or omissions were material to the issue of probable cause; and (3) the false statements or omissions were made knowingly and intentionally, or with reckless disregard for the truth. *United States v. Robinson*, 2021 WL 2209403 at *13 (D.D.C. May 31, 2021) (citing *United States v. Becton*, 601 F.3d 588, 594 (D.C. Cir. 2010); *United States v. Williams*, 827 F.3d 1134, 1146 (D.C. Cir. 2016)). "An omission is 'material' only if its inclusion in the affidavit would have 'defeat[ed] probable cause.'" *Robinson*, 2021 WL 2209403 at *13 (quoting *Becton*, 601 F.3d at 597); *see also United States v. Wharton*, 840 F.3d 163 (4th Cir. 2016) ("Even if relevant, information is not material unless its inclusion in the affidavit would defeat probable cause.") (internal quotation marks and citation omitted). "To mandate an evidentiary hearing,' the movant's attack on the affidavit supporting the warrant 'must be more than conclusory.'" *Robinson*, 2021 WL 2209403 at *13 (quoting *Franks v. Delaware*, 438 U.S. 154, 171 (1978)).

### III.   ARGUMENT

---

predisposed to engage in criminal activity. *United States v. Gonzalez*, 539 F.2d 1238, 1239-40 (9th Cir. 1976).

Mot. at 78. Given the defendant's apparent understanding of this distinction, the government will not separately address the potential implications of alleged entrapment.

The defendant's motion provides no basis for dismissal of the indictment, nor does it establish any grounds for a *Franks* hearing.  The motion should be denied.

### A.  The Government Did Not Violate the Defendant's Due Process Rights

The defendant's claim that he has been the target of a long-term undercover FBI operation designed to "direct defendant into criminal activity" is unfounded.  Mot. at 80.  The defendant's grandiose beliefs that a seemingly countless number of people he engaged with between March 2020 and June 2021—ranging from his "friend at the time" and co-defendant Russell Taylor, to other individuals he met and associated with through his anti-lockdown/pro-Trump activism in 2020, to local elected officials in Orange County, California, to a pair of documentary filmmakers, to name a few—were all "informants," handled either by the FBI itself or by "third party intermediaries, thereby giving the government plausible deniability" (Mot. at 2) are simply not true.  The defendant has not provided any evidence of this alleged conspiracy against him other than his own beliefs.  This omission is unsurprising because such evidence does not exist.

Regardless, even if the defendant's baseless allegations were true, they still would not meet the high standard required for dismissal.  The D.C. Circuit has made clear that it is the type of conduct—"not the amount of the alleged misconduct"—that is determinative.  *Jenrette*, 744 F.2d at 824 ("[t]he character and not the amount of the alleged misconduct is determinative in assessing the fundamental fairness of the investigation").  Unless the government's conduct included "the infliction of pain or physical or psychological coercion" there is no due process violation.  *Kelly*, 707 F.2d at 1476.  Indeed, even an elaborate, wide-ranging sting operation orchestrated by the FBI does not violate due process unless it entails such actual coercion or

physical pain.  *Jenrette*, 744 F.2d at 824 (finding FBI's Abscam sting operation did not violate due process for this reason); *Kelly*, 707 F.2d at 1476 (same).

Here, the defendant makes no allegation of any "infliction of pain or physical or psychological coercion" at any point in time, nor does he proffer any evidence of such conduct by any law enforcement agent or purported "informant" whom he encountered.  To the contrary, through his lengthy Timeline (to which the defendant averred under penalty of perjury), the defendant admitted to much of the conduct that forms the basis for the charges against him. Through the Timeline, he makes clear that he traveled to Washington, D.C. with the understanding that Congress would be in a Joint Session on January 6 to certify the 2020 election results (Mot. at 39); that on January 6, 2021, after former President Trump finished speaking at the Ellipse, the defendant walked "directly to the Capitol building" with Taylor and another associate (Mot. at 45); when he arrived at the Capitol grounds the defendant—a former police officer and Chief of Police—saw people "scaling the walls," smelled pepper spray and CS gas, "and could hear additional flash bangs or possibly sting balls or gas cannisters detonating," yet he still followed Taylor to move "generally in the direction of the Capitol Building" (Mot. at 46-47); that he watched a confrontation between Taylor and law enforcement in which "Taylor engaged in the acts described in the indictment" that resulted in the officers' retreat past a "choke point" that had been blocking the rioters' access to the Upper West Terrace (Mot. at 48); and that after the officers retreated he and Taylor took advantage of the breach and mounted the stairs to the Upper West Terrace, where they remained for a "couple of hours until Capitol Police moved us off the Plaza" (Mot. at 48, 52).  At no point does the defendant allege that he was coerced or threatened into any of this conduct.  Rather, he remains defiant for his own role in the riot:

21

"Defendant will never apologize for this or be anything but proud of his actions during the events of January 6th."  Mot. at 50.

