# GOVERNMENT EXHIBIT A

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____

United States of America,    ) Criminal Action
                                 ) No. 1:21-cr-00158-RC-1
                Plaintiff,    )
                                 )
vs.                            ) **Verdict - Bench Trial**
                                 )
Kyle Fitzsimons,            ) Washington, D.C.
                                 ) **September 27, 2022**
               Defendant.   ) Time:  10:00 a.m.

_____

**Transcript of Verdict - Bench Trial**
**Held Before**
**The Honorable Rudolph Contreras**
**United States District Judge**


**A P P E A R A N C E S**

For the Government:     **Douglas B. Brasher**
                         UNITED STATES ATTORNEY'S OFFICE
                         Northern District of Texas
                         1100 Commerce Street, Third Floor
                         Dallas, Texas 75242

                         **Michael M. Gordon** (via Zoom)
                         UNITED STATES ATTORNEY'S OFFICE
                         400 North Tampa Street, Suite 3200
                         Tampa, Florida 33602

For the Defendant:      **Natasha Taylor-Smith**
                         FEDERAL COMMUNITY DEFENDER OFFICE
                         601 Walnut Street, Suite 545 West
                         Philadelphia, Pennsylvania 19106

_____

Stenographic Official Court Reporter:
                         Nancy J. Meyer
                         Registered Diplomate Reporter
                         Certified Realtime Reporter
                         333 Constitution Avenue, Northwest
                         Washington, D.C. 20001
                         202-354-3118

1                           **I N D E X**

2                                                          PAGE:

3       **Exhibits Admitted:**

4           Government Exhibit 218........................... 8
            Government Exhibit 219........................... 8
5           Government Exhibit 220........................... 6
            Government Exhibit 221........................... 6
6           Government Exhibit 222........................... 6
            Government Exhibit 223........................... 6
7           Government Exhibit 223A.......................... 6
            Government Exhibit 224........................... 6
8           Government Exhibit 225........................... 6
            Government Exhibit 226........................... 6
9           Government Exhibit 230-3......................... 8
            Government Exhibit 230-4......................... 8
10          Government Exhibit 230-5......................... 8
            Government Exhibit 230-6......................... 6
11          Government Exhibit 230-7......................... 6
            Government Exhibit 230-8......................... 6
12          Government Exhibit 230-9......................... 6
            Government Exhibit 230-10........................ 6
13          Government Exhibit 230-11........................ 6

14

15

16

17

18

19

20

21

22

23

24

25

<u>P R O C E E D I N G S</u>

1

2       THE COURTROOM DEPUTY:  This is Criminal Action

3  21-158, United States v. Kyle Fitzsimons.  For the

4  United States, I have Doug Brasher; and Michael Gordon by Zoom.

5  For defendant, I have Natasha Taylor-Smith.  Our court reporter

6  today is Nancy Meyer.

7       All parties are present.

8       THE COURT:  Good morning, everybody.

9       MS. TAYLOR-SMITH:  Good morning, Your Honor.

10      MR. GORDON:  Good morning, Your Honor.

11      MR. BRASHER:  Good morning, Your Honor.

12      MS. TAYLOR-SMITH:  Your Honor, I apologize for my

13  tardiness.

14      THE COURT:  No problem.  No problem.  You come a long

15  way, and it's a busy day in the courthouse today.

16      Mr. Gordon, are you the one from Tampa?

17      MR. GORDON:  I am, Your Honor.

18      THE COURT:  Are you evacuating?

19      MR. GORDON:  Yes, Your Honor.

20      THE COURT:  All right.  Be safe.

21      MR. GORDON:  Thank you.

22      THE COURT:  All right.  So we're here for the

23  verdict.  There are a number of counts.  So I'm going to go

24  through them one by one.  So it's going to take a bit of time.

25  So relax.

1       So I'll start off with the open-source videos,

2   evidentiary issues that I left open at the end of the trial,

3   so -- and whether the open-source videos were properly

4   authenticated.  The defendant's reply to the government's trial

5   brief on this issue emphasizes that an authentication is a

6   prerequisite to admissibility, and that is true.  But the case

7   cited, *United States v. Khatallah*, was actually more supportive

8   of the government's position.  In that case, the D.C. Circuit

9   affirmed admission of foreign phone records based on their

10  appearance, format, and connection to the defendant.

11      The D.C. Circuit rejected the defendant's arguments that

12  the phone records had not been authenticated to the jury,

13  holding that "in deciding the telephone records' admissibility,

14  the question is not whether the government conclusively proved

15  their authenticity.  It is only whether the government's

16  showing 'permit[ted] a reasonable juror to find that the

17  evidence is what its proponent claims.'"  And that's *United

18  States v. Khatallah*, 41 F.4th, 608, 623, D.C. Circuit (2022).

19  Any difference between that articulation and the government's

20  is semantic.

21      The question here is, therefore, whether the

22  government's showing regarding the open-source videos could

23  permit a reasonable fact-finder to find that they are, in fact,

24  what the government claims.  The government has attempted to do

25  that primarily through comparison through other admitted

1    evidence such as the CCTV video and the body-worn-camera

2    footage.

3         With respect to the government's video exhibits 220,

4    221, 222, 223, 223A, 224, 225, 226, I find that the

5    government's authentication is sufficient.  These exhibits

6    include the photos and videos of Mr. Fitzsimons outside the

7    tunnel and retreating from the tunnel.  Each of those videos

8    depicts events that can also be seen on the properly

9    authenticated CCTV or body-worn-camera footage, albeit from

10   different angles or further distance, such as the crowd member

11   who shouts, "Make a hole!" and another tells Mr. Fitzsimons

12   that he is an American hero.

13        But the defendant and other individuals who are

14   identifiable on both the CCTV and body-worn-camera videos by

15   their clothing and movements appear in the open-source videos

16   as well as other objects, such as crutches, the spraying of

17   pepper spray from the tunnel, and a moving ladder that further

18   align the open-source videos with the CCTV and body-worn-camera

19   footage.

20        In addition, the defendant's pictured in the same

21   distinctive clothing that was found during the FBI search of

22   his truck and house, and that has been admitted into evidence,

23   and the defendant described himself as wearing in his later

24   accounts of that day.  In some of the videos, even the pattern

25   of blood on his butcher jacket is consistent with the stains on

1    the actual butcher jacket that has been admitted into evidence.

2    I also note that many of those open-source videos are

3    consistent with each other, in that the same voices and

4    conversation are captured on each one, where the movement and

5    distance that Mr. Fitzsimons retreats before turning around is

6    the same.

7          I, therefore, hold that the government has sufficiently

8    authenticated those exhibits and admit them into evidence.

9              (Government Exhibit 220, 221, 222, 223, 223A, 224,

10   225, and 226 admitted into evidence.)

11             THE COURT:  Similarly, I will admit the photos in

12   Government Exhibit 230-6 through 230-11.

13             (Government Exhibit 230-6 through 230-11 admitted

14   into evidence.)

15             THE COURT:  Photos 7, 8, and 9 show the scene outside

16   the tunnel that can be seen from the other direction in the

17   CCTV footage in approximately the same time frame.  The pattern

18   of blood dripping down his face in those photos exactly matches

19   Photo 6, which I will admit as well.  Photos 10 and 11 appear

20   to show Mr. Fitzsimons still with approximately the same blood

21   marks as he leaves through the crowd and also show his

22   distinctive outfit, where the bloodstains in the photo match

23   with the bloodstains on the jacket entered into evidence.

24          The bloodstains and markings on his face are also

25   consistent with Photo 12 of that series, which was also

1    admitted as Defense Exhibit 407, and to which there was no

2    objection.  If anything, these photos are so similar that they

3    border on cumulative, and I have not given any single one of

4    them significant weight.

5         The videos of Mr. Fitzsimons at the Ellipse and

6    approaching the Capitol Building are a closer call, although

7    the video of Mr. Fitzsimons at the Ellipse is at least somewhat

8    consistent with the photos found on his cell phone.  There is

9    no body-worn-camera or CCTV footage that corroborates this

10   video, and the defendant was not yet wearing his distinctive

11   clothing.  I will, therefore, exclude Exhibit 216.

12        Another video of Mr. Fitzsimons approaching the Capitol

13   from a further distance away, Government Exhibit 217, also

14   lacks sufficient authenticated evidence to corroborate it and

15   only shows him momentarily from the back.  And I will exclude

16   it for the same reasons I will exclude the still photos at

17   Government Exhibit 230-1 and 230-2.  So that was 230-1 and

18   230-2.  In accordance with this ruling, I have not considered

19   the excluded exhibits in reaching my verdict in this case.

20        The videos in Exhibits 218 and 219 of Mr. Fitzsimons

21   going up the stairs, including footage of him helping pull

22   other rioters up with him and chanting freedom, clearly show

23   his distinctive outfit, and the government suggests that this

24   moment is visible in the CCTV footage in Government Exhibit

25   201.  I'm not convinced that the CCTV footage, which is from a

1   significant distance away, shows Mr. Fitzsimons or the

2   others -- or the other people and objects around him in that

3   location with sufficient clarity to permit meaningful

4   comparison.  While the scenes in the footage appear generally

5   consistent with the West Front of the Capitol that day, there's

6   not enough detail visible in the CCTV footage to be able to

7   meaningfully compare these specific videos to it.

8        Likewise, the still photos in Government Exhibits 230-3

9   through 5 show Mr. Fitzsimons' distinctive outfit, key parts of

10  which have been admitted into evidence.  Those photos and

11  videos in Government Exhibit 218 and 219 are also consistent

12  with each other and show some of the same other individuals

13  around Mr. Fitzsimons.  I will admit this group of photos but

14  note that their probative value is minimal and I have not

15  placed a significant weight on them.

16        (Government Exhibit 230-3 through 230-5, 218, 219

17  admitted into evidence.)

18        THE COURT:  Turning now to the heart of the matter,

19  the defendant, Kyle Fitzsimons, traveled from his home in Maine

20  to Washington, D.C., to take part in the "Stop the Steal" rally

21  on January 6th, 2021.  Following the speeches at the Ellipse,

22  he joined the mob that was violently attempting to enter the

23  Capitol Building and himself attempted to violently attack the

24  officers stationed in the tunnel of the lower west terrace.

25        As a result, he is charged with 11 separate offenses:

1   civil disorder; obstruction of an official proceeding;

2   assaulting MPD Officer Sara Beaver with a dangerous or deadly

3   weapon; inflicting bodily injury on Sergeants Phuson Nguyen and

4   Aquilino Gonell; assaulting, resisting, or impeding certain

5   officers; entering and remaining in a restricted building or

6   grounds; disorderly and disruptive conduct in a restricted

7   building or grounds; engaging in physical violence in a

8   restricted building or grounds; disorderly conduct in the

9   Capitol Grounds or Buildings; and act of violence in the

10  Capitol Grounds or Buildings.

11       I'll start with the counts in numeric order.  So the

12  first count is the civil disorder count.  Count 1 charges

13  Mr. Fitzsimons with a violation of 18 U.S.C. § 231(a)(3),

14  committing or attempting to commit an act to obstruct, impede,

15  or interfere with law enforcement officers lawfully carrying

16  out their official duties incident to a civil disorder, where

17  the civil disorder obstructed, delayed, and adversely affected

18  the conduct and performance of a federally protected function.

19       In order to find the defendant guilty of this offense, I

20  must find the following three elements beyond a reasonable

21  doubt:

22       First, the defendant knowingly committed an act or

23  attempted to commit an act with the intended purpose of

24  obstructing, impeding, or interfering with one or more law

25  enforcement officers.

1          Second, at the time of the defendant's actual or

2     attempted act, the law enforcement officer -- officers were

3     engaged in the lawful performance of their official duties

4     incident to and during a civil disorder.

5          Third, the civil disorder in any way or degree

6     obstructed, delayed, or adversely affected either commerce or

7     the movement of any article or commodity in commerce or the

8     conduct or performance of any federally protected function.

9          I find beyond a reasonable doubt that Mr. Fitzsimons

10    knowingly committed an act with the intended purpose of

11    obstructing, impeding, and interfering with one or more law

12    enforcement officers.  To give just two examples, he attempted

13    multiple times to grab at Sergeant Nguyen in what can only be

14    described as an attempt to obstruct and interfere with

15    Sergeant Nguyen's duties.

16         Mr. Fitzsimons' final charge into the tunnel in which he

17    flailed his arms and hit multiple officers can also be

18    described as an act of interference.  Both of these acts were

19    committed knowingly, meaning that Mr. Fitzsimons realized what

20    he was doing and was aware of the nature of his conduct.  In

21    both those instances, Mr. Fitzsimons could have retreated but

22    instead attempted to escalate the violence in the tunnel.

23         Nor is there any plausible argument for those two acts

24    that he was acting out of ignorance, mistake, or accident.  The

25    videos show him looking towards Sergeant Gonell and reaching in

1    his direction in a calculated manner.  The video also shows

2    Mr. Fitzsimons pause for a matter of seconds, look forward, and

3    brace himself before charging into the line of officers.  That

4    is not the body language of someone taking those actions

5    accidentally.  After those acts, he also encouraged others to

6    get in there, demonstrating his clear knowledge and

7    understanding of exactly what actions he had just taken.

8         The first element also requires a finding of the

9    defendant's specific intent to obstruct, impede, or interfere

10   with the law enforcement officers.  This, too, has been

11   satisfied beyond a reasonable doubt.  His intent in these two

12   respects is, again, apparent from his actions on the video.

13        When -- excuse me.  When reaching for Sergeant Nguyen,

14   he leaned in and calculated where he was reaching, and did so

15   multiple times over the course of that interaction.  And when

16   he ran into the tunnel, he was waving his arm in an apparent

17   attempt to increase the amount of physical contact he made with

18   them.  If his goal was simply to get into the building,

19   charging the line of officers would have been a highly

20   illogical choice.  After all, the tunnel was defended by seven

21   deep rows of officers.  All this leads to the conclusion that

22   Fitzsimons had the specific intent to interfere with and impede

23   the officers themselves.

24        As for the second element, the officers that

25   Mr. Fitzsimons interfered with were engaged in the lawful

1  performance of their official duties incident to and during a

2  civil disorder.  As all three law enforcement officers

3  testified, they had responded to the scene at the lower

4  west terrace as a result of the public disturbance, and the

5  parties' stipulation confirms that those officers were engaged

6  in their official duties.

7       The parties' Stipulation No. 3 also covers the

8  requirement that the evidence of January 6th, 2021, were a

9  civil disorder; which is defined as any public disturbance

10  involving acts of violence by groups of three or more persons

11  which causes an immediate danger or injury to another

12  individual, causes an immediate danger of damage to another

13  individual's property, results in injury to another individual,

14  or results in damage to another individual's property.  Even if

15  the parties had not so stipulated, the mountain of video and

16  photographic evidence showing the violent acts of hundreds of

17  rioters that day and in that specific location, including

18  scaling walls, throwing objects, breaking windows, and forcing

19  through doors, would leave no doubt in this particular element.

20       Turning to the final element, the defense moved under

21  Federal Rule of Criminal Procedure 29 for a judgment of

22  acquittal on Count 1, claiming that the government failed to

23  introduce evidence of any causal nexus between the defendant's

24  prohibited act and the purported impact on interstate commerce

25  and because 231(a)(3) exceeds Congress's power under the

1    Commerce Clause.

2         As to the first point, the government did enter evidence

3    that the Capitol riot impacted commerce by necessitating a

4    curfew in D.C. and the closure of Safeway stores throughout the

5    District.

6         And as to the second, the government correctly notes

7    that Rule 29 motions are not the proper vehicle for raising

8    legal arguments, such as the constitutionality of a statute.

9    See *United States v. Naegele*, 537 F. Supp. 2d 36, *40,

10   (D.D.C. 2008).

11        Fortunately, I need not wade into either argument

12   because there are two prongs to section 231(a)(3):  the

13   interstate commerce prong and the federally protected function

14   prong.  The full statutory text of 18 U.S.C. 231(a)(3) reads,

15   "Whoever commits or attempts to commit any act to obstruct,

16   impede, or interfere with any fireman or law enforcement

17   officer lawfully engaged in the lawful performance of his

18   official duties incident to and during the commission of a

19   civil disorder which in any way or degree obstructs, delays, or

20   adversely affects commerce or the movement of any article or

21   commodity in commerce *or* the conduct *or* performance of any

22   federally protected function shall be fined under this title or

23   imprisoned not more than five years, or both."

24        The plain text of the statute uses the -- the

25   disjunctive "or" throughout.  Other courts in this district

1    that have recently addressed challenges to section 231(a)(3)

2    have suggested that either prong is sufficient to sustain a

3    conviction.