None of this establishes government misconduct of any kind, let alone outrageous conduct that calls into question the "fundamental fairness" of this prosecution.  *See Russell*, 411 U.S. at 432.  The defendant has admitted that he stormed the Capitol on January 6, 2021, even as he saw law enforcement officers attempting to stop the rioters from advancing toward the Capitol building.  He has no remorse for his actions.  Given this context, even if the innumerable individuals he encountered between March 2020 and June 2021 were, in fact, "informants" against him, that still would not establish a due process violation requiring dismissal.[7]  The defendant's motion should be denied.[8]

_____

[7] The cases the defendant cites in favor of his motion do not support dismissal here.  In addition to being non-binding authority from the Ninth Circuit, the court held that there was no outrageous government conduct that violated due process in all but one of those cases.  *See United States v. Black*, 733 F.3d 294 (9th Cir. 2013); *United States v. Stinson,* 647 F.3d 1196 (9th Cir. 2011); *United States v. Williams*, 547 F.3d 1187 (9th Cir. 2008); *United States v. Holler*, 411 F.3d 1061 (9th Cir. 2005); *United States v. Gurolla*, 333 F.3d 944 (9th Cir. 2003); *United States v. Montoya*, 45 F.3d 1286 (9th Cir. 1995); *United States v. McClelland*, 72 F.3d 717 (9th Cir. 1995); *United States v. Restrepo,* 930 F.2d 705 (9th Cir. 1991); *United States v. Bonnano*, 852 F.2d 434 (9th Cir. 1988);  *United States v. Emmert*, 829 F.2d 805 (9th Cir. 1987); *United States v. Simpson*, 813 F.2d 1462 (9th Cir. 1987); *United States v. So*, 755 F.2d 1350 (9th Cir. 1985); *United States v. O'Connor*, 737 F.2d 814 (9th Cir. 1984); *United States v. Gonzalez*, 539 F.2d 1238 (9th Cir. 1976).  In the remaining case cited by the defendant, the court remanded the case for further factual findings by the district court, and therefore did not rule on whether a due process violation had occurred.  *United States v. Bogart*, 783 F.2d 1428 (9th Cir. 1986).

[8] The defendant also makes a cursory allegation in support of his motion that the government produced to him in discovery an attorney-client privileged email between the defendant and an attorney for his non-profit organization, APP.  The government is taking steps to determine whether there has been any accidental production of potentially privileged material to anyone other than the defendant.  To the extent any such materials have been produced, the government will ensure that they are destroyed or segregated.  However, the government has so far found no such email in the scoped materials from defendant's devices and notes that, in addition to scoped materials, defendant also received full digital images of all of his own devices, to which neither the government nor co-defendants have access.  (Indeed, several of these devices are still undergoing a privilege review by a filter team at FBI and therefore have not yet been reviewed

### B.  The Defendant Failed to Establish Any Grounds for a *Franks* Hearing

The defendant also falls far short of the necessary showing for a *Franks* hearing.  First, the allegedly omitted information identified by the defendant was not material in any way, let alone to the magistrate's probable cause determination.  The search warrant application sought authorization to search for evidence that the defendant was unlawfully present on the U.S. Capitol grounds on January 6, 2021, in violation of 18 U.S.C. § 1752, and the supporting affidavit was replete with evidence that the defendant was.  That the defendant's non-profit organization's website contained additional information about the organization's goals does not negate the facts showing probable cause for that crime.  *See Williams*, 827 F.3d at 1146 ("An omission is 'material' only if its inclusion in the affidavit would have 'defeat[ed] probable cause." (quotation marks omitted)).  This reason alone negates the need for a *Franks* hearing.

Second, the warrant affidavit was not misleading in the manner the defendant claims. The defendant asserts that the affidavit omitted facts that "provide quite a different perspective on both defendant and American Phoenix Project"—specifically, that the organization's website had explained that the revolution it seeks will be peacefully achieved through a Convention of States under the U.S. Constitution.  Mot. at 69.  However, while it is true that the affidavit did not expressly state that the organization claimed its revolution would be "peaceful," the affidavit did explain, in consecutive sentences, that APP's goal was to utilize the constitutional provision for a Convention of States:

> According to its website, the goal of the American Phoenix Project 'is nothing less than a second American revolution.' The American Phoenix Project seeks to enact a 'Convention of States' under Article V of the U.S. Constitution.

---

by the prosecution team or produced to any co-defendants.)  Regardless, even if this email was mistakenly provided in discovery to the defendant's co-defendants, that on its own does not form the basis for dismissal of the indictment.

Affidavit ¶ 38.  While the affidavit undoubtedly did not recite APP's full website, this paragraph did not provide the materially misleading account of APP's goals that the defendant alleges.

Finally, the defendant has not established that the alleged material omissions from the affidavit were made knowingly and intentionally, or with reckless disregard for the truth.  At the time of the affidavit's submission to the magistrate judge, the defendant had made multiple public statements advocating for violence against those who supported the 2020 presidential election results, and he had repeatedly championed the events of January 6 and his own role in them on social media.  Given this context, the alleged omission that APP sought a "peaceful" revolution does not establish the affidavit to be intentionally false or misleading in any material way, or that it was submitted with reckless disregard for the truth.  There is simply no basis for a *Franks* hearing here, and the motion should be denied.[9]

---

[9] For the same reasons the defendant has not established any basis for a *Franks* hearing, his allegations concerning the search warrant application also do not support dismissal of the indictment for outrageous government conduct.

24

## IV.    CONCLUSION

For the reasons given above, the defendant's motion should be denied.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
DC Bar No. 481052


By:      */s/ Risa Berkower*
RISA BERKOWER
Assistant United States Attorney
NY Bar No. 4536538
U.S. Attorney's Office
555 Fourth Street, N.W.
Washington, DC  20530
Risa.berkower@usdoj.gov
(202) 803-1576

*/s/Katherine Nielsen*
KATHERINE NIELSEN
Trial Attorney, Detailee
D.C. Bar No. 491879
U.S. Attorney's Office
555 Fourth Street, N.W.
Washington, DC  20530
Katherine.nielsen@usdoj.gov
(202) 355-5736