4         Those examples are *United States v. Grider*, Criminal

5    No. 21-22 in front of Judge Kollar-Kotelly, which held that

6    section 231(a)(3) does not exceed Congress's authority under

7    the Commerce Clause and, therefore, did not address a separate

8    challenge to the federally protected function progress; *United*

9    *States v. Mostofsky*, Criminal No. 21-138, in front of

10   Judge Boasberg, which found that section 231(a) was permissible

11   under the Commerce Clause and suggested that the federally

12   protected function prong could be an alternate route to

13   conviction; and *United States v. Sargent*, 21-258, in front of

14   Judge Hogan, which stated that the government did not need to

15   specify whether the defendant obstructed, delayed, or adversely

16   affected a federally protected function or an article and

17   commodity in commerce.

18        What's more, the second superseding indictment does not

19   charge Mr. Fitzsimons under the commerce prong at all, only the

20   federally protected function prong.  As a result,

21   Mr. Fitzsimons' commerce-related challenges to Count 1 are

22   entirely beside the point, and his Rule 29 motion will be

23   denied by separate order.

24        I find beyond a reasonable doubt that the civil disorder

25   in which Mr. Fitzsimons took part impacted a federally

1    protected function, which means any function, operation, or

2    action carried out under the laws of the United States by any

3    department, agency, or instrumentality of the United States or

4    by an officer or employee thereof.

5        The term department includes executive departments, one

6    of which is the Secret Service.  As other courts in this

7    district have concluded, and I agree, the Secret Service's

8    statutorily prescribed responsibility to protect the

9    Vice President during the joint session of Congress on

10   January 6th, 2021, counts as a function carried out under the

11   laws of the United States.  See *United States v. Nordean*,

12   Criminal No. 21-175 in front of Judge Kelly.

13       The testimony of Special Agent Paul Wade of the

14   Secret Service makes clear that the civil disorder interfered

15   with the Secret Service's function of protecting Vice President

16   Pence on that day.  The Vice President was evacuated to a

17   secure location and was forced to remain there rather than

18   being able to evacuate the building because of the rioters,

19   including Mr. Fitzsimons, who had breached the perimeter and

20   the building.

21       Special Agent Wade credibly testified that the

22   Vice President's safety was jeopardized as soon as the

23   perimeter was breached and that they could not have moved him

24   until the grounds were clear.  Mr. Fitzsimons may have only

25   played a small part in the civil disorder that day, but he was

1    an active participant --

2              THE COURT REPORTER:  Excuse me, Judge.  Can we go off

3    the record.

4              (Off the record.)

5              THE COURT:  So I will go over the last sentence I was

6    in the middle of.

7              Mr. Fitzsimons may have only played a small part in the

8    civil disorder that day, but he was an active participant whose

9    presence and violent interference with law enforcement officers

10   escalated the circumstances and prolonged the interference with

11   the Secret Service's ability to protect the Vice President.

12             Accordingly, I find Mr. Fitzsimons guilty beyond a

13   reasonable doubt as charged in Count 1, civil disorder.

14             Count 2 is obstruction of an official proceeding and

15   aiding and abetting.

16             Count 2 charges Mr. Fitzsimons with corruptly

17   obstructing or attempting to obstruct an official proceeding in

18   violation of 18 U.S.C. § 1512(c)(2), or aiding and abetting

19   others to commit that offense.

20             In order to find the defendant guilty of corruptly

21   obstructing an official proceeding, I must find that the

22   government proved each of the following four elements beyond a

23   reasonable doubt:

24             First, the defendant attempted to or did obstruct or

25   impede an official proceeding.

1    Second, the defendant intended to obstruct or impede the

2    official proceeding.

3    Third, the defendant acted knowingly, with awareness

4    that the natural and probable effect of his conduct would be to

5    obstruct or impede the official proceeding.

6    And fourth, the defendant acted corruptly.

7    The defense moved for a judgment of acquittal on Count 2

8    on the basis that the first element could not be satisfied

9    because the term official proceeding only extends to

10   tribunal-like proceedings related to the administration of

11   justice.  Relatedly, the defense argues in that motion that

12   there was no evidence of conduct that otherwise obstructs,

13   influences, or impedes an official proceeding because such

14   conduct must relate to some kind of evidence.

15   Not only are these both legal arguments, I have already

16   considered and rejected them both.  As I explained in my

17   opinion on Mr. Fitzsimons' pretrial motion challenging this

18   particular charge in the indictment, section 1512(c)(2) is

19   unambiguous and certainly not as limited as he contends.  The

20   certification of the Electoral College vote was a formal

21   convocation at which Congress convened to conduct its official

22   business and, therefore, an official proceeding.

23   And the use of the term otherwise at the beginning of

24   section 1512(c)(2) signals a prohibition of conduct that is

25   different in another way or manner from the conduct prohibited

1    in 1512(c)(1) rather than being limited by it.  A more

2    exhaustive discussion can be found in my prior opinion, and I

3    will deny the motion for judgment of acquittal on Count 2 by

4    separate order.

5         I will note that that -- those issues are before the

6    circuit in a government's appeal of Judge Nichols' rulings on

7    some of those issues.  So perhaps we will have an answer by the

8    time we get to sentencing.

9         I conclude beyond a reasonable doubt that Mr. Fitzsimons

10   attempted to and did obstruct an official proceeding before

11   Congress; the certification of the Electoral College vote.  As

12   Stipulation 2 establishes, the certification had commenced

13   earlier that afternoon and had to be suspended shortly after

14   2:00 p.m.  As that stipulation and the testimony of

15   Special Agent Wade established, Congress could not resume its

16   official business for several hours, until after 8:00 p.m. that

17   evening.  The certification of the electoral vote was,

18   therefore, obstructed and impeded in the most literal sense of

19   those terms.  It was prevented from going forward.

20        Mr. Fitzsimons was only one of many, but his actions

21   directly contributed to the inability of Congress to conduct

22   the official proceeding as scheduled on that day.  There's also

23   no doubt that Mr. Fitzsimons understood the certification to be

24   happening in Congress that day.  That was the entire point of

25   the trip to D.C., and he had announced in advance that he was

1   traveling to D.C. because he knew the certification would be

2   taking place on that day in both of the voice mails he left for

3   Representative Golden and the Facebook posts asking if anyone

4   wanted to form a caravan to D.C.

5          That evidence is also relevant to the second element;

6   whether Mr. Fitzsimons had the specific intent to obstruct or

7   impede the certification of the Electoral College vote.  I find

8   beyond a reasonable doubt that he did.  In his Facebook post,

9   Mr. Fitzsimons asked if anyone would be interested in

10  organizing a caravan to Washington, D.C., for the Electoral

11  College vote count on January 6th, 2021, and ended the posting

12  by asking, "If a call went out for able bodies, would there be

13  an answer?"  That's Government Exhibit 612.

14         In his first call to Representative Golden, he stated, I

15  will be in D.C. on the 6th.  I don't think that I'll see you

16  there, but maybe I will.  Maybe I will.  That's Government

17  Exhibit 611.

18         In the post and both voice mails, he also directly

19  linked his desire to be in D.C. on the 6th with not just the

20  certification, but the certification of what he believed was

21  the result of a fraudulent election.  The defense points out

22  the protests and what he believed to be a fraudulent election

23  is perfectly legal, and that is true.  But it's clearly from

24  those statements and others that he considered this more than

25  political expression.  He considered it something of an

1    existential crisis.

2         Even if Mr. Fitzsimons did not travel to D.C. with the

3    explicitly developed intent to engage in directly

4    obstructionary or violent conduct, those statements show that

5    he at least entertained the possibility that it might be, and

6    in his view, quote, necessary to do so.  His statements after

7    the fact further corroborate this.  When describing his goals

8    after the fact, he described it as the last day of the republic

9    to both the local newspaper and the town board.  Those are

10   Government Exhibits 616 and 250.

11        After the fact, Mr. Fitzsimons expressly linked the

12   events of that day when not just protesting the certification

13   but delaying it.  He told the local newspaper that the speeches

14   from the morning were overtly preaching that there was a plan

15   to delay the certification by the House and Senate and then

16   state legislators would convene and certify the right result.

17   Government's Exhibit 616.

18        He told the town board, as recorded in Government

19   Exhibit 250, that in those same speeches, we were given all the

20   lowdown of how they were going to fight through Lawfare, part

21   of which involved asking for a few more days to allow the

22   legislators from the swing states to decertify their electors

23   and send new ones.

24        These statements show that Mr. Fitzsimons understood

25   the official proceeding that was supposed to take place in

1   Congress and how obstructing or impeding that proceeding was

2   central to what he subjectively believed was the future of the

3   republic.

4        In the alternative, I find that the evidence is

5   sufficient in these respects that show that Mr. Fitzsimons

6   aided and abetted the obstruction of an official proceeding.

7   He was physically present in one of the most violent areas of

8   fighting.  And, in fact, we returned to the tunnel entrance a

9   second time after being pepper sprayed and starting to retreat.

10  He was aware of the unlawful tactics of the crowd, having had a

11  front row view of the crowd throwing things, spraying officers,

12  climbing the walls, and engaging in hand-to-hand combat.  He

13  took affirmative steps toward engaging in this behavior

14  himself, attacking the officers and preventing them from

15  pushing back the crowd.

16       Even after leaving the tunnel, Mr. Fitzsimons encouraged

17  others to get in there; and told them his full name, showing

18  that he knowingly associated himself with the commission of the

19  crime, participated in support of its commission, and

20  encouraged others to continue the crime thereafter.

21       It is clear beyond a reasonable doubt that

22  Mr. Fitzsimons personally acted knowingly, with awareness that

23  the natural and probable effect of his conduct would be to

24  obstruct or impede the official proceeding.  He was aware of

25  the violent scene and understood that the Capitol was closed to

1   the public.  In that context, natural and probable cause of

2   violently engaging with the officers was obvious to further

3   besiege the building and prevent the certification from going

4   forward.

5        To take just his final charge at the officers as an

6   example, Mr. Fitzsimons could have retreated prior to that act

7   when he was already well aware of the situation in the tunnel,

8   Government Exhibit 204 at 4:12:36.  He, instead, paused and

9   then doubled down.  The video is unambiguous.  Mr. Fitzsimons

10  did not charge at the officers ignorantly or by mistake.  He

11  did it knowingly and, as described above, with the knowledge

12  that his acts would obstruct or impede the certification and,

13  in fact, the specific intent to do so.

14       Finally, I find beyond a reasonable doubt that

15  Mr. Fitzsimons acted corruptly.  Corruptly means that the

16  defendant used an unlawful means or had a wrongful or unlawful

17  purpose or both.  Physically attacking law enforcement officers

18  engaged in their official duties in an attempt to gain entrance

19  to an area that is off-limits to the public is certainly

20  unlawful.  And "[u]nusual or illegal conduct is a useful, if

21  not necessary, indicator of improper purpose," *United States v.*

22  *Andries*, Criminal No. 21-93.

23       Mr. Fitzsimons also acted with consciousness of

24  wrongdoing, meaning that he understood his actions to be

25  unlawful.  Mr. Fitzsimons knew the dividing line between

1    peaceful protest and unlawful violence.  His statements after

2    the fact, in which he emphasized his peaceful intent and cast

3    himself as an unwitting victim, are sharply at odds with the

4    video evidence of his actions that day and provide further

5    circumstantial evidence that he knew he had crossed that line.

6          It makes no difference whether Mr. Fitzsimons believed

7    his unlawful actions were justified, as long as he understood

8    that they were unlawful, which I find that he did.

9    Mr. Fitzsimons' fervent belief in the lies he was being told

10   about the election is truly saddening, and to be sure, much of

11   the blame for the events of that day rest with the people in

12   positions of power who spread those lies.  Nevertheless, that

13   does not absolve Mr. Fitzsimons of knowingly and intentionally

14   breaking the law to act on his convictions.

15         I, accordingly, find Mr. Fitzsimons guilty as charged in

16   Count 2.

17         Counts 3 through 6 involve assault, resisting, or

18   impeding certain officers.  Counts 3 through 6 charge the

19   defendant with forcibly assaulting, resisting, opposing,

20   impeding, intimidating, or interfering with the federal officer

21   while the officer is engaged in the performance of his or her

22   official duties in violation of 18 U.S.C. § 111(a)(1) and (b).

23         Count 3 relates to Officer Sarah Beaver of the

24   Metropolitan Police Department.

25         Count 4 relates to Sergeant Phuson Nguyen of the

1    Metropolitan Police Department.

2            Count 5 relates to Sergeant Aquilino Gonell of the

3    United States Capitol Police.

4            And Count 6 relates generally to officers from the

5    United States Capitol Police and Metropolitan Police

6    Department.

7            The elements of the offense are:

8            First, the defendant assaulted, resisted, opposed,

9    impeded, intimidated, or interfered with the officer or

10   officers described in the indictment.

11           Second, the defendant did such act forcibly.

12           Third, the defendant did such act intentionally.

13           Fourth, the person assaulted, resisted, opposed,

14   impeded, intimidated, or interfered with, was an officer or an

15   employee of the United States who was then engaged in the

16   performance of his official duties or any person assisting such

17   an officer or employee in the performance of that officer's

18   duties.

19           Fifth, the defendant made physical contact with the

20   federal officer or acted with the intent to commit another

21   felony.

22           As established by their testimony, Officer Beaver,

23   Sergeant Nguyen, and Sergeant Gonell were law enforcement

24   officers with the MPD or Capitol Police who responded to the

25   lower west terrace as part of their duties that day, as were

1    the other officers present in the tunnel.  As established by

2    their testimony and Stipulation No. 6 of the parties, MPD

3    officers were assisting the Capitol Police officers with their

4    official duties as officers or employees of the United States

5    on January 6th, 2021.  It was a part of the official duty of

6    those officers to protect the U.S. Capitol complex on

7    January 6th, 2021, and to detain individuals who lacked

8    authorization to enter the restricted area around the complex.

9         Accordingly, the fourth element of the violation is

10   satisfied beyond a reasonable doubt for Counts 3 through 6.

11   And I will focus on the remaining elements with respect to each

12   count in turn.

13        Count 3 is the one that covers Officer Sarah Beaver, who

14   is a member of the MPD, who responded to the Capitol on

15   January 6th, 2021.  As her credible testimony established, she

16   responded to the west terrace and was present alongside other

17   officers of the MPD and Capitol in the tunnel when

18   Mr. Fitzsimons first reached that area.

19        As can be seen in Government Exhibits 204, 206, and

20   206B, which is the slow-motion version, at about 4:09:16 p.m.,

21   a long wooden object is thrown into the tunnel and bounces off

22   something before hitting her helmet.  In Government

23   Exhibit 240, the CCTV footage, you can clearly see

24   Mr. Fitzsimons' distinctive white sleeve with a black jacket

25   underneath throwing the bow and see his face momentarily as he

1    throws it as well.

2         The same moment of the bow making impact is visible from

3    different angles in Government Exhibits 205 and 206 as well.

4    The long wooden object, which is captured on body-worn camera

5    as it passed -- as it is passed back through the video, is

6    consistent with Fitzsimons' own description of it as an

7    unstrung bow; Government Exhibit 207 and 207A.  I, therefore,

8    find beyond a reasonable doubt that the wooden object was the

9    unstrung bow that Fitzsimons described bringing to the Capitol

10   and that Mr. Fitzsimons was the one who threw it.

11        But Mr. Fitzsimons does not actually contest that he

12   threw the bow.  Instead, he presented a defense of another

13   defense for that action.  The other person in question was

14   referred to during trial as the woman in red, a female rioter

15   who had advanced several rows of officers into the tunnel.  The

16   video footage shows, and Officer Beaver acknowledged during her

17   testimony, that another officer to her right, identified as

18   Lieutenant Bagshaw, struck or attempted to strike the woman

19   with his baton and later his fists.

20        Also in the body-worn camera you can hear a woman say,

21   quote, I don't -- I didn't even touch you at 4:07:23, and a man

22   shout, quote, please help, end quote, at 4:07:55, Defense

23   Exhibit 102.

24        Mr. Fitzsimons does not reach the mouth of the tunnel

25   until -- until somewhere between 1 or 2 minutes later, at

1    4:00:02, Government Exhibit 204.  At 4:09:07, Officer Bagshaw

2    lifts his hand and begins to strike the woman in red with a

3    closed fist, and another man can be heard shouting, quote,

4    please don't beat her, end quote, as was compiled on

5    Defendant's Exhibit 102.  As can also be seen on that

6    compilation video, Fitzsimons raises the bow just after

7    Lieutenant Bagshaw begins striking the woman but before or

8    perhaps simultaneously with the pleading of the unidentified

9    male voice in the video.

10        Every person has the right to use a reasonable amount of

11   force in defense of another person if, one, he actually

12   believes that the other person is in imminent danger of bodily

13   harm and if, two, he has reasonable grounds for that belief.

14   Both sides agree on that standard but disagree on whether the

15   evidence shows that Mr. Fitzsimons was acting in defense of the

16   woman in red.

17        The government argues that this defense fails at the

18   outset because there is no evidence to suggest that

19   Mr. Fitzsimons actually believed the women in red to be in

20   imminent danger or, indeed, that he was even aware of her.

21        There's evidence on both sides.  The government points

22   out that Fitzsimons did not witness the first part of

23   Lieutenant Bagshaw's actions when he hit the woman in red with

24   a baton because he had not yet arrived at the mouth of the

25   tunnel and it would have been impossible to see up the steps

1    and over the officers to what was happening before then.

2    Fitzsimons might well have heard the man's cry of, quote,

3    please help, close quote, although it is highly doubtful that

4    Mr. Fitzsimons would have been able to glean any meaningful

5    context from that.

6         As the government also points out, even after reaching

7    the mouth of the tunnel, Mr. Fitzsimons' view was obscured by

8    multiple police shields which appeared dirty and scuffed, as

9    well as several lines of officers between him and the woman in

10   red.  He is also only there for a few seconds before almost

11   immediately raising his bow to take aim.  I seriously doubt

12   that he could see enough to draw a conclusion about whether the

13   woman in red was in imminent danger in that time.

14        At most, the circumstantial evidence might suggest that

15   Fitzsimons leaped to a conclusion that someone was in danger

16   based on the shouts, but even assuming that -- that only gets

17   Fitzsimons so far.  The standard also requires that the

18   defendant have reasonable grounds for that belief.  There was

19   simply not enough time or visibility between Mr. Fitzsimons'

20   arrival and when he began to throw the bow for him to have had

21   reasonable grounds to believe that the specific woman in red

22   was in imminent danger of bodily harm.

23        Even the defense's formulation requires, quote,

24   reasonable fear that a real and specific threat existed at the

25   time, close quote.  There is not any evidence, whether from the

1    video or any other after-the-fact statements, that there was

2    anything reasonable about Mr. Fitzsimons' fear, assuming

3    without deciding that he had one at all.  As other courts have

4    pointed out, "[a] third party is usually in an even worse

5    position than the arrestee to make an adequate assessment of

6    the initial legality of an arrest."  That's *Glover v. State*,

7    88 Md. App. 393, *408 (1991).  And that certainly was the case

8    here.  I, therefore, reject Mr. Fitzsimons' affirmative

9    defense.

10        The throwing of the bow, as Officer Beaver credibly

11   testified, impeded her ability to defend the Capitol.  Throwing

12   a bow also opposed and interfered with Officer Beaver within

13   the ordinary meaning of those words.  I also find that the

14   throwing of the bow was an assault because it was an attempt or

15   threat to inflict injury, coupled with the present ability to

16   do so.  There's no real doubt that Mr. Fitzsimons as he threw

17   the bow had the present ability to inflict injury, although the

18   defense claims that it was only meant to counter

19   Lieutenant Bagshaw's force, it at minimum threatened to inflict

20   injury.

21        There's also no reasonable doubt that the act of

22   throwing the bow was an act that used force against

23   Officer Beaver and, thus, that Mr. Fitzsimons acted forcibly.

24   I also have no difficulty concluding that Mr. Fitzsimons' bow

25   made physical contact with the victim, Officer Beaver, as

1   described by her testimony and visible in the videos.

2        Next, I determined that Mr. Fitzsimons threw the bow

3   intentionally, as the video shows he threw the bow with full

4   control and, in fact, took several seconds to aim it.  It is

5   not clear that he intended to assault, oppose, or interfere

6   with Officer Beaver specifically, since, in fact, the bow

7   appears to have bounced off something or someone else before

8   hitting her.  It is, nonetheless, clear that he intended to

9   assault someone in the line of officers, since it was virtually

10  a certain result that by throwing the bow as a spear into the

11  line of officers he would hit one of them.

12       Thus, Mr. Fitzsimons had the clear intent to assault,

13  oppose, impede, and interfere with the federal officers in her

14  vicinity, since he aimed and threw the bow into directly where

15  the officers were defending the tunnel.

16       Finally, I must consider for Count 3 whether the bow was

17  a dangerous or deadly weapon.  I find that it was.  A deadly or

18  dangerous weapon means any object which as used or attempted to

19  be used may endanger the life of or inflict great bodily harm

20  on a person.  The unstrung bow which was, in essence, a long

21  piece of curved wood with slightly more pointed ends and a grip

22  in the middle was capable of inflicting great bodily harm.

23       When thrown as a spear, it has the obvious potential to

24  harm someone.  Further, both the video of the bow being thrown

25  and then being passed back show that it was fairly large, and

1    the earlier photos and videos of Mr. Fitzsimons with the bow

2    show that it was almost as tall as he was.  It was heavy enough

3    that Officer Beaver could feel the impact and involuntarily

4    moved her head to the side as a result of the impact even

5    though her heavy bulletproof helmet was on.

6         I tried on the helmet myself and found it highly

7    protective, such that a minor impact or a light object would

8    not have had that result.  I, therefore, conclude that the bow

9    was a dangerous or deadly weapon.

10        Accordingly, I find Mr. Fitzsimons guilty beyond a

11   reasonable doubt of assaulting Officer Beaver with a dangerous

12   or deadly weapon as charged in Count 3.

13        Count 4 is the charge involving Sergeant Nguyen.  After

14   committing that assault on Officer Beaver with the bow, the

15   video shows that an officer sprays pepper spray into the crowd

16   where Mr. Fitzsimons is standing; Government Exhibit 205 at

17   16:09:30; Government Exhibit 223; Government Exhibit 220 at

18   about 9:15.

19        Fitzsimons then retreats from the tunnel, walking

20   several steps down and grimacing, as shown in Government's

21   Exhibit 224 and 220.  He, nevertheless, turns around and walks

22   back about a minute later.  This time, Fitzsimons approaches

23   the other side of the tunnel and can be seen again in the

24   tunnel CCTV footage in Government Exhibit 204 at approximately

25   4:10:50.  At about 4:10:57, the footage shows his face and

1   outfit clearly.

2        It is at that point that the acts relevant to Count 4

3   begin, which charges Mr. Fitzsimons with the same violation of

4   18 U.S.C. § 111, with respect to Sergeant Phuson Nguyen.

5   Sergeant Nguyen is a member of the MPD who responded to the

6   west terrace on January 6th, 2021.  As he testified, he was

7   part of the line of officers defending the tunnel at the

8   relevant time.  At that point in the day, he was wearing a gas

9   mask which secures around the back of the head with adjustable

10  straps and has a filter that protrudes several inches from the

11  face downwards and to the left.

12       Sergeant Nguyen testified that he was at the front of

13  the line.  A man in a light jacket grabbed his mask and pulled

14  it while the other protester sprayed a substance like pepper

15  spray or bear spray and then let go, allowing the mask to snap

16  back into place and trap the gas there in an incredibly painful

17  experience.  Sergeant Nguyen testified that at that point he

18  fell down and momentarily thought he would die.  That's Nguyen

19  transcript at 16 -- pages 16 and 17.

20       Government Exhibit 205B shows in slow motion that

21  Fitzsimons is reaching towards Sergeant Nguyen and grabbing at

22  him.  Fitzsimons reaches out to grab Sergeant Nguyen.  Defense

23  Exhibit 214 shows this in a frame-by-frame slow motion.  At one

24  point, Fitzsimons appears to make contact with

25  Sergeant Nguyen's hand; Defense Exhibit 212, at 16:11:07, and

1   Defense Exhibit 214.  Sergeant Nguyen also testified that he

2   could tell Mr. Fitzsimons made contact with his hand; Nguyen

3   transcript at 47, line 4.

4        Within a few seconds, another rioter can be seen behind

5   Mr. Fitzsimons spraying what is pepper spray, bear spray, or

6   something similar, at the officers right over Mr. Fitzsimons'

7   head.  The spray appears to affect Mr. Fitzsimons as well, and

8   he leans against the wall at the opening of the tunnel and

9   lowers his head.  None of the videos clearly show contact being

10  made with the gas mask.

11       Sergeant Nguyen agreed that the footage and the still

12  photos did not show any contact being made, Defense

13  Exhibit 207, 208, 209, 210, and 211A.  Indeed, the moment this

14  could have occurred is incredibly brief because Mr. Fitzsimons

15  takes cover almost immediately after the spray stops and is no

16  longer grabbing.

17       On cross-examination, the defense suggested a different

18  narrative.  When Sergeant Nguyen first spoke to the FBI, he

19  stated that a man in a light gray jacket was responsible for

20  pulling his gas mask.  Although the document in question,

21  Defense Exhibit 8, was not formally admitted or adopted as

22  Sergeant Nguyen's statement, later in his testimony,

23  Sergeant Nguyen did adopt that particular statement, agreeing

24  that he had said the rioter in question was wearing a gray

25  jacket.  That's in Nguyen transcript at 50.

1    Slightly before in the video footage, a man in a bluish

2    gray jacket with a camo hat also reaches toward Sergeant Nguyen

3    and appears to make contact with his gas mask, after which

4    Sergeant Nguyen reaches toward his gas mask to possibly adjust

5    it; Defense Exhibit 206 at 16:10:30 through 41.

6    Based on all of this, I will now turn to the elements of

7    the offense.

8    I find that Mr. Fitzsimons assaulted, opposed, impeded,

9    intimidated, or interfered with Sergeant Nguyen.  His actions

10    show a purposeful intent to swipe at and intimidate

11    Sergeant Nguyen and were calculated to try and make contact.

12    Given the context and the calculated aim with which

13    Mr. Fitzsimons was reaching, I conclude that he acted with the

14    intent to cause bodily injury and, indeed, the specific intent

15    to oppose, assault, intimidate, and impede Sergeant Nguyen.

16    Again, there's no doubt that reaching out to strike at

17    someone is a forcible act, and I find that, at minimum,

18    Fitzsimons made physical contact with Sergeant Nguyen's hand

19    during that altercation as the video suggests and Sergeant

20    Nguyen credibly testified.

21    That is not enough to find -- that is -- I'm sorry.

22    That is enough to find Fitzsimons guilty of a violation of

23    section 111(a) but does -- that does not entirely end my

24    inquiry because the government seeks the enhancement of having

25    caused bodily injury.  There's no doubt that Sergeant Nguyen

1    suffered a terrible injury.  He credibly testified that the gas

2    trapped in his mask was so suffocating that he believed he was

3    about to die in that moment and that the pain and burning

4    lasted for days and weeks thereafter.

5         However, I cannot find beyond a reasonable doubt that

6    Mr. Fitzsimons was the -- was the one responsible for that

7    injury.  The other protester who does appear to make contact

8    and cause Sergeant Nguyen to adjust his gas mask may have been

9    the culprit as well or perhaps been responsible for moving his

10   mask out of place so that it was not properly sealed when the

11   other rioter sprayed him.  It is unclear Fitzsimons ever made

12   contact with the gas mask, and there are some inconsistencies

13   about the color of the jacket and whether the mask was pushed

14   or pulled and snapped back.

15        I tried the gas mask on as well and confirmed that the

16   seal breaks relatively easily when pulled outwards, but that it

17   is very difficult to do so when swiping at it from the

18   direction that Mr. Fitzsimons was swiping.

19        This is not to say that Sergeant Nguyen was incredible.

20   Much to the contrary, I find him to be forthright and willing

21   to admit uncertainty.  But the events in the tunnel were

22   chaotic, to say the least, and it is possible that he may have

23   confused the order or timing of events.  I sincerely regret

24   what Sergeant Nguyen went through that day, and I credit him

25   for his brave service.

1        However, I do have a reasonable doubt as to whether

2   Mr. Fitzsimons' assault caused him bodily injury, and I will,

3   therefore, find Mr. Fitzsimons guilty only of assaulting

4   Sergeant Nguyen and making physical contact, but not causing

5   bodily injury.

6        Count 5 is the one involving Sergeant Gonell.  Count 5

7   charges Mr. Fitzsimons with another violation of section 111,

8   this time with respect to Sergeant Aquilino Gonell.

9   Sergeant Gonell is a member of the U.S. Capitol Police who

10  responded to the tunnel as part of his official duties that

11  day.  He is easily identifiable in the videos by his round

12  shield, since he was the only officer in the tunnel at that

13  time using that type of shield.  Sergeant Nguyen was positioned

14  on the left-hand -- on the left-hand side of the tunnel facing

15  outward, quite near Sergeant Nguyen.

16       The actions at issue in this count occur shortly after

17  the other rioters spray toward Sergeant Nguyen, and

18  Mr. Fitzsimons is taking cover by leaning against the wall.

19  After the spraying stops, you can see in Government

20  Exhibit 204, the CCTV footage, that Mr. Fitzsimons stands

21  upright at 4:11:25 and that Sergeant Gonell's shield is

22  directly in front of him.

23       Also in that footage, you can see Sergeant Gonell fall

24  2 seconds later, at 4:11:27, while Mr. Fitzsimons is standing

25  but supporting himself on the wall.  At that point,

1    Mr. Fitzsimons looks over his shoulder out into the crowd and

2    then back towards Sergeant Gonell on the ground.  At 4:11:28,

3    Mr. Fitzsimons pushes off the wall and leans over to grab

4    Sergeant Gonell.  Mr. Fitzsimons is bent over but standing for

5    several seconds and appears to be pulling outwards before other

6    rioters and officers pile on top of them, and Mr. Fitzsimons

7    goes under the pile of people at 4:11:35.

8         In the slow-motion footage at Government Exhibit 211B,

9    Mr. Fitzsimons' hand, identifiable by the black sleeve

10   underneath the white jacket, is visible holding on to

11   Sergeant Gonell's shoulder strap even from under the pile of

12   people.  It's Government Exhibit 211B at 16:11:42 through 50.

13   That footage also shows Sergeant Gonell turning to call for

14   help from his fellow officers, consistent with his testimony.

15        Sergeant Gonell testified that he was helping another

16   officer who had fallen when Mr. Fitzsimons leaned in to grab

17   him.  He testified that Fitzsimons grabbed both his shield and

18   shoulder strap and pulled outward toward the crowd.

19   Sergeant Gonell was aware that being pulled into the crowd

20   would be a life-threatening situation.  He testified that his

21   arm was being pulled along with his shield and that he felt an

22   intense pain in his shoulder.

23        Sergeant Gonell attempted to use his collapsible baton

24   and considered firing his service weapon in self-defense but

25   ultimately did not do so because he was afraid that it would

1   further agitate the crowd and result in more violence.

2   Eventually, with the assistance of another officer,

3   Sergeant Gonell was able to break free, and Sergeant Gonell

4   went to the back of the tunnel.

5         With that background, I will turn to the elements of the

6   crime.  I find beyond a reasonable doubt that Mr. Fitzsimons

7   assaulted, opposed, impeded, intimidated, and interfered with

8   Sergeant Gonell through his actions.  Sergeant Gonell testified

9   that Mr. Fitzsimons' actions and the other rioters interfered

10  with and opposed his ability to do his job that day.

11  Sergeant Gonell also powerfully testified to the fear and

12  intimidation he felt as Mr. Fitzsimons pulled him toward the

13  crowd, so much so that he feared for his life and considered

14  firing his service weapon.

15        Mr. Fitzsimons' alternate theory is that he was

16  disoriented from the spray and slipped, grabbing on to whatever

17  he could.  But that is not what the video footage captured from

18  two different angles shows.  The video footage shows Fitzsimons

19  standing upright after the spray had stopped, looking over his

20  shoulder, and then back down at Sergeant Gonell, and leaning in

21  and down in a calculated attempt to grab him.  There was no

22  accident or confusion apparent in the video.  To the contrary,

23  Mr. Fitzsimons pauses momentarily, sees his opportunity, and

24  takes it.

25        The video also suggests, consistent with

1   Sergeant Gonell's testimony, that Mr. Fitzsimons was not merely

2   pulling down but out and into the crowd.  That's Government

3   Exhibit 204 at 4:11:30.  Grabbing Sergeant Gonell's shoulder

4   strap for several seconds, as is clearly captured on the video,

5   is a forcible act.

6        Mr. Fitzsimons also continued to intentionally hold on,

7   even after being pushed under the crowd.  It was clear from

8   Sergeant Gonell's shouting and struggling that he was in pain,

9   but even at that point, Mr. Fitzsimons continued to hold on.

10  All of this is enough to infer beyond a reasonable doubt that

11  Mr. Fitzsimons intended his actions to cause bodily injury.

12  In other words, he intended to inflict injury on

13  Sergeant Gonell.

14        Making contact with the shoulder strap counts as

15  physical contact, and there's simply no doubt that

16  Mr. Fitzsimons grabbed Sergeant Gonell's shoulder strap for

17  several seconds.

18        Finally, I also find that Mr. Fitzsimons' actions caused

19  Sergeant Gonell bodily injury.  Although more individuals

20  appear to have been pushing downwards on the shield once the

21  pile-on started, it was Fitzsimons who initially pulled him

22  down and out causing a shooting pain in his shoulder and

23  continued to hold on prolonging that pain.  Although the

24  defense entered footage showing that Sergeant Gonell was

25  standing, walking, and moving his shield a few minutes after

1    the incident, I do not believe that undercuts the credibility

2    of his testimony, particularly where Sergeant Gonell testified

3    that he felt obligated to fight through the pain and return to

4    the tunnel for the rest of the afternoon.

5         Sergeant Gonell needed surgery on his shoulder and

6    testified that he continues to have a limited range of

7    mobility.  This is more than sufficient to show that he

8    suffered serious bodily injury.

9         Accordingly, I find Mr. Fitzsimons guilty of assaulting

10   Sergeant Gonell and causing bodily injury beyond a reasonable

11   doubt.

12        Count 6 is the one I've referred to as the final charge.

13   Next, Count 6 does not relate to a specific officer.  Rather,

14   it involves Mr. Fitzsimons' final charge into the line of

15   officers after the previous assaults had already occurred.

16   This event is clearly captured on video in Government

17   Exhibits 204, the CCTV footage, and 205, the body-worn camera

18   from the officer on the ledge.

19        After standing up from the altercation with

20   Sergeant Gonell, Mr. Fitzsimons rushes toward the officers on

21   the left side of the tunnel, reaching out and grabbing them.

22   That's at 16:12:25.  This moment is captured on the body-worn

23   camera in Government Exhibit 208 and even more clearly in the

24   still photographs from that footage at 208A, 2 through 14.

25   After he is initially pushed back, Fitzsimons stumbles to the

1    center of the tunnel; Government Exhibit 204; 208; 208A, 14

2    through 15.

3            At that point, the videos and still photographs leave no

4    ambiguity whatsoever.  Mr. Fitzsimons stands in the center of

5    the mouth of the tunnel, pauses to steel himself, and then runs

6    forward into the line of officers with his arms flailing;

7    Government Exhibit 208A-16; 204; and 205.  He is pushed back by

8    the officers and stumbles out of the tunnel a few seconds

9    later; Government Exhibit 204 at 4:12:37 to 4:12:44.

10           It is clear that this conduct at a minimum falls within

11   the actions listed in section 111(a)(1).  Mr. Fitzsimons

12   opposed, impeded, intimidated, and interfered with those

13   officers within the ordinary meaning of those words by charging

14   at them, which both impeded and interfered with the officers'

15   activities, and was both oppositional and intimidatory.

16           The term assault is more technical and means any

17   intentional attempt or threat to inflict injury upon someone

18   else when coupled with an apparent present ability to do so.

19   At that point, Mr. Fitzsimons was not armed and using no other

20   weapon besides his body, but other rioters and Mr. Fitzsimons

21   himself had already inflicted harm without their weapons, and

22   the video shows him putting his full force into the forward

23   charge.

24           The definition of assault also requires not just an

25   attempt to use force, but an attempt to inflict injury.

1   Therefore, if Mr. Fitzsimons had been trying to push past the
2   officers to get through the police line but with no intention
3   of harming them, that would not necessarily be an assault.
4   Nevertheless, I believe that the evidence shows beyond a
5   reasonable doubt that Mr. Fitzsimons' intent was to inflict
6   injury.  He did not run in a way that attempted to maneuver
7   through or past the officers.  Instead, he was waving his arms
8   in an apparent attempt to increase the amount of physical
9   contact he made with the officers.

10        If his goal was simply to get into the building,
11  charging the line of officers would have been a highly
12  illogical choice; after all, rows of defending officers were
13  seven deep.  He had also just committed the previous assaults.
14  There's also no real room for debate that Mr. Fitzsimons' final
15  charge was a forcible act.  Running into someone while flailing
16  one's arms is a forceful act.

17        Again, I find beyond a reasonable doubt that
18  Mr. Fitzsimons' final charge at the officers was intentional.
19  He was not pushed and did not slip or fall.  Much to the
20  contrary, the video shows him pause for a moment, look straight
21  ahead, and prepare to run towards the officers.

22        Collectively, each of these four assaults provides
23  circumstantial evidence that Mr. Fitzsimons' acted
24  intentionally with respect to the others.  He repeatedly,
25  despite opportunities to retreat, took every opportunity he had

1    to continue inflicting harm on the officers, and afterwards he

2    encouraged other rioters to follow his example and get in

3    there.

4           Finally, Mr. Fitzsimons made physical contact with

5    multiple officers during his final charge, as can be seen and

6    heard on the video.

7           Accordingly, I find beyond a reasonable doubt that

8    Mr. Fitzsimons is guilty as charged in Count 6.

9           Count 7 is the entering or remaining in a restricted

10   building or grounds.  Count 7 charges Mr. Fitzsimons with

11   entering or remaining in a restricted building or grounds in

12   violation of 18 U.S.C. § 752 [sic] (a)(1).  In order to find

13   the defendant guilty of this offense, I must find that the

14   government proved each of the following elements beyond a

15   reasonable doubt:

16          First, that the defendant entered or remained in a

17   restricted building or grounds without lawful authority to do

18   so.

19          Second, that the defendant did so knowingly.

20          The first element of this offense is covered by the

21   parties' Stipulation No. 1 in which the parties agree that on

22   January 6th, 2021, the restricted area outlined in red in

23   Government Exhibit 601 was a posted, cordoned off, or otherwise

24   restricted area where the Vice President and members of his

25   immediate family were and would be temporarily visiting and,

1    therefore, constituted a restricted building or grounds, as

2    that term is used in Title 18, United States Code § 1752(c).

3    It was Stipulation 1, Exhibit 3 of the pretrial statement.

4         I also find persuasive the government's

5    evidence presented through the testimony of Captain Summers

6    which established the security measures in and around the

7    Capitol that day.  It also effectively -- it is also

8    effectively undisputed and confirmed through ample video

9    footage that Mr. Fitzsimons entered and for some time remained

10   in that restricted area.

11        The only area for debate is, therefore, the second

12   element, whether he did so knowingly.  As with Count 1, a

13   person acts knowingly if he realizes what he is doing and is

14   aware of the nature of his conduct and does not act through

15   ignorance, mistake, or accident.

16        Although it is possible that the barriers had already

17   been removed by the crowd when Mr. Fitzsimons approached the

18   Capitol at close to 4:00 p.m., I still find beyond a reasonable

19   doubt that he acted knowingly.  Particularly, when approaching

20   the mouth of the tunnel, there were alarms sounding, a line of

21   officers in riot gear attempting to push back rioters, and tear

22   gas being deployed on the crowd; all ample warnings to stay

23   away.

24        Mr. Fitzsimons' own statements after the event are also

25   strongly suggestive that he knew he and the other members of

1   the crowd were in a restricted area.  In the interview he gave

2   to *The Rochester Voice*, Mr. Fitzsimons noted that he had

3   himself seen the Capitol defended a day earlier and that he

4   found it strange that he could see people climbing on top of

5   the building from some distance away.  In that article and his

6   statements to the Lebanon town select board, he also recounted

7   noticing the smell of tear gas and pepper spray as he

8   approached, seeing someone with a sledgehammer, and hearing

9   that someone had been shot.

10          Finally, the video also shows that after his first

11   approach to the mouth of the tunnel, he was pepper sprayed and

12   began to walk away down the stairs unimpeded by the crowd, but

13   then turned around and went back a second time.  Having himself

14   been pepper sprayed, in addition to all the other evidence,

15   makes it abundantly clear that Mr. Fitzsimons acted knowingly

16   in entering and remaining in the restricted area.  There was

17   nothing ignorant, mistaken, or accidental about his presence

18   there.

19          Accordingly, I find the government has proven both

20   elements beyond a reasonable doubt and find Mr. Fitzsimons

21   guilty as charged with respect to Count 7.

22          Count 8, disorderly conduct in a restricted building or

23   grounds.  Count 8 of the indictment charges Mr. Fitzsimons with

24   disorderly or disruptive conduct in a restricted building or

25   grounds in violation of 18 U.S.C. § 1752(a)(2).  In order to

1    find Mr. Fitzsimons guilty of this offense, I must find that

2    the government proved each of the following elements beyond a

3    reasonable doubt.

4         First, that the defendant engaged in disorderly or

5    disruptive conduct in, or in proximity to, any restricted

6    building or grounds.

7         Second, that the defendant did so knowingly and with the

8    intent to impede or disrupt the orderly conduct of government

9    business or official functions.

10        Third, that the defendant's conduct occurred when or so

11   that his conduct, in fact, impeded or disrupted the orderly

12   conduct of government business or official functions.

13        The same stipulation that the tunnel on the lower

14   west terrace was within the restricted grounds applies here,

15   and I find that Mr. Fitzsimons engaged in disorderly and

16   disruptive conduct in that area.

17        Disorderly conduct occurs when a person is unreasonably

18   loud and disruptive under the circumstances or interferes with

19   another person by jostling against or unnecessarily crowding

20   that person.  And disruptive conduct is a disturbance that

21   interrupts an event, activity, or the normal course of a

22   process.  Even presence in a violent mob like the one on

23   January 6th, 2021, is, to some extent, disorderly and

24   disruptive because it contributes to disturbing the peace and

25   disrupting the normal and orderly business of the Capitol and

1    its occupants.  See *Rivera,* 21-cr-60 at 11.

2        And Mr. Fitzsimons' actions, throwing a bow at the

3    officers, grabbing and swiping at them and charging headlong

4    into the police line with his arms flailing doubtlessly come

5    within that definition.  The conduct was committed knowingly.

6    Mr. Fitzsimons was not pushed into the line of police officers.

7    He gathered himself and ran into it.  He threw his bow and

8    grabbed at the officers with full awareness of the situation,

9    as I have already explained.

10        I also find that Mr. Fitzsimons engaged in misconduct

11   with the specific intent of impeding or disrupting the orderly

12   conduct of government business, principally, the certification

13   of the Electoral College vote.  The law permits a fact-finder

14   to infer that a person intends the natural and probable

15   consequences of their actions, and the natural and probable

16   consequences of Mr. Fitzsimons' actions was to disrupt the

17   orderly business of Congress.  See *Rivera*, same case I cited

18   earlier.

19        Moreover, Mr. Fitzsimons knew the certification was

20   taking place in Congress that day and had traveled to D.C. for

21   that specific reason.  He may have started the day merely

22   hoping to peacefully support the senators and representatives

23   who were objecting, but at that point when he was physically

24   engaging officers in the tunnel, any such interpretation is

25   nonsensical.

1          I find beyond a reasonable doubt that his goal was to

2     delay the Congress's orderly official business, including

3     engaging in disorderly and disruptive conduct.  I also find

4     that his conduct, in fact, impeded the orderly conduct of

5     government business that day.

6          The House and the Senate were adjourned and evacuated,

7     and the Vice President had to shelter in a secure location as a

8     result of the mob's attack on the Capitol, as is established in

9     Stipulation 2 and the testimony of Paul Wade.  As Special Agent

10    Wade testified, the Vice President could not return from his

11    secure location to preside over the Senate until the entire

12    grounds had been cleared, including outside of the building.

13         The officers testified that absent the conduct of

14    Mr. Fitzsimons and others like him in the tunnel, they would

15    have been free to assist in other areas of the Capitol that had

16    been breached and restore order.  And, in fact, Congress could

17    not resume its business for several hours, until after

18    8:00 p.m. that evening.  Although Mr. Fitzsimons was only one

19    member of the mob at one part of the day, his actions were,

20    therefore, nonetheless, an impediment to the governmental

21    functions.

22         Accordingly, I find that the government has proved each

23    of these elements beyond a reasonable doubt and find

24    Mr. Fitzsimons guilty as charged in Count 8.

25         Count 9 is engaging in physical violence in a restricted

1    building or grounds.  Count 9 of the indictment charges

2    Mr. Fitzsimons with engaging in an act of physical violence in

3    a restricted building or grounds which is a violation of

4    18 U.S.C. 1752(a)(4).  The elements that I must find beyond a

5    reasonable doubt for this offense are:

6         First, that the defendant engaged in any act of physical

7    violence against any person in any restricted building or

8    grounds.

9         Second, that the defendant did so knowingly.

10        Much of the previously discussed reasoning applies here.

11   First, the lower west terrace of the Capitol was a restricted

12   area on January 6th, 2021.

13        Next, an act of physical violence means any act

14   involving an assault or other infliction or threat of

15   infliction of death or bodily harm on an individual, or damage

16   to or destruction of real or personal property.  Mr. Fitzsimons

17   engaged in multiple acts of physical violence.  Namely,

18   throwing a bow at officers, charging at officers, and grabbing

19   at officers.  These acts are captured on multiple videos and

20   were testified to by the officers.  These acts both threatened

21   and caused bodily harm to those officers.

22        Mr. Fitzsimons committed these acts knowingly for the

23   same reasons previously described.  He did not mistakenly

24   arrive to the police line.  He approached two separate times

25   and before leaving, paused and gathered his strength before

1    charging headlong into the police line.  Indeed, for the final

2    act of violence when he charged into the officers,

3    Mr. Fitzsimons does not even offer an alternative theory for

4    what happened.

5            I, accordingly, find that the government has proven

6    beyond a reasonable doubt that Mr. Fitzsimons is guilty as

7    charged in Count 9.

8            Count 10 is disorderly conduct in a Capitol Building.

9    Count 10 of the indictment charges Mr. Fitzsimons with

10   disorderly conduct in a Capitol Building or Grounds in

11   violation of 40 U.S.C. § 5104(e)(2)(D).

12           The elements of this offense, which the government must

13   prove beyond a reasonable doubt are:

14           First, that the defendant engaged in disorderly or

15   disruptive conduct in any of the United States Capitol

16   Buildings or Grounds.

17           Second, that the defendant did so with the intent to

18   impede, disrupt, or disturb the orderly conduct of a session of

19   Congress or either House of Congress.

20           Third, that the defendant acted willfully and knowingly.

21           My previous finding that the defendant engaged in

22   disorderly and disruptive conduct applies with equal force to

23   this count.  The parties have further stipulated that the lower

24   west terrace is part of the Capitol Building or Grounds for the

25   purposes of this count, which includes all squares,

1    reservations, streets, roadways, walks, and other areas as

2    defined on a map entitled, quote, Map Showing Areas Comprising

3    United States Capitol Grounds, end quote, dated June 25, 1946,

4    approved by the Architect of the Capitol and recorded in the

5    Office of the Surveyor of the District of Columbia in Book 127,

6    page 8.5.

7          As in Count 8, I find that Mr. Fitzsimons engaged in

8    this disorderly and disruptive conduct with the specific intent

9    of impeding and disrupting the orderly conduct of a session of

10   Congress; specifically, the certification of the Electoral

11   College vote in a Joint Session of Congress.  Mr. Fitzsimons

12   knew the certification was taking place in Congress that day

13   and had traveled to D.C. for that specific reason.  He believes

14   subjectively, if not correctly, that the election was

15   illegitimate and that it would represent the last day of the

16   republic and his actions were intended to delay and disrupt

17   that process.

18         For the third element, I have already explained how

19   Mr. Fitzsimons' disorderly conduct was knowingly committed.  I

20   also find beyond a reasonable doubt that he acted willfully.  A

21   person acts willfully if he acts with the intent to do

22   something that the law forbids; that is, to disobey or

23   disregard the law.  Mr. Fitzsimons acted with specific intent

24   to obstruct and assault police officers engaged in their lawful

25   duties, which is unlawful.

1    The definition of willfully does not require proof that

2    the defendant be aware of the specific law or rule that his

3    conduct may be violating, although it is certainly common

4    knowledge that assaulting a law enforcement officer is

5    unlawful.  Mr. Fitzsimons' recasting of a narrative afterwards

6    also provides further circumstantial evidence that he was, in

7    fact, aware that he had broken the law.

8    All three elements have been established beyond a

9    reasonable doubt, and I, therefore, find Mr. Fitzsimons guilty

10   as charged in Count 10.

11   Count 11, act of physical violence in the Capitol

12   Grounds or Building.  Finally, Count 11 of the indictment

13   charges Mr. Fitzsimons with engaging in an act of physical

14   violence in the Capitol Building or Grounds in violation of

15   40 U.S.C. § 5104(e)(2)(F).

16   The elements for this offense that I must find beyond a

17   reasonable doubt are:

18   First, that the defendant engaged in any act of physical

19   violence in any of the United States Capitol Buildings or

20   Grounds.

21   Second, that the defendant acted willfully and

22   knowingly.

23   Each of these elements has already been addressed.  I

24   find that Mr. Fitzsimons engaged in an act of physical violence

25   for the same reasons described in Count 9 and that he did so

1    within the Capitol Building and Grounds as described in Count

2    10.

3        I also find that he knowingly engaged in that act of

4    physical violence as described in Count 9, and he did so

5    willfully in disobedience and disregard for the law.

6        Accordingly, I find beyond a reasonable doubt that the

7    government has proved each element of Count 11, and

8    Mr. Fitzsimons is guilty as charged therein.

9        In summary, I have found Mr. Fitzsimons guilty of all

10   11 counts, although I do not find him guilty beyond a

11   reasonable doubt of having caused bodily injury to

12   Sergeant Nguyen.

13       So I guess it's time to set a sentencing date.  And

14   according -- the probation office is very backed up given all

15   of these January 6th cases.  So based on the time they need to

16   prepare the presentence report and my schedule, it looks like

17   the earliest week feasible is the week of February 13th.

18       What do the parties' schedules look like then?

19           MS. TAYLOR-SMITH:  Court's indulgence.

20           THE COURT:  Sure.

21           MS. TAYLOR-SMITH:  Your Honor, I have nothing on my

22   schedule for that.

23           MR. BRASHER:  I have no conflicts.

24           MR. GORDON:  Your Honor, I currently have a trial set

25   on -- with Judge Boasberg for that week.  I could be available

1    the week before or week after.

2            THE COURT:  Do you know if he sits Friday?  I don't

3    think he sits Fridays.

4            MR. GORDON:  I don't know, Your Honor, but I can also

5    say I do not expect that trial to last through Friday.  So

6    Friday, the 17th, would be fine.

7            THE COURT:  Okay.  Tanya, are you available Friday,

8    the 17th?

9            THE COURTROOM DEPUTY:  Yes, Judge.

10           MR. BRASHER:  That works for me as well, Your Honor.

11           THE COURT:  Okay.  What -- do I have anything on my

12   schedule that day?

13           THE COURTROOM DEPUTY:  10:00, another pretrial.

14   10:00 you have a pretrial conference.

15           THE COURT:  Which case?

16           THE COURTROOM DEPUTY:  Another January 6th case.

17           THE COURT:  2:00 p.m. Friday, the 17th, is -- was

18   that the date, the 17th?

19        Does that work for everybody?

20           MR. BRASHER:  Yes, Your Honor.

21           MS. TAYLOR-SMITH:  Yes.

22           MR. GORDON:  Yes.

23           THE COURT:  Okay.  Anything else we need to cover

24   today?

25           MR. BRASHER:  Not for the government.

1          MS. TAYLOR-SMITH:  Not from the defense.

2          THE COURT:  I didn't hear the government.

3          MR. BRASHER:  No, Your Honor.

4          THE COURT:  Okay.  All right.

5          THE COURTROOM DEPUTY:  This will be in person?

6          THE COURT:  In person, yes.

7      All right.  I'll note more at the time of sentencing how

8  good a job I thought the defense did in this case.  I can't

9  help -- as I watched the disturbances in Russia and Iran, I

10  can't imagine that those folks are going to get counsel paid

11  for by the government they're attacking and obtain the level

12  of -- and competence of the defense the defendant got in this

13  case.  That's -- this country has a lot of problems, but that's

14  a remarkable part of this system.

15      So thank you.

16          MS. TAYLOR-SMITH:  No.  Thank you, Your Honor.

17          THE COURT:  All right.

18      Thank you, Mr. Fitzsimons.

19      You're excused.

20          (Proceedings were concluded at 11:41 a.m.)

21

22

23

24

25

1        CERTIFICATE OF STENOGRAPHIC OFFICIAL COURT REPORTER

2

3            I, Nancy J. Meyer, Registered Diplomate Reporter,

4    Certified Realtime Reporter, do hereby certify that the above

5    and foregoing constitutes a true and accurate transcript of my

6    stenograph notes and is a full, true, and complete transcript

7    of the proceedings to the best of my ability.

8

9                        Dated this 23rd day of October, 2022.

10

11                   /s/ Nancy J. Meyer
                     Nancy J. Meyer
12                   Official Court Reporter
                     Registered Diplomate Reporter
13                   Certified Realtime Reporter
                     333 Constitution Avenue Northwest
14                   Washington, D.C. 20001

15

16

17

18

19

20

21

22

23

24

25

# GOVERNMENT EXHIBIT B

| From: | Alan Hostetter |
|---|---|
| To: | Ballantine, Thomas (ENRD) |
| Cc: | Dyke Huish; nic@cocislaw.com; steven@stevencbailey.org; nds@davidbsmithpllc.com; Kira West; Mariano, Anthony (USASPC); Manning, Jason (CRM); Salo, Jessica W. (LA) (FBI); Johnson, Eric Thomas (LA) (FBI); Karren Kenney |
| Subject: | [EXTERNAL] Re: (U.S. v. Hostetter et al) Please see the attached correspondence (review of earlier discovery) |
| Date: | Wednesday, April 19, 2023 11:17:05 AM |

Mr. Ballantine,

Good morning on this tragic 30th anniversary of the slaughter of dozens of innocent men, women and children by our federal government in Waco, TX. May their souls Rest In Peace.

1. As far as your memo - TLDR.

2. Trump won in one of the biggest, if not THE biggest, landslide election victories in U.S. history. You know it and I know it.

3. There are one of two possibilities in play here:

Possibility 1).  This entire prosecution (all of J6) is so entirely and completely corrupt, that there is really no possible way to defend against the ridiculous allegations/charges. Through this corruption you will convict me and sentence me to many years in prison. This is in God's hands, not ours. I am mentally and spiritually prepared for all outcomes.

The FBI, along with other federal law enforcement agencies, including military LE and intelligence units instigated, initiated and provoked the entire incident. Likely almost every person that day engaging in acts of vandalism/violence were federal informants and agents, widely filmed and photographed by their Mockingbird Media allies. Likely some innocent people also got caught up in the federally instigated frenzy. It was one gigantic entrapment scheme.You know it and I know it.

    a). Q Shaman is an "actor." He was literally wearing a costume. He's fake.
    b). There are "actors"/ informants in my case too.
    b). The Ashli Babbitt shooting was fake. It's obvious. Babbitt defined - "Narrow minded member of the middle class."
    c). The entire government of the U.S. to include the Vice President of the United States was together under one roof that day in one of the most contested elections in US history. Massive and violent counter-protests were a possibility. There was no secure fencing and light security. No explanation for this other than it was staged purposely.

Possibility 2). The "good guys/gals" are actually in control and I am simply a pawn in a grand play/drama playing out to awaken the masses to the corruption and evil that has become our federal government… just prior to the curtain being pulled back a la Wizard of Oz. Time will tell… God only knows.

With these possibilities in mind, I will never plead guilty and I will see you soon in court. God's will be done.

Alan Hostetter

On Apr 18, 2023, at 6:10 PM, Ballantine, Thomas (ENRD)
<Thomas.Ballantine@usdoj.gov> wrote:

Dear Counsel and Mr. Hostetter,

Please see the attached correspondence.

Best regards,

Tom

Thomas T. Ballantine
Assistant Section Chief
Environmental Crimes Section
U.S. Department of Justice
202 532 3048 (direct)
(he, him, his)

<Discovery Review Letter and Binder 18 April 23.pdf>

# GOVERNMENT EXHIBIT C

```
 1                  IN THE UNITED STATES DISTRICT COURT
                     FOR THE DISTRICT OF COLUMBIA
 2

 3      United States of America,      ) Criminal Action
                                       ) No. 21-cr-246
 4                      Plaintiff,     )
                                       ) VERDICT
 5      vs.                            )
                                       ) Washington, DC
 6      Edward Badalian,               ) April 4, 2023
                                       ) Time:  10:00 a.m.
 7                      Defendant.     )
        _____
 8
                           TRANSCRIPT OF VERDICT
 9                             HELD BEFORE
                 THE HONORABLE JUDGE AMY BERMAN JACKSON
10                   UNITED STATES DISTRICT JUDGE

11      _____

                         A P P E A R A N C E S
12

13      For Plaintiff:      Kimberly Paschall
                            Anthony Mariano
                            U.S. ATTORNEY'S OFFICE
14                          601 D Street, NW
                            Washington, DC 20530
15                          (202) 252-2650
                            Email:  Kimberly.paschall@usdoj.gov
16                          Email:  Anthony.mariano@usdoj.gov

17      For Defendant:      Robert M. Helfend, Esq.
                            23838 Pacific Coast Highway, No. 309
18                          Malibu, CA 90265
                            (310) 456-3317
19                          Email:  Rmhelfend@gmail.com

20                          Kira Anne West
                            LAW OFFICE OF KIRA WEST
21                          712 H St, NE, Unit 509
                            Washington, DC 20002
22                          (202) 236-2042
                            Email:  Kiraannewest@gmail.com
23      _____

24      Court Reporter:       Janice E. Dickman, RMR, CRR, CRC
                              Official Court Reporter
25                            Janicedickmandcd@gmail.com
```

```
1            THE COURTROOM DEPUTY:  Good morning, Your Honor.

2   This morning we have criminal case number 21-246-2, the United

3   States of America v. Edward Badalian.  Mr. Badalian is present

4   and in the courtroom.

5            Will counsel for the defendant appearing by video

6   please identify himself for the record, to be followed, at the

7   podium, by local counsel and then government counsel.

8            Go ahead, sir.

9            MR. HELFEND:  Robert Helfend, Your Honor.  I'm

10  appearing via zoom.  Mr. Badalian is present in the courtroom

11  with Kira West.

12            THE COURT:  All right.  Good morning, Mr. Helfend.

13            MS. WEST:  Good morning, Your Honor.  Kira Anne West

14  appearing for Mr. Helfend and Mr. Badalian.

15            THE COURT:  All right.  Good morning.

16            MS. PASCHALL:  Good morning, Your Honor.  Kimberly

17  Paschall for the United States, with my co-counsel Anthony

18  Mariano, our paralegal Kyle Clements and Special Agent Enrique

19  Armenta.

20            THE COURT:  All right.  Good morning, everyone.  When

21  we last were together, at the close of the government's case,

22  the defense had filed a motion for a judgment of acquittal

23  pursuant to Rule 29, and then at the close of all the evidence,

24  I took the verdict under advisement.  And so I'm going to be

25  ruling on both of those matters today.
```

3

1          To the extent findings of fact are necessary to

2     support either ruling, they're all going to be incorporated in

3     the transcript of this ruling.  There's not going to be a

4     written opinion that follows today.  So I'm going to rule on

5     everything now, and that may take a little, while so you can

6     get comfortable.  There will be a transcript.

7          I want to start with the facts that were established

8     at the trial.  What we have is a defendant who was extremely

9     well aware of what was going on politically and procedurally

10    after the election, and who was following the various state

11    procedures and legal challenges closely.  He knew exactly what

12    was supposed to happen on January 6 and he wasn't having any of

13    it.  He planned, he tried to organize others, and he went to

14    Washington with a clear intent, the single-minded purpose to

15    keep the transfer of power from taking place.

16         It may have turned out that he's not so brave, or

17    he's not such a great military tactician after all, or that he

18    turned out to be more talk than action.  He tended to cheer on

19    others, rather than doing any dirty work himself.  Or it may be

20    that he was 100 percent ready to take action with bare hands.

21    But the traitors and tyrants never presented themselves.  After

22    all, he could never really penetrate the building.  But his

23    intentions were clear and he expressed them repeatedly.

24         The defendant created and administered an online

25    group, the Patriots 45 MAGA Gang, which was active at least as

1   of November 2020.  He chose to use Telegram, an encrypted

2   program.  And as it got closer to January 6, he closely

3   monitored who could be added or stay in the group.

4        The record includes a number of statements by the

5   codefendant, DJ Rodriguez.  And those are also relevant to the

6   conspiracy charge.  He spoke in language about war and

7   revolution.  And all of his statements can be attributed to the

8   defendant to the extent they were made in furtherance of the

9   conspiracy legally.

10       Also, factually, that would make sense since there's

11  no evidence that the defendant ever urged him to tone it down

12  or took issue with any of it.  But I don't need to rely on what

13  Danny Rodriguez said to reach a verdict in this case about what

14  defendant intended.

15       We start out in November of 2020.  Chris Almonte

16  testified that the defendant was obsessed with the election.

17  Unlike many January 6 defendants who have argued that they were

18  just pro Trump and they just showed up and they were otherwise

19  clueless, this defendant knew exactly what January 6 was all

20  about.  He'd been active in anti Black Lives Matters and pro

21  Trump protests and rallies and other political protests and

22  rallies well before January 6.

23       Also, while it's not a part of the government's case

24  for Rule 29 purposes, his testimony added to the record that he

25  viewed himself as a skilled and trained and certified protestor

1    and agent of change, a graduate of various courses on the

2    subject offered by individuals we are supposed to understand

3    are experts.

4          And the level of his understanding about what was

5    going on in the record was available in the government's case

6    alone, and consisted largely of the defendant's own statements.

7    And Mr. Almonte, at the end of the day, was somewhat reticent

8    as a narrator anyway.

9          Immediately after the election the focus was not

10   antifa, with whom the defendant had tussled before.  But

11   rather, it starts right away.  Government's 907.6, on November

12   3rd, there's a message from Rodriguez identifying the enemy as

13   George Soros, Gates, and Democrats.  What did the defendant

14   respond to that?

15         Exhibit 901.04, on November 4, the defendant said,

16   It's time to arrest Biden.  And, yes, I acknowledge that in

17   that first post, he used an LOL along with that statement.

18         Exhibit 901.22, on November 9th, someone asked if

19   they should kill Biden or Obama.  "If they're guilty of

20   treason, they should be executed," was the defendant's answer,

21   901.23.  "Biden is definitely guilty of treason.  Treason

22   equals death," says Edward Badalian.  The LOL is now gone and

23   it stays gone for the rest of the case.

24         Exhibit 902.03 November 18, he says we won 410

25   Electoral votes on election night.  He was more sophisticated

1    than the candidate at that point because the candidate was

2    harping always on the 7 million votes, but Mr. Badalian knew it

3    was all about the Electoral college all along.

4            Exhibit 902.04, November 19th, after the Rudy

5    Guiliani press conference, defendant says, "The conditions of

6    war are set."  And he says that the Constitution mandates it.

7    Exhibit 902.06, on November 19th, the defendant's intentions

8    are clear.  "We need to arrest the enemies of the free state."

9            Exhibit 902.09, the same date, "We don't have to kill

10   them, just arrest them and drag them into court.  That's why we

11   need to organize, to make these arrests.  We need surgical

12   force, not brute force."

13           Meanwhile, at least at that point, Danny Rodriguez is

14   worried about breaking the law.  He's actually been to prison,

15   unlike Mr. Badalian, who says, in Exhibit 902.10, "We have the

16   right to enforce the Constitution."

17           Exhibit 901.06, November 20th, he tells everyone,

18   quote, Stay strapped, close quote.  Quote, It's not a game

19   anymore, close quote, and attaches the photograph of a person

20   with an assault rifle.

21           November 25th, Exhibit 902.12, he is closely tracking

22   the Electoral votes and sends out a message about what's going

23   on in Pennsylvania.  902.18, on November 29th, defendant is

24   talking about the need to train for the coming unrest.  "It

25   will be scarer to the powers that be if the patriots are

1    organized."

2           Exhibit 902.19, on the next day, November 30th, the

3    defendant is watching what's going on in Arizona, also he says

4    it could be contested.  In other words, he gets what happens in

5    January.

6           Exhibit 902.01, on December 2nd, he circulates a

7    YouTube video concerning Sidney Powell and her efforts in the

8    courts to overturn the election.  The next day, December 3rd,

9    Exhibit 906.08, he's upset that the police don't seem to be

10   taking sides.  They seem more concerned with their own jobs

11   than supporting the patriots.  There are some discussions about

12   local protests, but the defendant's focus comes up over and

13   over again.

14          Exhibit 906.10, on December 3rd, "If our charge of

15   treason has no teeth, we're fucked.  If you can't kill

16   traitors, too, you're fucked.  In Trump doesn't go after them,

17   we have to."

18          Same day he messages about Georgia.  He's still

19   extremely aware of what's happening on a day-to-day basis in

20   all the states that matter.

21          December 6th, Exhibit 906.15, the defendant is still

22   going on and on about getting deputized to make arrests.  He's

23   talking about posse comitatus arresting the Clintons, Governor

24   Newsom and George Soros at one point and then describes their

25   gory deaths at other points.

1          Exhibit 906.20, on December 6th, "I think they should

2     arrest Biden already."  And by that point Bill Barr, who wasn't

3     having any of the false election stuff, is now a traitor too.

4          December 6, Exhibit 906.21, the defendant says, "The

5     way is train and train and one day when we're all together in

6     training, the decision has to be made and executed

7     spontaneously as to whom we arrest."  And he says, quote, all

8     of our recreation should pertain to this war, close quote.

9          He likes to show off his erudition.  He says they'll

10    be, quote, gathering intel through reconnaissance and

11    surveillance, setting traps, asymmetrical attacks, chicanery,

12    and subterfuge, close quote.  In other words, everyone needs to

13    know thine enemy by watching what they do.

14          As others go on to debate the pros and cons and

15    levels of organization found in the Proud Boys and the Oath

16    Keepers and how or whether patriots should unite and get

17    organized, and some engage in talk about antifa, the defendant

18    has one refrain, December 7th, Exhibit 906.27, one of the

19    things that is critical is severe punishment of traitors.

20          903.06, on December 12th, we need to consolidate

21    under General Flynn.  Again, he's paying attention to the news

22    and what's up.  903.08, this is also from December 12th, "The

23    fight has only just begun."

24          903.10, on December 14th, he now knows that Trump has

25    won Nevada.  Also on December 14th, Exhibit 903.13, there was

1    some complaining in the discussions about QAnon versus Alex

2    Jones and that possibly Q was just all talk.  And the defendant

3    says, "Q has been holding back patriots from taking action with

4    all of that trust the plan BS."

5          On December 14th, Exhibit 903.11, the defendant is

6    talking about sending the election to the delegations and he

7    says, "We have 27 to 22."  Again, he understands what's

8    happening.  As the government said in its closing argument, he

9    is really in the weeds on this election Electoral College

10   stuff.  And he says, "Game over, scum, and invokes the

11   Constitution."

12         Exhibit 903.16, on December 16th, people are talking

13   about the election not being overturned and he says, "Let's

14   deal with it then, goddamnit.

15         Exhibit 903.27, on the 17th of December, he's still

16   following what Sidney Powell is up to.  But also on the 17th,

17   Exhibit 903.20, others named Justice Roberts and Hunter Biden

18   and Kamala Harris now as potential traitors.  But the

19   defendant, on that date, in Exhibit 903.24, is using extremely

20   violent language about Bill Gates and Hillary Clinton.

21         Exhibit 903.22, "We need to start stacking commie

22   bodies or lose.  Tyrants should be gruesomely mutilated."

23   Finally, Government's 538, December 19th, the former president

24   posts his Tweet regarding how could he have possibly lost,

25   given all the votes he had, and tells people to be there on

1    January 6, it will be wild.

2            This gives the group the focus needs it tells them

3    where to be and when.  And no one needs to tell Edward Badalian

4    what January 6 is.  The group notices this immediately.  In

5    Exhibits 904.01 and 904.05, Rodriguez notes the Trump has

6    called for us.  Throughout the 904 series of exhibits

7    immediately there's a lot of discussion within the group about

8    who is going and when they should go, and is January 6 more

9    important or is the inauguration more important?  But there's

10   no ambiguity about where the defendant stands.  Exhibit 904.16,

11   "Our duly elected leader has given us his marching orders."

12           This seems to be an appropriate point for me to

13   digress a bit and take up the subject of paintball, which had

14   come up both before and after this date.  I had already read a

15   post about our recreational activities and what they should be

16   geared towards.

17           On December 2nd, Exhibit 906.02, the defendant is

18   concerned about people who fail to show up for paintball.  He

19   points out that those who came are one step further along in

20   group fighting tactics.  "We need to train our minds to listen

21   to each other in the heart of battle, to call out enemy

22   positions, et cetera."

23           On December 4th, Exhibit 906.03, he urges another

24   member of the group to "grow a pair" and "water that tree of

25   liberty with tyrant blood again."  Still not seeing antifa as a

1     big theme here.

2           On December 6th, 906.22, "What's more fun than

3     training for war?"  And then on Government Exhibit 903.01, on

4     December 9th, he sends out an invitation for patriot paintball,

5     and tells people to only share this with people you know and

6     trust.

7           He explains, in Exhibits 903.02 and .03 that this is

8     a way to train as a group, it's "full contact chess."  And then

9     on December 13th, Exhibit 903.09, he says, "We're at the

10    paintball park, everyone should come."  Later says, "It was

11    awesome.  We're going to be that much sharper and more

12    organized in a fire-fight now.  It's all about the teamwork."

13    He tries to, again, another time, to get people together, on

14    December 22nd.  He sends out exhibits that are available at

15    904.20 through .26.  "So, this Sunday, paintball.  One last

16    group training before D.C.  Please, guys and gals, we need to

17    know how to fight together while under fire.  Get used to that

18    feeling.  Learn each other's advantages and disadvantages."

19    And he does talk about armed terrorists at that point, too.

20          Others mock him in response, but the defendant is

21    resolute.  He has a detailed explanation of why paint ball is

22    training.  It involves extensive physical exertion, group

23    coordination and communication, hand-eye coordination, shooting

24    while moving on a moving target, using cover, taking the flank.

25    He tells another member of the group it's better than sitting

1    on your ass.  And he has a friend who is a veteran who will

2    confirm how important and how useful paintball is.  He says

3    that being organized requires commitment and participation, you

4    can't sit on your hands, you can't sit on the sidelines.  "I

5    want to take collective action."

6           Now, the defense says that this part of the

7    government's case is really much ado about nothing.  Basically

8    it's baloney.  Paintball is a game.  And it is.  Kaylin

9    Frishcorn's observation after she went and watched

10   Mr. Badalian, her then boyfriend, and Mr. Rodriguez, that it

11   was just two little boys playing war was one of the truest

12   statements uttered during the trial.

13          But that's not how the defendant saw it.  He had some

14   grandiose ideas about his importance in the scheme of things.

15   And back then in, real time -- as opposed to for my consumption

16   at trial -- he was actively encouraging the others to show up

17   for training purposes.  So it really doesn't matter to the

18   analysis that it was all incredibly immature and incredibly

19   ineffective.

20          The defense also asked in closing argument, How could

21   this be evidence of planning if only four people showed up?

22   Well, that fact may be indicative of the state of mind of the

23   people who failed to show up, but it doesn't say anything about

24   the defendants.  What's more telling is that he chastised the

25   people who failed to show up.

13

1    And these weren't his only affirmative steps in
2    furtherance of the conspiracy anyway.  By December 26th he's
3    posting fliers about the caravan and the meeting points.

4    On December 28th he warns others that while we're
5    talking about this stuff now, now that it's real we need to
6    minimize the paper trail.  Exhibit 904.54, Don't use Eventbrite
7    when we're making these plans.  All this feeds into the
8    government's proof of consciousness of wrongdoing.

9    On December 31st he's still working on arrangements.
10   January 2nd, Exhibit 905.09, he's posting more information
11   about the Republican party challenging Electoral votes.
12   Electoral votes.  January 2nd, Exhibit 904.03, his manifesto,
13   "We need to violently remove traitors, and if they are in key
14   positions, rapidly replace them able-bodied patriots.
15   Translation:  There will be no transfer of power to the
16   Democrats.

17   The same day he reminds everyone that real Trump
18   supporters are looking to arrest traitors, not attack
19   buildings.  He knows why he's going.  And then he says, "We
20   have to take down anyone who does attack the buildings because
21   they are antifa," which turned out to be a highly inaccurate
22   prediction.

23   Exhibit 905.16, "It's about arresting traitors, not
24   shooting them unless they resist."  And he's got a lot to say
25   about the whole thing.  Exhibit 904.18, he responds to a

1   contact by Lin Wood that, "We, the people, must fight back for

2   our freedom, with, "I'd fight with him any day."

3          Exhibit 904.19, "It's time to stop giving a fuck

4   about optics.  We're not trying to win a God damn election

5   anymore, it's not a popularity contest.  If you know the

6   Constitution is what's right, then it's time to fight for it."

7   Exhibit 904.22, he identifies himself as one of the Three

8   Percenters.

9          904.31, he knows all about the Insurrection Act.

10  He's up to date on that.  "Trump has to let the legislation" --

11  in which congress was trying to take away those powers -- "sit

12  on his desk until January 3th.  By the time Mitch can do the

13  override we'll be there and then he can invoke it and the

14  patriots will be at the ready.

15         Exhibit 904.35, "The tree of liberty must be

16  refreshed from time to time with the blood of patriots and

17  tyrants."  I note that every single one of these comments was

18  posted before he got to Washington, D.C. and before he heard

19  the speech on the Ellipse.

20         One act he takes full responsibility for is the

21  transportation, renting a car that will hold a group.

22  Government Exhibits 536 and 537.  Defense would have me believe

23  that it was just a series of unfortunate events that led to

24  Kaylin's name on the rental agreement, which is Government

25  Exhibit 720.  It wasn't really a part of the defendant's stated

1    goal of a minimum paper trail.  Gee, I really wish I could have

2    done it, but I had bad credit and they wouldn't take cash and

3    we tried, it just didn't work out.

4         I'm curious that if all of that happened, I didn't

5    see any surveillance video of the group coming in and out of

6    the office, as Ms. Frishcorn described.  But the defendant

7    doesn't have an obligation to present evidence and the

8    government never filled in the gap by putting on a witness who

9    said we reviewed the entire type from the whole day and this

10   was the only time the defendant went in.

11        So I can't draw any inferences from the surveillance

12   video one way or the other.  But I can say that the defendant's

13   story doesn't make any sense.  The whole business about trying

14   to add money to a credit card at an ATM doesn't make sense,

15   whether it's a debit card or a credit card.  And at the end of

16   the day, no matter why the rental ended up in the girlfriend's

17   name, you can't get around the fact that they very deliberately

18   left the defendant's name off the list of drivers.  And Danny

19   Rodriguez is not listed as a driver either.  Kaylin wasn't

20   going to be driving at all and her name is the only one there.

21        After this the defendant ratchets up the rhetoric

22   about replacing traitors and he's still trying to recruit.

23   Exhibit 904.52 shows that he knows exactly what's happening on

24   January 6.  "Either they certify or they return it to the

25   states."  905.10, he understands Mike Pence's role.  This is

1    all consistent with Chris Almonte's testimony about his

2    obsession and his knowledge.

3           Exhibit 905.15, January 2nd, "Arrest traitors" means

4    Nancy Pelosi, Mitch McConnell and Biden.  905.16, "If traitors

5    resist, it's okay to shoot them."  The defense said that

6    Almonte didn't have a basis to testify as to what the defense

7    meant by traitors, but I'm not relying on his testimony alone.

8    The defendant said it himself over and over.

9           The defendant also gets actively involved in planning

10   for, collecting and transporting the weapons they want to have

11   on hand, Government's Exhibit 904.38 and .39, .46.  And then in

12   the 905 series he's in charge of the van, the discussions about

13   pepper spray, bear spray and tasers.

14          I was a little disgusted by defense counsel's aside

15   during closing argument, "Bear spray, like that's going to

16   work."  The videos are full of officers being sickened and

17   temporarily disabled by the array of substances sprayed in

18   their faces by untrained individuals when many of the officers

19   didn't even have masks and they had to leave the line, leave

20   their defense of the building to tend to their own health.  So,

21   I think that sarcasm was not well placed.

22          But the defense tells me that none of this

23   preparation was for interfering with the certification of the

24   election at all, it was just so they could all be protected

25   against antifa.  But the defendant said exactly the opposite at

1   the time.  He said, on January 5th, "I don't want to fight

2   antifa.  The goal is to arrest traitors."  And again on that

3   date he is understanding the situation in Georgia, the runoff,

4   perfectly.  If you look at 904.52, it's indisputable that the

5   defendant knew that January 6 is when Congress would be

6   meeting.

7           And there's no doubt that that's where they were

8   headed.  We have Exhibit 905.16, the meme that was circulated

9   that shows the speech on the Ellipse followed at 1 p.m. with

10   the Capitol.  And they do end up there.  At the Ellipse,

11   though, it's true that the defendant hears the former

12   president, but what does he hear him say?  "All of us do not

13   want to see our election stolen; that's what they are doing.

14   We will not give up, concede.  We will not take it anymore.  We

15   will stop the steal."

16           I do not accept the defense suggestion, no matter

17   what the case was with other people, that the defendant had no

18   idea he was going to the Capitol until that point.

19           But in any event, immediately after that, he gets

20   there.  The government properly identifies the defendant

21   Rodriguez's participation in the tunnel battle as an overt act

22   in furtherance of the conspiracy, but that's only one of many.

23           We know that the defendant egged Rodriguez on, stoked

24   Rodriguez up, trained him for combat in advance and made sure

25   he had a way to get to Washington.  And the defendant was not

1    passive and certainly wasn't helping the police when the battle

2    in the tunnel was raging right in front of them.  He says he

3    couldn't really see it, it was 75 feet away.  I don't think so.

4    I don't think estimating distances is one of his strong points.

5    When the rioters outside are pushing to try to get into the

6    tunnel because the officers have finally made it to the mouth

7    of the tunnel, he cheers for the heave-hoe effort going on,

8    trying to push their way in.  He gives it the thumbs up.  You

9    can see on Government Exhibit 322.02, him cheering when the

10   other rioters spray chemical spray into the tunnel at the

11   officers.

12         The defendant says the heave-hoe, the utterly

13   unacceptable and unlawful effort he tried to minimize by

14   saying, well, it was just kind of catchy, how could I not chant

15   along?  It was no big deal because at that point the battle in

16   the tunnel was over.  That's not even correct.  Nothing about

17   what was going on at that point was a deescalation.  The

18   rioters were still actively trying to overcome the police and

19   get in.  You can see weapons being passed to the rioters,

20   things still being thrown.  So the defendant watches that, he

21   does nothing, he cheers along, he approves.  That he would

22   still prefer us to believe that he is hero.

23         I fought antifa and I protected our beautiful

24   national treasure, the Capitol.  And I can pick out antifa.

25   They wear black.  I would just like to say, if you look at

1    Government's Exhibit 504, the picture of the defendant's group,

2    both DJ Rodriguez and a young woman in the group are wearing

3    black.  Exhibit 506, Gina is dressed in black.

4          The defendant is very proud of the video where he

5    pulls down another rioter trying to break a window, but he's

6    using it to tell more than one story.

7          He tells InfoWars, "I was an antifa warrior."  And if

8    you look at Government's Exhibit 422 and the defense exhibits,

9    this incident, yes, someone nearby yelled "antifa."  But what

10   did the defendant say when he got the person in his hands?

11   "Knock it off.  We want to arrest traitors, not damage the

12   building."  "We" gives rise to a fair inference that he knew

13   perfectly well that the guy was with them.

14         So either he knew that from the start and that was

15   why he acted, because one of the patriots was doing something

16   he wasn't supposed to do, or mistook the person for antifa for

17   a moment when someone shouted that out, but realized

18   immediately that that's not who it was.  But then he

19   embellishes the story for Alex Jones after he finds out that

20   Gina has already shared it and decides to go for some glory in

21   the eyes of that particular audience.

22         But the problem with trying to get that story past me

23   is that the defendant's own Exhibit 1 plainly shows that he

24   pulled a guy in a brown jacket and camouflage pants -- which

25   were a very popular fashion statement among the January 6

1    participants, but not the post-modernist antifascists -- off

2    the window.

3          He makes his way to the Upper West Terrace.  He's

4    waiving people in the crowd to his position.  He's directing

5    them to the entrances.  His characterization of his movements

6    as something else doesn't hold up either, the defense says,

7    okay, if you don't believe what we're saying about what he's

8    doing, it's important to note that nobody seems to be paying

9    attention to what he's doing, nobody is following his hand

10   gestures and command.  And that seems to be true, but once

11   again, the issue isn't their intent, it's his, and he thought

12   he was important.

13         He certainly wasn't helping matters.  If you look at

14   Government Exhibit 322, Mr. Back the Blue watches officers

15   scuffle with a rioter, and who does he tell off?  The officers.

16   He gives the officers the finger.

17         At 4:47 p.m. he finally goes inside the building and

18   he says, "Well, of course I went inside.  Gina said I was

19   needed to fight antifa, and that's why I went in."  But if you

20   watch the videos and you watch her screaming into her

21   microphone, she is calling for patriots.  You do see her talk

22   to the defendant at one point before he goes in.  But even she

23   doesn't quite support his version.

24         Her testimony about what they said was very vague.

25   She couldn't really recall at all until counsel prompted her

1  with a leading question that antifa was the subject.  Oh, yes.

2  But still, all she said in court was, quote, Everybody was

3  saying there were busloads of antifa there.  And she testified

4  that she hadn't seen personally anyone who met their

5  description.  And based on her experience, like the

6  defendant's, she said, "You know them when you see them.  They

7  have distinctive dress."

8       Meanwhile, once the defendant gets inside, he doesn't

9  tell one person to knock off what they were doing.  So he has a

10 different theory.  He says, Well, I went in the window to get

11 away from the teargas.  If you watch the video really

12 carefully, you'll see a little puff of smoke at about the same

13 time on the video as the time that the other video shows me

14 going into the window.

15      Well, I don't find that credible because if you watch

16 the video of him going in the window, he is lined up to go in

17 before the puff of smoke ever happens.  It happens behind him

18 and he never even turns around.  And later, when he climbs out

19 the window, he takes his mask off.  He doesn't put it back up.

20      I agree with the government that the evidence showed,

21 by the close of the government's case, that the defendant went

22 in because he wanted to.  His partner Rodriguez went in just

23 before him.  There were no traitors on the terrace, after all.

24 Meanwhile, Gina describes a pretty disgusting scene going on

25 inside, but the defendant doesn't urge anyone to stop tearing

 1     furniture apart or being disruptive or ransacking.  If they

 2     thought they were antifa, he wasn't much of an antifa fighter.

 3     Jeff is asking about how to get upstairs, how to get further

 4     into the building.

 5             The defendant is there when DJ Rodriguez is telling

 6     people to use the table as a shield, to use the legs as

 7     weapons.  He doesn't disagree.  And I believe the video did

 8     reflect that he was able and likely able to hear and see

 9     Rodriguez breaking the window in the next room, as he --

10     shortly before he left.  But I'm not basing my verdict on that.

11             When the group does get out of the first room and

12     heads down a small hallway and they encounter a locked door, he

13     is standing right there while they are trying to kick it in.

14     There is no suggestion that those guys were antifa.  He's part

15     of that effort and he's disappointed when it didn't lead him

16     any where.

17             The defendant finds, when he said, "Nothing from me

18     here," that that shows sort of an exculpatory fact, that shows

19     his attitude.  But it gave the impression, shucks, there's no

20     traitors, there's no access to the people I'm trying to get to,

21     this doesn't lead me anywhere.  If the disappointment was

22     because he really wanted an exit, there was one right there and

23     he didn't take it.

24             Eventually the police arrive, they order everyone

25     out.  And, yes, he complies.  But how does he conduct himself

1    after he leaves?  Government Exhibit 905.50, the defendant is

2    on alert early that afternoon that DJ Rodriguez had tased an

3    officer in some manner.  Rodriguez sends out the message, "OMG

4    I did so much F'ing shit and got away with it.  I tased the

5    fuck out of the blue."  It's one of the worst pieces of

6    evidence we have in this entire case.

7          It's not by Mr. Badalian, but Mr. Badalian is a

8    recipient of it and after they leave the building, Rodriguez's

9    bragging in triumph, mission accomplished.  Chris Almonte said

10   the defendant was there that evening when DJ was excited about

11   what he'd stolen and what he'd done.  Was the defendant

12   concerned, was he disgusted with this violence?  Was he eager

13   to be sure that all wrongdoers were prosecuted?  Was he ready,

14   willing, and able to be a witness, as he claimed?  No.  He was

15   sending around a meme, proud of the day, made out of LEGOS.

16   He's pleased, too.

17         He says his goal was to support the police, to help

18   them when they make arrests, he's always been pro blue.  And I

19   would love to say that I saw that on the videos.  But if he

20   stood up for the blue against Black Lives Matter protestors, he

21   sure didn't do it on January 6 when the officers were trying to

22   protect the Capitol against an angry mob who called themselves

23   patriots.

24         By January 7th, Government Exhibit 908, he knew the

25   FBI was looking for people who were there.  Gina's videos, I

1    believe, had already been posted by that point.  People in the

2    group are talking about laying low and deleting posts.  But, is

3    he eager to be a witness?  There doesn't seem to be any tip, no

4    call from the back-the-blue guy about his own friend, because

5    he knew he'd be caught, too.

6          The evidence regarding the trip to Gina's after she

7    called him Ed on Alex Jones' InfoWars will be taken up more

8    specifically when I talk about Count 3.  But there is

9    undisputed evidence that he was advancing a false narrative

10   even on his own platform.

11         Government Exhibit 604.07 bears on his knowledge of

12   wrongdoing throughout.  He says, "We didn't do anything.  We

13   didn't assault law enforcement," when you knew from Rodriguez

14   that that was a completely false statement.  He says now, "Oh,

15   I was charging my phone when DJ sent that message."  But that

16   doesn't matter because DJ had already told him he tased

17   officers.  And he can't wiggle out of that by saying, Oh, but

18   he didn't tell me he tased one in the neck, he just told me he

19   tased one in their hands, if somehow that's a better piece of

20   information.

21         He also posts, "Simply being on Capitol grounds is

22   not illegal," which is a true statement, but that is not what

23   he did because he knew they'd both gone in.

24         And then he gets a new phone.  I don't buy the

25   I-was-afraid-of-being-doxxed theory, which I find was crafted

1    for this trial.  This is a guy whose brushes with antifa were

2    all over the internet before the election, before January 6.

3    He was well-known in the community, his local adversaries knew

4    his full name already.  After January 6, he was trying to

5    protect himself from someone else; the FBI.  And he knew full

6    well he wasn't supposed to have been inside.

7         So what are the legal standards that I need to apply

8    to that evidence?  Under Federal Rule of Criminal Procedure 29,

9    pursuant to *United States versus Davis*, 562 F.2d 681, at 683,

10   from the D.C. Circuit in 1977, it is only when there is no

11   evidence upon which a reasonable mind might fairly conclude

12   guilt beyond a reasonable doubt that the judge may properly

13   take the case from the jury.

14        Put another way, as the Circuit said in *United States*

15   *versus Weisz*, 718 F.2d at 437, citing *United States versus*

16   *Singleton*, 702 F.2d 1159, a district court may grant a motion

17   for judgment of acquittal only when a reasonable juror must

18   necessarily have had a reasonable doubt as to the defendant's

19   guilt.  In evaluating a motion for judgment of acquittal, the

20   court should consider the evidence in the light most favorable

21   to the government.  That's *United States versus Wahl*, 290 F.3d

22   370, at 375.  And the standard was also set out in

23   *United States versus Treadwell*, 760 F.2d 327, from the D.C.

24   Circuit in 1985.

25        What about when the court, sitting as the finder of

1    fact, goes on to reach a verdict?  The standard, as we all

2    know, that the government must prove each element of each

3    offense beyond a reasonable doubt.  I have reviewed, and this

4    ruling was reached after close consideration of and in

5    accordance with the agreed-to set of elements of the offenses

6    that I created drawn from the parties' proposed jury

7    instructions, including all of the commentary and the lengthy

8    definitions that followed each of the elements in those

9    documents that I distributed before the trial started.

10          I docketed them yesterday for the record and they are

11   incorporated by reference today.  So I'm not going to read each

12   of the entire instructions in full into the record today, but

13   they, too, are part of the basis for what I'm about to say, and

14   I will be reading excerpts of them.

15          Also, of the standard jury instructions for the

16   District of Columbia, I paid special heed to the standard

17   instruction for burden of proof, presumption of innocence,

18   2.107; reasonable doubt, 2.108, and; proof of state of mind, at

19   3.101.

20          Count 1 charged conspiracy, in violation of 18

21   U.S. Code § 371.  The elements are:  That from December 19th,

22   2020, until on or about January 19, 2021, an agreement existed

23   between two or more people to commit the crime of obstruction

24   of an official proceeding or the crime of tampering with a

25   record, document, or object;

1        Second, the defendant knowingly and intentionally

2   joined in the agreement, with the intent to achieve the

3   unlawful object of the conspiracy, and;

4        Third, one of the people involved in the conspiracy

5   took an overt act for the purpose of carrying out the

6   conspiracy.

7        As I said, the complete instructions is part of the

8   record, but it includes the following:  The conspiracy is an

9   agreement by two or more persons to join together to accomplish

10  some unlawful purpose.

11       The first element is the existence of the agreement,

12  that two or more persons knowingly and intentionally arrived at

13  a mutual understanding or agreement, either explicitly or

14  implicitly, to work together to achieve a common and unlawful

15  objective or objectives.  Here, the two or more persons would

16  include the defendant, Ed Badalian, and the co-defendant,

17  Daniel Rodriguez.

18       There is no need for a formal or written agreement.

19  An express oral agreement, or even a meeting where all the

20  details are agreed upon or discussed.  But it's also true that

21  merely because people get together and talk about common

22  interests or do similar things doesn't necessarily show that an

23  agreement exists.  It does not matter whether the persons who

24  formed the agreement actually carried out their plans or

25  whether the agreement ultimately was successful.

1          The second element is whether the defendant

2     intentionally participated in the conspiracy with the knowledge

3     of its unlawful purposes, and with the innocent to further its

4     unlawful objectives.  There has to be proof that the defendant

5     knowingly and intentionally entered into the conspiracy with

6     criminal intent; that is, with a purpose to violate the law,

7     and that he agreed to take part in the conspiracy to promote

8     and cooperate in its unlawful objectives.

9          Unlawfully means contrary to law.  The defendant

10     doesn't have to know that he's breaking any particular law, but

11     he has to have been aware of the generally unlawful nature of

12     the goals.  It's not necessary to find that the defendant

13     agreed to all the details of the crime.  What matters is that

14     the person understands the unlawful nature of the plan and

15     voluntarily and intentionally joins in it with the intent to

16     advance or further the unlawful object of the conspiracy.  The

17     mere presence at the scene of the agreement or of the crime or

18     merely being with other participants doesn't show that he

19     knowingly joined in the agreement.  Also, unknowingly acting in

20     a way that helps the participants, without more, doesn't make

21     the defendant part of the conspiracy.

22          Third thing the government has to prove is that one

23     of the members of the conspiracy took an overt act to

24     accomplish some object of the conspiracy.  In determining

25     whether a conspiracy existed and whether the defendant was one

1   of its members, the factfinder may consider the acts and

2   statements of the other members of the conspiracy.

3        While I have and I will refer to some of those today,

4   I want to emphasize that the verdict I'm going to return can be

5   supported without need to rely on other individuals'

6   statements.

7        Count 1 charges the defendant with conspiring to

8   achieve two separate goals:  To stop, delay, or hinder

9   Congress's certification of the Electoral College vote, or;

10        To corruptly alter, destroy, or mutilate and conceal

11   a record, document, or other object to prevent evidence of

12   their unlawful acts on January 6 from being used in a different

13   official proceeding; that is, the grand jury investigation into

14   the attack of the Capitol on January 6.

15        The government had to prove at least one of those two

16   goals beyond a reasonable doubt to succeed on Count 1.

17        For purposes of Count 1, then, it's also useful to

18   review the elements of those offenses which are also separate

19   counts I'm going to have to consider anyway.

20        Count 2, obstruction of an official proceeding and

21   aiding and abetting, in violation of 18 U.S. Code § 1512(c)(2)

22   and 2.  The elements of the 1512 count are:  First, that the

23   defendant attempted to or did obstruct or impede an official

24   proceeding; second, that he intended to obstruct or impede the

25   official proceeding; third, that he acted knowingly, with

1    awareness that the natural and probable effect of his conduct

2    would be to obstruct or impede the official proceeding, and;

3    fourth, that he acted corruptly.

4         For the first element, the term "official proceeding"

5    includes a proceeding before the Congress.  And as used in

6    Count 2, the term "official proceeding" was defined to mean

7    Congress's joint session to certify the Electoral College vote.

8         The word "attempted" in the first element means that

9    the defendant had the intent to do the act and took a

10   substantial step towards completing it.  It would not be enough

11   to show merely that the defendant thought about it.  The

12   government needs to prove that the defendant's mental state

13   passed beyond the stage of thinking about the crime to actually

14   intending to commit it.  Nor would it be sufficient if he

15   simply made plans to commit it.  The evidence must show that he

16   took clear steps to carry out his intent.  If the government

17   proves either that the defendant knowingly committed the act or

18   attempted to commit it, the first element is satisfied.

19        But the third element, a person acts "knowingly" if

20   he realizes what he's doing and is aware of the nature of his

21   conduct, and doesn't act through ignorance, mistake, or

22   accident.

23        With respect to the fourth element, to act

24   "corruptly," the defendant must use an unlawful means or have a

25   wrongful or unlawful purpose, or both.  The defendant must act

1    with consciousness of wrongdoing, which means with an

2    understanding or awareness that what the person is doing is

3    wrong or unlawful.

4          While the defendant must act with intent to obstruct

5    the official proceeding, this doesn't have to be the

6    defendant's sole purpose.  The defendant's unlawful intent to

7    obstruct justice is not negated by the simultaneous presence of

8    another purpose for the defendant's conduct.

9          The defendant may be found guilty of this count as a

10   principal and also as an aider and abetter, and the elements of

11   aiding and abetting were set out in the elements that I

12   docketed.  I won't repeat all of them here.  But I do agree, as

13   the defendant reiterated in his closing argument, that mere

14   presence is not enough for aiding and abetting.

15         But, in sum, for Rule 29 purposes for both Counts 1

16   and 2, the government had to prove defendant's intent to

17   obstruct the official proceeding alleged in the indictment.

18   The law does not require proof that the official proceeding was

19   actually pending or underway, or that it was about to be

20   instituted at the time of the defendant's actions.  But if the

21   official proceeding was not pending at the time of the

22   defendant's conduct, the government must prove beyond a

23   reasonable doubt that the official proceeding was reasonably

24   foreseeable to the defendant at that time.

25         In addition, the law requires that there be a

1   connection or relationship in time, causation, or logic between

2   the obstructive act and the proceeding; that is, the government

3   must show that the defendant had knowledge that his actions

4   were likely to affect the proceeding.

5          The Supreme Court set out this requirement in *United*

6   *States versus Aguilar*, 518 U.S. 593, 599 to 600.  *Aguilar*

7   defined what we're calling the nexus requirement in connection

8   with the offense of obstructing a judicial proceeding to be:

9   That the act must have a relationship in time, causation, or

10  logic with the judicial proceeding.  The court reiterated the

11  requirement that there be a nexus between the obstructive act

12  and the proceeding, *United States versus Arthur Anderson*, 544

13  U.S. 696, and it applied the same principle to § 1612 as well

14  the defendant has to have a particular official proceeding in

15  mind and here that official proceeding has to be one alleged in

16  the indictment.  The congressional certification of the

17  Electoral college results not simply some business of the

18  government that congress with the results of the election in

19  general and the government again is not required to show that

20  the defendant's sole intent was to impede the proceeding.

21          This is where the defense says the evidence falls

22  short but I disagree.

23          With respect to Count 1, I find that there was

24  sufficient evidence that the close of the government's case to

25  support a determination by a reasonable juror that the

1    defendant was guilty of conspiring with Danny Rodriguez at

2    least to commit the offense of obstructing the official

3    proceeding taking place at the Capitol that day, the Electoral

4    College vote, and corruptly seeking to conceal evidence from

5    the grand jury and, therefore, I deny the motion for judgment

6    of acquittal.

7           And then I need to go on to my verdict.  And I find

8    the defendant guilty beyond a reasonable doubt of conspiring to

9    commit the offense of obstructing the official proceeding, that

10   is, the certification of the Electoral vote.  The evidence does

11   not reflect an intent on Badalian's part, even if it was the

12   case for Al Carstens, of a plan to travel to D.C. just to hear

13   the President one last time.  Nor did he travel for what he's

14   trying to claim now was his plan to defend protestors from an

15   act by antifa.

16          He was following the election closely and he was

17   determined that the results should be undone.  His stated

18   purpose, which he underscored both before and while he was at

19   the Capitol, was to arrest traitors; that is, to ensure that

20   the lawful transition -- of which he knew the certification was

21   an essential part -- did not take place.

22          He had knowledge that the official proceeding was

23   supposed to take place that day.  He not only joined, but

24   formed and initiated the conspiratorial agreement.  And putting

25   as side the obvious overt committed by his co-conspirator,

1    Danny Rodriguez, this defendant personally organized the

2    travel, obtained the van, and organized and transported not

3    only protective gear and people, but weapons.

4           The defense says, well, he didn't do much of anything

5    once he got there.  And that may be true, but that doesn't

6    negate the elements of a conspiracy.  It's about making the

7    plan, taking a step to implement the plan, but it doesn't

8    require executing the plan and it doesn't require success.

9           It's not surprising that even the badly outnumbered

10   and poorly equipped police force that greeted the rioters

11   didn't let anyone effect an utterly unlawful citizen's arrest

12   of Nancy Pelosi.  And no, Mr. Badalian, the Constitution does

13   not give you the right to do that.

14          The defense says, well, there's no evidence that the

15   defense knew what President Trump would tell them to do.  But

16   the defense arrived in a bellicose, aggressive mood before he

17   heard anything that President Trump had to say, and his plans

18   were set.  Chris Almonte testified that he finally realized the

19   defendant meant everything he'd been saying when they arrived

20   at the Ellipse and he insisted on pushing past a barricade.

21          The poster with the schedule for the day and the

22   Capitol as the 1 p.m. activity was circulated by Rodriguez

23   before January 6, and not a single one of the defendant's

24   pre-January 6 communications with about hearing what the

25   President had to say.  It was all about getting and stopping

1    the traitors.  He was ready when he arrived.

2            As for the argument that, well, if the U.S. Capitol

3    Police didn't know, how can we impute the necessary knowledge

4    of an impending insurrection to the defendant?  I find that to

5    be entirely unpersuasive and just an effort of misdirection.

6            First of all, there was no evidence in this record

7    regarding the state of the intelligence known to the FBI or the

8    U.S. Capitol Police or MPD prior to January 6.  But even if

9    every single member of law enforcement was as clueless as the

10   officers who testified, the record amply supports a finding

11   that this defendant knew what he intended to do and why he was

12   there.  Just because no one else, no one in a position to

13   intervene was aware of the conversations he tried to keep

14   within a close group of confidants, doesn't mean they weren't

15   happening.  The fact that Carstens doesn't know is irrelevant.

16   He wasn't even on the chain.

17           Nor did the defendant's own testimony give rise to a

18   reasonable doubt.  The defendant appears to be a very self-

19   satisfied young man, impressed with his own intelligence and

20   strategic acumen.  He seemed to think that charming me,

21   impressing me with how smart he was was the way to go.  For

22   example, the defendant told me, Oh, I couldn't call and turn in

23   Danny because I didn't know Danny had assaulted officers, that

24   was hearsay.  Actually, Mr. Badalian, it wasn't.

25           Also, Mr. Badalian's demeanor did not lend

1    credibility to the story he was trying to tell, and in the end

2    the story appeared to be have been reverse engineered based on

3    the videos the government had introduced, with the defendant

4    cherry picking the parts he wanted to emphasize and ignoring

5    the rest.  And the self satisfaction and the hubris on display

6    in this courtroom was, as the government argued in rebuttal, of

7    a piece with the hubris he showed all along; that he had the

8    right to come to the nation's Capitol and arrest people.  To

9    make sure the Electoral process did not come to its conclusion.

10    To be part of the havoc of the day and then blame it on

11    everyone else.  So that's Count 1.

12           With respect to Count 2, I find the defendant guilty

13    beyond a reasonable doubt of obstructing an official

14    proceeding, both as a principal and as an aider and abetter.

15    And I deny the Rule 29 motion based on the evidence at the

16    close of the government's case.

17           Do I think he organized the entire assault on the

18    Capitol on January 6?  He's not charged with that.  Did he

19    assault a law enforcement officer or plan to do so?  He's not

20    charged with that.  And he will not be sentenced for what his

21    co-defendant, Daniel Rodriguez, did to a Metropolitan Police

22    officer who was heroically performing his duty that day.

23           He was not the worst January 6 offender in this

24    courthouse, or even in this courtroom.  But he is guilty of

25    violating the law.

1          He traveled 3,000 miles with a crew to make sure the

2     certification never happened, to undue the outcome of the

3     election.  The idea that he ended up pushing his way through

4     the crowd, pushing his way up the building, climbing up a

5     concrete banister to stand in a tight line with others was

6     because he was trying to get around the building to the other

7     side made no sense whatsoever.

8          After all, he's the one who said, in Government

9     Exhibit 904.11, "We shall act.  Protests don't get people

10    elected."  And even if his plans didn't coalesce until he heard

11    the former President speak -- which I don't believe --

12    Mr. Trump did not call upon the crowd to make a loop around the

13    city.  The speakers encourage the crowd to fight.

14          The defendant not only stood by, but actively

15    encouraged as others assaulted officers, broke into and

16    destroyed items in the Capitol building.  It really does not

17    matter to me if he was moving the chair in the room because he

18    was overcome by a sudden urge to tidy up, or if he was trying

19    to get it out of his way because it was blocking the door that

20    led further into Capitol.  The point is, either way, once the

21    doorway was cleared, the defendant was one of the first people

22    to go through it.

23          And if he was so motivated to go inside by a call to

24    stop antifa, and he was so offended by what he saw when he got

25    there -- a group of people who were not wearing black or "most

1    modernist" berets -- breaking the furniture apart to arm

2    themselves and trying to gain access to other parts of the

3    building, he was sure quiet about it.

4              And it doesn't matter to this Count if he entered the

5    building after the official proceeding had been suspended and

6    the Vice President had already been evacuated to another safe

7    place within the building.  First of all, there's zero evidence

8    in the record that the defendant was aware of that at the time.

9    The defendant understood and the evidence proves beyond a

10   reasonable doubt that he was well aware that on January 6, at

11   the Capitol, that is where the election results he could not

12   abide would become official.

13             And, no, one person alone was unlikely to stop that

14   from happening, but whether as a principal or as an aider and

15   abetter, his presence inside the building added bulk to the mob

16   and made it impossible for the count to take place as the

17   building was no longer secure.

18             The Vice President could not return to the Senate

19   chamber and resume the proceeding, which was not over but had

20   only been suspended, and none of the members of Congress could

21   return to either chamber until each and every one of the

22   disruptive trespassers -- especially the ones who were there to

23   "arrest" them -- had been removed from the building.  Further,

24   there was evidence that our expert protestor understood well

25   that even just swarming a building can affect the ability to

1    get the business of the day accomplished inside.

2           So that's count 2.

3           He's also charged, in Count 3, with tampering with

4    documents or proceedings, in violation of 18 U.S. Code §

5    1512(c)(1), and that was an alternative object of this

6    conspiracy offered up for Count 1.

7           Elements of that are:  First, that the defendant

8    altered, destroyed, mutilated or concealed, or attempted to

9    aller, mutilate or conceal a record, document, or other object;

10   that he acted with the intent to impair the object's integrity

11   or availability in an official proceeding; that the defendant

12   knew or should have known that the official proceeding was

13   pending or likely to be instituted and acted with awareness

14   that the natural and probable effect of his conduct would be to

15   obstruct or impede that proceeding; fourth, that he acted

16   corruptly, and; fifth, that the official proceeding was a

17   federal proceeding, in this case, identified as the grand jury

18   investigation into January 6.

19          All those elements were further described and defined

20   in greater detail in the instruction that's already been made

21   part of the record and that I distributed to counsel before the

22   trial began.

23          But I don't think I need to get further into the

24   definition of "knowing" or "corruptly" since the issue with

25   respect to Count 3 is was he there or not?  And for Count 1,

1    did he knowingly join an agreement to accomplish this unlawful

2    goal?  There is no question that an overt act was undertaken by

3    Jeff, at least, when he showed up at Gina's house and told her,

4    memorialized in a note, that she should take down her

5    incriminating videos and put them all on a secure hard drive

6    instead, and when he drove her to Best Buy to obtain one.

7         But can we tie this defendant to all of that?  For

8    purposes of Rule 29, I do find that the evidence was sufficient

9    such that a reasonable juror, resolving all inferences in the

10   government's favor, could reach a determination that the

11   defendant was guilty of this offense.  Gina Bisignano did say

12   initially on direct that after she spoke on InfoWars and named

13   defendant as "Ed," that "everybody was a little mad at me,

14   although Ed didn't get nasty."

15        She did recall a conversation where he was in her

16   kitchen.  This version made sense, since she specifically

17   recalled that they came on their way home from D.C., when they

18   would still have been together in the van.  And not only in the

19   grand jury, but in court, she had a distinct recollection of

20   the defendant sitting in her kitchen and being part of the

21   incident involving DJ and Jeff.  It was whether Gabe was there

22   or Gabe wasn't there that she was confused about.  And she was

23   sure that the trip to Best Buy was with Jeff alone, so the

24   other incident was not Jeff alone.  And even under cross

25   examination she came back to a vision of Ed in her kitchen.

1       So when I consider the in-court testimony, plus the

2    grand jury testimony with which she was impeached, and apply

3    the appropriate legal standard resolving inferences in favor of

4    the government, the Rule 29 motion with respect to Count 3 will

5    be denied.

6       But I can't in good conscience find him guilty beyond

7    a reasonable doubt of Count 3.  Gina was a hot mess.  She was

8    possibly one of the worst witnesses I've ever sat next to in

9    this courtroom.  She came in beaming.  She struck a pose as if

10   this was about to be her break-out performance, a star turn.

11   At times she seemed to be smiling and flirting with the agent,

12   possibly hoping to please him.

13      But from the start, she appeared torn between her

14   obligation to cooperate with the government and testify in a

15   way that could improve her own sentence for her own

16   misconduct -- which the defense maintains undermined her

17   credibility -- but she appeared equally motivated, and in the

18   end more motivated to maintain her standing with her peers, the

19   patriot community in California.

20      I think that was even a stronger motivation to shade

21   her testimony and avoid implicating the defendant than her fear

22   in the face of what the government described as ongoing

23   intimidation, or at least snarky disparagement and insults

24   being thrown her way that fell somewhere short of threats by

25   friends of the defendant who were apparently in communication

1    with the defendant during the trial.  Which is not a fact, by

2    the way, that helps the defendant.

3         All of these competing impulses, which you could

4    practically see flickering across her face, produced testimony

5    which was internally inconsistent and inconsistent with her

6    prior sworn testimony on the matter, which I do understand I

7    may consider as substantive evidence on this point.  It's part

8    of why I just denied the Rule 29 motion.

9         Her claimed lack of memory was probably the most

10   incredible aspect of her testimony since it came and went

11   depending on who was asking the questions.

12        And it is true, that the defendant's current

13   girlfriend, Kaylin -- it was hard to keep them all straight

14   during the trial -- was obviously biased in his favor.  And

15   notwithstanding her bias, though, she was generally a more

16   credible witness than Gina was.

17        But, immediately after remembering Ed at her table,

18   Gina also said he wasn't there when Jeff told her to not to say

19   anything, and explained why they were there.

20        Given all of that, in the end, I think even the

21   prosecutors know that if the factfinder adheres to the

22   presumption of innocence and the standard jury instruction for

23   what beyond a reasonable doubt means and how it should be

24   applied, this count with Gina did not get over the finish line.

25   So I'm going to find the defendant not guilty of Count 3.

1          That brings us to Count 10, entering or remaining in

2     a restricted building or grounds, in violation of 18 U.S. Code

3     § 1752(a)(1) and(b)(1)(A).  It has two elements:  The defendant

4     entered or remained in a restricted building or grounds without

5     lawful authority to do so, and; second, that he did so

6     knowingly.

7          The term "restricted building" means any posted,

8     cordoned off, or otherwise restricted area of a building or

9     within the Capitol and its grounds where a person protected by

10    the Secret Service is or will be temporarily visiting.

11         The term "person protected by the Secret Service"

12    includes the Vice President and his immediate family.

13         The person acts knowingly if he realizes what he is

14    doing and is aware of the nature of his conduct and doesn't act

15    through ignorance, mistake, or accident.  In deciding whether

16    the defendant knowingly entered or remained in a restricted

17    building, one may consider all of the evidence, including what

18    the defendant did or said.

19         I find that the evidence at the close of the

20    government's case plainly supported a guilty verdict on this

21    count and I find the defendant guilty beyond a reasonable doubt

22    of this offense.  Perhaps the snow fence had already been

23    trampled, but the signs saying the area was closed hadn't

24    evaporated.  I reject the notion that the defendant didn't

25    know, given the announcements and the rows of officers, the use

1    of chemical spray and the sirens and the fact that he had to

2    climb up the building, that he wasn't supposed to be on the

3    grounds.

4          But even if there is some sliver of a reason to

5    suppose that our professional protestor was ignorant about all

6    of that, we have the restricted building part of the offense as

7    well, and he knew perfectly well he wasn't supposed to climb in

8    a window and be inside the Capitol, a window that he knew

9    someone wasn't even supposed to have broken.  There has been no

10   serious argument presented as to why there would be any

11   reasonable doubt about this, and there isn't any.

12         So, with that, the guilty verdicts of Count 1, 2, and

13   10, we need to set a date for sentencing and for the filing of

14   sentencing memoranda.  And we need to talk about bond pending

15   sentencing.  But I want to start first by setting dates.  It's

16   taking the probation office, at this point, approximately 90

17   days to prepare a presentence report.

18         So where does that take us, Mr. Haley?

19         THE COURTROOM DEPUTY:  One second, Your Honor.

20         (Pause.)

21         THE COURTROOM DEPUTY:  That takes us, at a bare

22   minimum, into the week of the 4th of July, Your Honor.

23         THE COURT:  All right.  We have a trial starting the

24   10th.

25         THE COURTROOM DEPUTY:  Yes.

1          THE COURT:  My calendar is taking its good old time.

2     I'll have it up in a minute.

3          (Pause.)

4          THE COURT:  All right.  That is not a good week for

5     me.  I don't know that we've said whether we're going to sit on

6     Fridays during the trial, but people usually strongly prefer

7     that we don't.  The jurors need a break, the lawyers often need

8     a break.  So, I could conceivably set it on Friday, July 14th,

9     or look to the 21st of July.

10          Mr. Helfend, you're nodding at me.

11          MR. HELFEND:  That's fine.  The 21st is fine, Your

12     Honor.

13          THE COURT:  And what about you, Ms. Paschall?

14          MS. PASCHALL:  I think the 21st is better.

15     Mr. Mariano is expecting to be in trial at that time, so the

16     21st would be best.

17          THE COURT:  We'll set this down for sentencing on

18     July 21st, at 9:30 in the morning.  Sentencing memoranda then,

19     make them due on July 12th.

20          And, Mr. Helfend, what I tend to prefer, if you

21     supply sentencing letters in support of your memorandum, it's

22     easier if they come to me as attachments to your memorandum.

23     If people write me directly, I can tell you, I'm going to

24     docket every letter I get anyway, but I think it's easier when

25     they all come in a package and you've had a chance to see them

1    and take any identifying, you know, addresses, information off

2    of them and then make them exhibits to your sentencing

3    memorandum, if you choose to provide letters.

4            The government, as I understand it, is not opposing

5    that the defendant remain on release pending sentence in this

6    case.

7            MS. PASCHALL:  That's correct, Your Honor.

8            THE COURT:  All right.  And given the defendant's

9    ongoing compliance with his conditions of release and the fact

10   that the government is not asking for a change, I will permit

11   him to remain on release pending sentence.  However, it is

12   important to note that the burden here has shifted and we are

13   subject to a new standard under § 3143.  And for the first time

14   in this case, the defendant now knows he is facing sentencing

15   for serious felonies the next time he appears, and he has to

16   bring himself all the way across the country to do that.

17           Given his distance from this jurisdiction, the

18   serious nature of what he's facing and the terms of the

19   statute, I am still satisfied that he should be released today,

20   but I'm not confident that the conditions we have are

21   sufficient.  And, therefore, I'm going to add as a condition

22   that between now and the sentencing date, the defendant be

23   subject to location monitoring in the form to be directed by

24   the pretrial services agency in his district, that he must,

25   before leaving the courthouse today, report to the pretrial

1    services agency -- just to your right as you exit the door --

2    to receive the ankle bracelet.  And this is going to be a

3    condition of his release moving forward.

4            Is there anything further on behalf of the government

5    at this time?

6            MS. PASCHALL:  No, Your Honor.  Thank you.

7            THE COURT:  Anything further, Ms. West, on behalf of

8    the defendant?

9            MS. WEST:  No, Your Honor.

10           THE COURT:  Mr. Helfend?

11           MR. HELFEND:  No, Your Honor.

12           THE COURT:  All right.  I will see --

13           THE DEFENDANT:  Can I say something?

14           THE COURT:  I'm sorry, can you say something?

15           THE DEFENDANT:  Can I say one thing?

16           THE COURT:  Why don't you ask Ms. West first.

17           (Off-the-record discussion between defendant and

18   counsel.)

19           MS. WEST:  We have nothing, Your Honor.

20           THE COURT:  Okay.  All right.  I'll see everybody in

21   July.

22           Ms. West, I would appreciate it if you would escort

23   him to pretrial.

24           MS. WEST:  Yes, Your Honor.

25           THE COURT:  Thank you.

                              *   *   *

1                    CERTIFICATE OF OFFICIAL COURT REPORTER

2

3          I, JANICE DICKMAN, do hereby certify that the above and

4     foregoing constitutes a true and accurate transcript of my

5     stenographic notes and is a full, true and complete transcript

6     of the proceedings to the best of my ability.

7                              Dated this 16th day of April, 2023

8

9

10                              _____

11                              Janice E. Dickman, CRR, CMR, CCR
                                Official Court Reporter
12                              Room 6523
                                333 Constitution Avenue, N.W.
13                              Washington, D.C.  20001

14

15

16

17

18

19

20

21

22

23

24

25