# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | **Case No. 21-cr-392-1 (RCL)** |
| **ALAN HOSTETTER,** | |
| **Defendant.** | |

## GOVERNMENT'S SENTENCING MEMORANDUM

*"Choke that city off, fill it with patriots, and then those people behind the walls of the Senate and the House are gonna be listening to us chanting outside those walls. . . . And they're gonna realize, we have one choice.   We either fix this mess and keep America America, or we become traitors, and those five million people outside the walls are gonna drag us out by our hair and tie us to a fucking lamp post.   That's their option."*

Alan Hostetter, December 19, 2020, Government's Trial Exhibit 309.

Alan Hostetter planned for the January 6, 2021 riot for weeks.   He conspired with others, he collected weapons, and he traveled across the country for the riot, with the goal of using the threat of violence to disrupt the peaceful transfer of power.   On January 6, 2021, armed with a hatchet and other weapons, he joined his coconspirators and a mob of other rioters in surrounding the U.S. Capitol building, where he remained for hours, in defiance of police commands and at risk to the safety of the government officials in the building.   For the reasons set forth herein, for his convictions for Conspiracy To Obstruct an Official Proceeding, Obstruction of an Official Proceeding, Entering and Remaining in a Restricted Building or Grounds with a Deadly or Dangerous Weapon, and Disorderly and Disruptive Conduct in a Restricted Building or Grounds with a Deadly or Dangerous Weapon, the United States requests that this Court sentence Hostetter

1

to 151 months of incarceration, 36 months of supervised release, $2,000 in restitution, and a special assessment of $400.   The United States recommends this upward departure from the government's calculated advisory Guidelines range of 108–135 months, to reflect the gravity of Hostetter's conspiratorial conduct, including his planning and preparations with Russell Taylor for the attack on the U.S. Capitol on January 6th—an attack that was clearly calculated to influence and affect the conduct of the United States government and to disrupt the peaceful transfer of power.

## I.      FACTUAL BACKGROUND

### A.      The January 6, 2021 Attack on the Capitol

The government refers the Court to the Statement of Offense filed in the case of Hostetter's codefendant, Russell Taylor, ECF 197 at ¶¶ 1–7, for a short summary of the January 6, 2021 attack on the United States Capitol by hundreds of rioters, in an effort to disrupt the peaceful transfer of power after the November 3, 2020 presidential election.

### B.      Hostetter's Role in the January 6, 2021 Attack on the Capitol

#### *Preparing for Violent Revolution After the 2020 Election*

On November 3, 2020, the 2020 presidential election was held, and, by November 7, major news media outlets declared that Joe Biden had emerged victorious, and then-President Donald Trump had lost his bid for reelection.   That is not the result that Alan Hostetter and his principal coconspirator, Russell Taylor, had hoped for.   *See* July 7 Trial Tr. 15:25–16:11.   Hostetter and Taylor were close friends and served together on the board of the American Phoenix Project—an

organization that Hostetter had founded.[1]   *See* July 7 Trial Tr. 23:2–11, 27:4–15.   Hostetter and

Taylor closely followed and frequently discussed the 2020 presidential election.   *See* July 7 Trial

Tr. 37:20–39:23, 68:14–20.

When Trump lost, Hostetter and Taylor turned to each other to figure out how to take action

to help change the results.   *See* July 7 Trial Tr. 42:11–43:15.   Shortly after the election, Russell

Taylor asked Hostetter how they should respond to the 2020 election results.   He asked, "How do

we have a show of force?   Motorcade?   Rally?   Riot?"   Exhibit 908.04.   Hostetter responded,

"[W]e need to watch Trumps press conference in 30 minutes.   Might give some cues on how we

react.   If he declared victory, we should announce our victory party shortly thereafter."   *Id.*   As

the results became clear, Hostetter and Taylor began to use the American Phoenix Project to

organize protests to the election results and to encourage violence.   *See, e.g.*, Exhibit 909; July 7

Trial Tr. 43:9–44:18, 70:7–72:23.   Hostetter had a clear view of what was coming: "If this doesn't

turn around we will eventually 'Occupy' every state capitol and DC with millions of people!"

Exhibit 909.02; *see also* Exhibit 909.04 ("I bet Georgia state Capitol is flooded tomorrow.   This

is exactly what needs to happen.   Big names like Wood and Powell telling people to get angry,

engage in civil disobedience, take to the streets.").

Notably, even before the election, Hostetter was promoting a violent and revolutionary

ideology—just in case the election did not go his way.   For example, at an October 2020

conference focused on the QAnon conspiracy theory in Scottsdale, Arizona, Hostetter was a

---

[1] Hostetter has characterized the American Phoenix Project—the emblem for which Hostetter regularly stood behind as he advocated for political candidates and called for political violence— a "nonprofit."

featured speaker, on behalf of his organization, the American Phoenix Project.   Hostetter told the crowd, "Nobody wants violence.   Nobody wants violence."   Exhibit 333.   But Hostetter's message that day was not a nonviolent one:

> We are taught from the time we are children in this country to always think that violence is a horrible, horrible thing.   Until we go back and reflect on our revolutionary war.   They picked up guns at some point and said, "Enough."   Until we reflect on the Civil War, when we ended slavery by picking up guns and dealing with it that way.   We don't want that to have to have happen, but it always has to be something in the back of your mind.   We've never been as close to it as we are today since the Civil War.   And you have to be thinking like that.   I'm all about peace, until somebody comes after my kids and my grandkids and says, "No, they're gonna live under Communist rule.   We're gonna have Marxist school systems."

*Id.*   Hostetter made it clear that he did not view violence as necessary at that time, but only for one reason: he thought Trump would win.   He explained, "There comes a time when people end up picking up guns.   I'm not advocating that.   I think through the ballot box on November 3rd, it's gonna be such a huge victory that we will avoid violence by a landslide election."   *Id.*   Hostetter told the crowd that he would abstain from violence—*if* Trump won.   Then Trump lost.

In November 2020, Hostetter traveled to Washington, D.C., for the "Million MAGA March"—a rally to protest the 2020 election results.   Hostetter drove to Washington, D.C. for that event, so that he could bring weapons for himself and for Taylor, who flew in for the event.   July 7 Trial Tr. 46:1–49:17; July 12 Trial Tr. 116:11–117:17.

As he drove across the country, Hostetter recorded a video, where he called for the execution of political officials he viewed of as traitors: "Some people, at the highest levels, need to be made an example of, with an execution or two or three."   Exhibit 305.   He continued, "Tyrants, and traitors, need to be executed as an example, so nobody pulls this shit again in our

lifetime, and the lifetime of our children, and our grandchildren, and their children's children."
*Id.* Hostetter explained how he wanted this violence to send a message: "People should never forget who did this to us, what they did, and what the ultimate punishment ended up being.   That's how you stop this nonsense."   *Id.*   Hostetter didn't merely make these remarks in private. Instead, he intentionally put them on YouTube to promote his violent message.[2]

In the same video, Hostetter explained the purpose of his trip.   He was not going just to protest.   He wanted to send a message to members of Congress that if he did not get his way, he would come back for those members of Congress, to "starve those mother fuckers out" and to "replace" them with people he viewed as "actual patriots."   *Id.*

> I'm going to D.C.   I'm going to be there on Saturday for this march.   I hope there are a million patriots there.   Between that—that's gonna be a shot across bow to the deep state when they see a million patriots surrounding that shithole of a city, the swamp.   Because its gonna make all those swamp creatures know that at any time we want, we'll come back with a million patriots, and we'll surround that city, and we'll starve those mother fuckers out until they come out of their hiding and we'll replace them with actual patriots.

*Id.*   He continued, "I'm telling the swamp right now that we will be back if this doesn't get resolved peacefully and soon."   *Id.*

But November 2020 was far from the only time Hostetter called for executions of people he disagreed with.   In other written, planned remarks from December 5, 2020, Hostetter repeated his calls for executions of political officials he disagreed with:

> As long as people like the Clintons, Brennan, Clapper, the dirty cops of the FBI, the treacherous agents of the CIA remain free, as long as they remain free, we have no justice in this system until all the traitors and coup plotters -- and, yes, that includes Barack Hussein Obama himself -- until these criminals and traitors are behind bars or swinging

---

[2] When asked at trial if the 587 views for this video was a high number of viewers for him, he quipped, "that's pretty low actually."   July 12 Trial Tr. 121:14–22.

from the gallows, there is no justice in this country.   And as long as there is no justice in this country, there can be no renaissance.   There can be no peace.

Exhibit 604.13; *see also* Exhibit 604.09 (metadata).

On December 12, 2020, Hostetter gave another speech calling for the execution of his perceived political enemies.   Speaking to a crowd of supporters, flanked by his coconspirator Russell Taylor to his left and a former U.S. Representative to his right, Hostetter rallied the crowd: "There must—absolutely must—be a reckoning.   There must be justice.   President Trump must be inaugurated on January 20th, and he must be allowed to finish this historic job of cleaning out the corruption in the cesspool known as Washington, D.C.   The enemies and traitors of America, both foreign and domestic, must be held accountable.   And they will.   There must long prison terms, while execution is the just punishment for the ringleaders of this coup."   Exhibit 307; *see also* Exhibit 604.14 (written notes for that speech); Exhibit 332 (Hostetter promoting that speech on Twitter).

### *"Death To Traitors": Hostetter's Plans for January 6, 2021*

On December 19, 2020, then-President Trump shared a Tweet, writing, "Statistically impossible to have lost the 2020 Election.   Big protest in D.C. on January 6th.   Be there, will be wild!"   Exhibit 507.

For many January 6 rioters, this Tweet provided the impetus to get to Washington, D.C. and provided January 6 as the focal point.   Not for Hostetter.   Hostetter was already well aware of the congressional proceeding on January 6, and he knew why it was so important.   On December 16, 2020, Hostetter directed an American Phoenix Project colleague to contact Ali Alexander, an organizer of the Stop the Steal campaign, to suggest a January 6 rally.   Exhibit

909.05.   "Can you try to raise him and see if they are planning any rallies in DC on 1/6/2020 during the joint session of Congress where the electoral results will either be accepted or objected to?   If ever a million patriots needed to be in DC it will be on this day to put the fear of God in those traitors and RINO bastards!"   *Id.*   Hostetter, who was already planning to be in Washington D.C. for that proceeding, added, "'Death to traitors' will be my preferred chant for that day!"   *Id.* *See generally* July 7 Trial Tr. 88:9–89:18.

That same day, December 16, Hostetter made an Instagram post—from the account of the American Phoenix Project—writing, "The time has come when good people may have to act badly…but not wrongly."   Exhibit 515.   The post featured Hostetter holding a hatchet, which Russell Taylor had given him.   *Id.*; *see also* July 7 Trial Tr. 86:2–88:2.



*Exhibit 515*

When then-President Trump sent out the "wild protest" Tweet related to January 6, Hostetter knew what it meant.   "We asked for it…we got it!"   Exhibit 907.21 & 907.21A; *see also* Exhibit 911.02.   When that happened, Taylor testified, "[w]e immediately started planning to come to DC ourselves and starting to kind of organize individuals to come with us."   July 7 Trial Tr. 91:9–11.

On December 19, 2020, shortly after then-President Trump sent out his call for a "wild protest," Hostetter began to amplify that call.   He posted on Instagram about it, and explained why January 6 was so important.   *See* Exhibit 520; *see also* Exhibits 521 & 522.

**1,064 views · Liked by g_money__8 and lulu_sempione**

americanphoenixproject Fight For Trump! · Late last night President Trump tweeted that all patriots should descend on Washington DC on Wednesday, 1/6/2021. This is the date of the Joint Session of Congress  in which they will either accept or reject the fake/phony/ stolen electoral college votes. I will be there, bullhorns on fire, to let the swamp dwellers know we will not let them steal our country from us. I hope you can join me!! #fightfortrump #stopthesteal #savetherepublic

December 19, 2020

*Exhibit 520*

That same day, December 19, Hostetter took to the stage at a rally to pass along the message:

The most important thing that we saw happen in the last 48 hours—did you see President Trump's Tweet last night, where he asked all patriots to descend on Washington, D.C. on January 6th?   Did you see that Tweet last night?   January 6th is going to be one of the most important days in the history of this country.   We're gonna have an opportunity on January 6th for millions of patriots to show up in Washington, D.C., and have an impact on what happens in that joint session of Congress.   That's going to be the last opportunity that we solve this problem constitutionally before we move into the Insurrection Act.   One way or another, this problem is going to be solved.

Exhibit 308.   Hostetter told the crowd what he wanted to accomplish on January 6, when Congress was in session:

Choke that city off, fill it with patriots, and then those people behind the walls of the Senate and the House are gonna be listening to us chanting outside those walls. . . .   And they're gonna realize, we have one choice.   We either fix this mess and keep America America, or we become traitors, and those five million people outside the walls are gonna drag us out by our hair and tie us to a fucking lamp post.   That's their option.

*Id.*   He encouraged his supporters to take off work and find any way to get to Washington, D.C. for January 6.   He compared the planned event to "the Boston Tea Party."   *Id.*

While Hostetter was often out in front of crowds giving speeches, his close friend and coconspirator, Russell Taylor, was doing their organizing behind the scenes, principally through a series of Telegram groups.   *See* July 7 Trial Tr. 49:18–50:8, 52:18–53:24.   As discussed at trial, Taylor created or was the principal communicator in four relevant Telegram groups.

- Taylor created the "California Patriots—Spec Ops," Telegram group, which was owned by Taylor, Exhibit 905, and in which Hostetter was a member, Exhibit 905.01, to organize "Patriots that are ready to function as operators of disruption against Tyranny" with the goal "to remove authority."   Exhibit 905.02.   In this group, Taylor made plans to "disable the vehicles" of city workers, and smash windows at Facebook's offices, all while disguising their actions as those of Antifa.   *Id.*   As Taylor wrote, "[L]et [antifa] get the credit."   *Id.   See generally* July 7 Trial Tr. 82:10–85:9.

- Taylor owned a Telegram group, "So Cal Patriots," in which Hostetter was a member. Exhibit 901.   In the So Cal Patriots Telegram group, Taylor called for violence against political leaders—saying that California governor Gavin Newsom "[n]eeds to be drug out

on the street"—and called for group members to "[s]torm" the California state capitol building, all while Hostetter cheered him on.   Exhibit 901.03.   *See generally* July 7 Trial Tr. 57:25–62:19.

- In Telegram group called "California Patriots—Answer the Call," owned by Hostetter, Taylor organized others to go to Washington, D.C. for January 6, in response to the call from then-President Trump.   *See* Exhibits 902.02, 902.03, 902.04.   Taylor rallied others, saying, "I personally want to be on the front steps and be one of the first ones to breach the doors!"   Exhibit 902.06.   Another group member added, "I like it.   Be the first ones to storm the Capitol.   Go BIG or go home."   *Id.*   Taylor encouraged others to not just attend the Washington, D.C. events, but to bring weapons.   *See* Exhibit 903.02.   *See generally* July 7 Trial Tr. 98:10–102:11, 113:21–115:9.

- Taylor also organized another Telegram group, for those "that are traveling to DC for Jan 6th event that are comfortable with violence."   Exhibit 903.03.   Taylor called them a "group of warriors."   *Id.*   That Telegram group was called "The California Patriots—DC Brigade," and it included dozens of members.   Exhibit 904.01.   In his first messages to the group, Taylor stated, "This thread is exclusive to be utilized to organize a group of fighters."   Exhibit 904.03.   He wrote, "Initially our intent is not to go after and seek violence," but explained, "[a]s we are on site and events begin to unfold that may change."   *Id.*   Hostetter and Taylor's coconspirators and codefendants—Erik Scott Warner, Felipe Antonio "Tony" Martinez, Derek Kinnison, and Ronald Mele[3]—were all members of this "group of fighters."   Exhibit 904.01.   Members of the group discussed their expectation for violence on January 6.   One member wrote, "I am going to dc for rally not to talk but to take care of business, time for talking is over!   This is tyranny and our constitution states we can put bitches 6ft deep!   Let's do it!   There are not enough cops to stop us!"   Exhibit 904.04.   Another member introduced himself and added, "Diplomatic on occasion, less likely this time.   Armed."   Exhibit 904.05.   Kinnison introduced himself, Warner, Martinez, and Mele as "so cal 3%," noted that they "train with each other" and that they would be bringing "lots of gear," including "bear spray, knives, flags, plates[,] goggles, helmets."   Exhibit 904.04.   In a sign that he knew what they were planning was unlawful, Kinnison wrote, "we should clear all text in this chat the morning of the 5th just in case for opsec purposes."   *Id.*

*See generally* July 7 Trial Tr. 102:12–103:17, 115:10–123:25, 127:1–129:9.

While Hostetter was less active on Telegram than Taylor, Taylor viewed Hostetter as a

---

[3] Following a jury trial, on November 8, 2023, Warner, Martinez, Kinnison, and Mele were each convicted of Conspiracy To Obstruct an Official Proceeding, among other offenses.   *See* Minute Entry of November 8, 2023 & ECF No. 376.

leader and stated, "everything had to go through him, for our events, communication, anything else that we were doing."   July 7 Trial Tr. 77:10–21.   Taylor explained, with respect to Telegram, "I would always communicate with him as far as what was going on and what we were doing as part of organizing and getting ready for going to DC."   July 7 Trial Tr. 123:22–25.

### *"Examples of mass uprisings toppling governments":* *The Days Prior to January 6, 2021*

Hostetter drove to Washington, D.C. for January 6.   He chose not to fly, so that he could load his car with weapons for himself and Russell Taylor.[4]   Exhibit 920 ("I'll be bringing 'equipment' so I plan on driving."); *see also* July 7 Trial Tr. 104:16–20, 108:7–20, 109:14–20. Hostetter brought tactical gear, a helmet, hatchets, knives, stun batons, pepper spray, and other gear for himself, Taylor, and others.   *See* Exhibit 918 ("Unloaded all my gear, Russ's gear, Morton's gear and your step mama's gear!"); July 7 Trial Tr. 109:14–20; July 12 Trial Tr. 96:2– 22.   Hostetter told Taylor that he was bringing a pistol to Washington, D.C. as well.   July 7 Trial Tr. 108:17–20.   After Hostetter arrived, Taylor unpacked the gear Hostetter brought for him and snapped a picture.   *See* Exhibit 516.

---

[4] Hostetter's other reason for driving is equally alarming.   He was planning for the possibility of a long term stay if revolution broke out.   *See* Exhibit 908.19 (Hostetter stating he brought "8 weeks worth of food"); July 7 Trial Tr. 126:4–17.



*Exhibit 516*

Indeed, it was Hostetter's idea that they bring hatchets to Washington, D.C.   *See* Exhibit

909.06 ("I can take your hatchets again!").   On December 29, 2020, he wrote to Taylor, "I'll be

heading to DC on 12/31.   Let's hook up on 12/30 so you can give me your backpack."   Exhibit

908.10.   Taylor asked, "Alan are you bringing firearms?"   Hostetter responded sarcastically,

"NO NEVER (Instagram now monitors all text messages…this has been a public service

announcement)."   Exhibit 908.10.   He indicated that they should "stick to" hatchets.   *Id.*

12



*Exhibit 908.11A*

As he drove to Washington, D.C., Hostetter had war and revolution on his mind.  He texted one individual, "I am on my way to Washington DC for either a party or a war."  Exhibit 910.01.  Records recovered from Hostetter's cell phone and laptop illuminate Hostetter's state of mind when he arrived in Washington, D.C.  On his Macbook, he made two searches: the first, on the evening January 4, was "Where will the joint session of Congress take place?"  Exhibit 604.04.  The second, made that same evening, was "Examples of mass uprisings toppling governments."  *Id.*  Hostetter made these searches not from his iPhone and through Google, *see* Exhibit 602.03, but on his laptop through DuckDuckGo, a website that "bills itself as giving you the ability to conduct private searches that will not be tracked."  July 11 Trial Tr. 92:12–14.

On January 5, Hostetter gave a speech to a large crowd outside the U.S. Supreme Court.  The crowd had assembled for a rally cohosted by the Virginia Women for Trump and the American

13

Phoenix Project and featured not only Alan Hostetter and Russell Taylor as speakers, but other well-known political figures as well.   Hostetter bragged about his prior arrest for what he called "civil disobedience"—and the fact that his arrest "went viral."   Exhibit 310.   He then turned to promoting conspiracy theories regarding the 2020 election results: "That's who beat Donald Trump.   Dominion and all the fakes and frauds, led by these vipers behind you in the people's house.   They're gonna hear our voice tomorrow.   They're gonna hear us loud and clear.   We are at war in this country!   We are at war."   *Id.*   He continued, "Our voices tomorrow are going to put the fear of God in the cowards and the traitors, the RINOs and the communists of the Democrat Party,   They need to know we as a people, 100 million strong, are coming for them if they do the wrong thing!"   *Id.*   Hostetter concluded, "I will see all tomorrow at the front lines.   We are taking our country back!"   *Id.*[5]

### January 6, 2021: The Attack on the U.S. Capitol Building

Hostetter and Taylor met at their hotel early on the morning of January 6, 2021.   July 7 Trial Tr. 152:21–156:15.   As they spoke, Taylor showed Hostetter weapons that he was carrying,

---

[5] Hostetter began his speech by noting that he was setting aside his prepared remarks and would speak without notes.   Exhibit 310.   The prepared remarks that Hostetter wrote out are equally illuminating as to his intent, and just as alarming.   He planned to tell the crowd, "Those treacherous grifters sitting behind those walls tomorrow . . . have filled us with the same 'terrible resolve!'   And tomorrow they will HEAR.   OUR.   RAGE!   The time is NOW and it is up to US to be the spark in this revolution."   Exhibit 602.07; *see also* Exhibit 602.06 (metadata).   He planned to invoke the collapse of the Soviet Union, and explain, "It takes courage, passion, resolve and huge numbers of people to make this kind of an impact.   Tomorrow, right here in the SWAMP's backyard we have all of that!   OUR.   VOICES.   WILL.   BE.   DEAFENING.   TOMORROW!!   Our rage and resolve will shake the walls of that den of vipers!   We will ENCOURAGE those few patriots in the People's House.   We will put the fear of God in the traitors and the cowards."   Exhibit 602.07.

including the hatchets he was carrying in his jacket at the time. *Id.* Hostetter was "celebrating" that they were "prepared" and showed Taylor he, too, had his hatchet in his backpack. *Id.* After conferring with each other, Hostetter and Taylor met up with other members of their DC Brigade Telegram group to head to the Ellipse for the speeches planned that morning. *Id.*

Hostetter and Taylor knew that they could not bring the weapons they had collected and were carrying to the Ellipse, Exhibit 908.20, or to the U.S. Capitol, Exhibit 908.13. As they headed to the Ellipse, Hostetter recorded an Instagram video, stating, "Patriots are on the march now." Exhibit 334. He noted that he, Taylor, and others, "are not actually going to be going into the Ellipse, because we have some personal protective gear." *Id.* Accordingly, rather than leaving their weapons behind, Hostetter and Taylor observed the speeches from outside of the secured area, to avoid going through a security screening. July 7 Trial Tr. 137:3–24. Hostetter and Taylor listened to the speeches from the Ellipse, including the speech by then-President Trump, in which he stated that then-Vice President Mike Pence would be at the U.S. Capitol building that day. July 7 Trial Tr. 163:14–165:12.

From the area of the Ellipse, Hostetter and Taylor joined others in walking to the U.S. Capitol building. As they approached the building, Russell Taylor, standing next to Hostetter, recorded a video of himself. *See* Exhibit 409. He said, "We are converging on the Capitol." *Id.* He added, "I heard something, of such, indicating that the barricades have been breached." *Id.* He continued, as they walked toward the Capitol, "We'll see if the Capitol Police are oath keepers of the Constitution." *Id.* At that point, Taylor received a message from someone remotely viewing his video live, and he announced, "Ashley said the barricades have been breached." *Id.*;

July 7 Trial Tr. 169:9–15.   Hostetter confirmed the information from Taylor, and added, "I hear sirens."   Exhibit 409.   Taylor read out the next update, "They are storming the Capitol."   *Id.* Hostetter laughed when he heard it, and replied, "May it be true!"   *Id.*

As they entered Capitol grounds, Hostetter and Taylor approached the police line on the west plaza area of the Lower West Terrace.   *See* July 7 Trial Tr. 173:9–25.   As they approached the building, they observed not just the police line, but also "chemical agents like tear gas" being deployed.   *Id.*   They heard flash bang grenades and saw rioters scaling the walls of the Capitol. July 12 Trial Tr. 154:19–25.   But Hostetter and Taylor didn't stop.

From the west plaza, Hostetter and Taylor climbed into scaffolding covering a northwest set of stairs leading to the Inaugural Stage.   July 7 Trial Tr. 174:18–175:9.   As they climbed through the scaffolding, Hostetter and Taylor emerged from a hole in the scaffolding and continued climbing toward the Inaugural Stage.   *See* Exhibit 330.   As he came out from the scaffolding, Hostetter carried a bullhorn and looked down over the west plaza, where rioters were battling with the police line they had passed earlier.   *Id.*; *see also* Exhibit 403; July 7 Trial Tr. 179:20–180:7. From his highly visible perch, and with his bullhorn directed to the crowd and his American flag waving above the chaotic scene, Hostetter encouraged the rioters below, who were overrunning the police line.   *See* Exhibits 314 & 330.



*Exhibit 314*



*Exhibit 330*

Hostetter and Taylor were exposed to the strong smell of tear gas in the area.   July 7 Trial

Tr. 180:18–24.   There, they encountered a line of police officers who were holding back the rioters from advancing onto the Inaugural Stage.   July 7 Trial Tr. 175:16–22, 182:4–23.   From their position overlooking the west plaza, Taylor and Hostetter saw the police line below fall, as rioters overran the police and forced them to retreat.   *See* Exhibit 404; July 7 Trial Tr. 184:9–18; July 12 Trial Tr. 158:11–159:15.   Taylor cheered them on, "Move forward, Americans!"   Exhibit 404. Hostetter celebrated, "This is how it fucking works!"   *Id.*; *see* July 7 Trial Tr. 186:4–10.

After seeing the police line on the west plaza fall, the group trying to gain access to the Inaugural Stage was "encouraged," and turned to the police line in front of them.   July 7 Trial Tr. 191:11–15.   Taylor then turned to the police holding them back from the Inaugural Stage and shouted, "Last chance, boys!  Move back!  Move back!" Exhibit 404.   Hostetter then joined other rioters, including Taylor, who were moving forward against the police line.   July 7 Trial Tr. 192:8–193:11; *see also* Exhibits 207.01, 313.01, 316.01.   Taylor, with Hostetter following closely behind, pushed against the police line, contributing to its collapse.   July 7 Trial Tr. 192:8–193:11; *see also* Exhibits 207.01, 313.01, 316.01.   Officers continued trying to retain control, and one deployed pepper spray against Taylor.   July 7 Trial Tr. 193:12–194:1; *see* Exhibit 208.01.   Taylor retreated only briefly and told Hostetter he had been pepper sprayed. Taylor then advanced again, with Hostetter in tow, proceeding up the stairs on the construction on the Inaugural Stage, toward the Upper West Terrace.   July 7 Trial Tr. 194:2–195:18; *see also* Exhibit 402.



*Exhibit 313.01*



*Exhibit 402*

Hostetter and Taylor ascended to a set of bleachers overlooking the Inaugural Stage and the sea of rioters on the West Plaza.   Taking in the scene, Hostetter recorded a video, turning the camera towards the mob, and saying, "The people have taken back their house.   I don't think I've ever seen such a beautiful sight in my whole life.   We've been sitting here, quietly for years, watching this corruption unfold.   Hundreds of thousands of patriots showed up today to take back their government."   Exhibit 602.75.   At that moment, Hostetter was interrupted by another rioter, who exclaimed, "Oh shit, they're going inside!"   *Id.*   Hostetter turned the camera away from the crowd and toward the bleachers, leading to the Capitol building and said, "We hear they're going inside," as Taylor called out to the crowd, "Inside!"   *Id.*   Hostetter added, "I'll be back later," and then stopped the video.   *Id.*   Hostetter and Taylor then moved toward the Capitol building.   July 7 Trial Tr. 204:1–10.

Hostetter and Taylor descended from the bleachers overlooking the Inaugural Stage and walked up to the Upper West Terrace Door, where they saw other rioters entering the building. July 10 Trial Tr. 11:6–14:6.   They reached the steps leading up to the door, before stopping and turning away, as police began visibly converging on the door from south and north of the door. *See* Exhibits 319 & 203.01; July 10 Trial Tr. 16:8–17:2.   Hostetter and Taylor decided to stay outside of the building, to decrease their risk of being arrested, given the sheer number of rioters outside the building, compared to the number of police officers.   *See* July 10 Trial Tr. 14:2–15:2.

Hostetter and Taylor remained on the Upper West Terrace for hours.   While there, Hostetter carried his bullhorn and used it to encourage the crowd.   *See* July 10 Trial Tr. 21:22– 22:8.



*Exhibit 105*

On the Upper West Terrace, Hostetter and Taylor met up with other members of the DC Brigade Telegram group—including codefendants and coconspirators Derek Kinnison and Tony Martinez. *See* Exhibit 519; July 10 Trial Tr. 22:11–23:23. Hostetter and Taylor only left the Upper West Terrace when forced to do so by police officers clearing the area. July 12 Trial Tr. 168:15–17. Even then, they remained defiant. As police officers were resisting attacks from rioters, Hostetter stood behind Taylor as Taylor shouted at police, "1776! Choose a side!" Exhibit 326.01. He added, still yelling at the police, "You will be defined by this moment!" *Id.* Taylor continued, "You know what you want to do! Stand down! This is your last chance, boys!" *Id.*; *see also* July 12 Trial Tr. 168:18–169:9.

While still at the Capitol, Hostetter received updates about the riot on his cell phone. He responded by bragging about his exploits—about how he was "tear gassed" and "flash banged,"

but celebrated that he "Stormed the Capitol."   Exhibit 915.02; *see also* Exhibit 925 (Hostetter sharing a video from the Upper West Terrace and writing "Me and Russ stormed [the] Capitol with the patriots!").   He told another he was "[r]ight in the middle of it."   Exhibit 916.05.   While still at the Capitol, Hostetter was told, "Congress had to put on escape hoods and gas masks to be evacuated."   Exhibit 926.02.   Rather than express remorse, Hostetter beamed, "Got tear gassed and flash banged.   This was the shot heard round the world.   We were in the thick of it."   *Id.*

### After January 6, 2021: Hostetter Celebrates Storming the Capitol

After he stormed the Capitol, Hostetter was proud and wanted everyone to know what he had accomplished.   He boasted that he and Taylor "did our part," and he compared their conduct to the Boston Tea Party and the American Revolution of 1776.   Exhibit 526; *see also* Exhibit 556; Exhibit 919 ("Shot heard round the world today."); Exhibit 922.04 ("This is the short heard round the world!").



*Exhibit 526*



*Exhibit 556*

In the aftermath, he joined others in characterizing then-Vice President Mike Pence as

"Judas." Exhibit 912.02. He bragged that he was "leading the charge" and that his "clothes

[we]re full of tear gas!"   Exhibit 923.03.   He made clear that anyone blaming Antifa for the attack at the Capitol was wrong.   When a friend tried to attribute the Capitol attack to Antifa, Hostetter was quick to reject it: "Patriots broke into Capitol Hill!   I was one of them!   Don't listen to the FAUX News.   This was the shot heard round the world!"   Exhibit 913.03.    To another friend, Hostetter wrote, "I did not see what I believed to be ANTIFA."   Exhibit 917.02.   He added, "people I saw and spoke with were clearly pissed off patriots who felt there was no alternative after word went out that Pence was about to certify those electors and our country would be doomed."   *Id.*

## II.      THE CHARGES AND VERDICT

On May 10, 2023, a federal grand jury returned a second superseding indictment charging Hostetter with four counts: Count One (Conspiracy To Obstruct an Official Proceeding, in violation of 18 U.S.C. § 1512(k)); Count Two (Obstruction of an Official Proceeding, Aiding and Abetting, in violation of 18 U.S.C. §§ 1512(c)(2) & 2); Count Three (Entering and Remaining in a Restricted Building and Grounds with a Deadly or Dangerous Weapon, in violation of 18 U.S.C. § 1752(a)(1) & (b)(1)(A)); and Count Four (Disorderly and Disruptive Conduct in a Restricted Building and Grounds with a Deadly or Dangerous Weapon, in violation of 18 U.S.C. § 1752(a)(2) & (b)(1)(A)).   On July 13, 2023, Hostetter was convicted on all counts following a bench trial. Minute Entry of July 13, 2023; ECF No. 276 (hereinafter "Verdict").

## III.     STATUTORY PENALTIES

Hostetter now faces sentencing on Conspiracy To Obstruct an Official Proceeding, in violation of 18 U.S.C. § 1512(k); Obstruction of an Official Proceeding and Aiding and Abetting

that offense, in violation of 18 U.S.C. §§ 1512(c)(2) & 2; Entering and Remaining in a Restricted

Building and Grounds with a Deadly or Dangerous Weapon, in violation of 18 U.S.C. § 1752(a)(1)

& (b)(1)(A); and Disorderly and Disruptive Conduct in a Restricted Building and Grounds with a

Deadly or Dangerous Weapon, in violation of 18 U.S.C. § 1752(a)(2) & (b)(1)(A).

As noted by the Presentence Report issued by the U.S. Probation Office, PSR at ¶¶ 130–

33, 138 & 151, Hostetter faces a maximum sentence of 20 years' imprisonment, 3 years'

supervised release, and a fine of $250,000 for each of Counts One and Two; and a maximum

sentence of 10 years' imprisonment, 3 years' supervised release, and a fine of $250,000 for each

of Counts Three and Four.

## IV.   THE SENTENCING GUIDELINES AND GUIDELINES ANALYSIS

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings

by correctly calculating the applicable Guidelines range."   *United States v. Gall*, 552 U.S. 38, 49

(2007).

### A.  Guidelines Calculations

The United States submits that, with the exception noted below regarding aggravating role,

the calculation laid out in the PSR for Count Two, the Section 1512(c)(2) offense, is correct.   PSR

at ¶ 80–87.   Hostetter has filed no objection to the Presentence Report's Guidelines calculation.

Probation did not calculate the offense level for the three other counts for which this Court

convicted Hostetter, which this Court must do.   *See* U.S.S.G. § 1B1.1(a)(4) ("If there are multiple

counts of conviction, repeat steps (1) through (3) [regarding how to calculate the offense level for

a single count] for each count.").   The United States's calculation of the offense levels for each of

the four counts of conviction is as follows[6]:

That calculation is as follows:

**Count One: 18 U.S.C. § 1512(k):**

| U.S.S.G. § 2X1.1(a) | Conspiracy Base Offense Level (Adjusted) | **31** |
|---|---|---|
| | | **(See Below)** |
| | Total | **31** |

**Count Two: 18 U.S.C. § 1512(c)(2), § 2**

| U.S.S.G. §§ 2J1.2(a), 2X2.1 | Obstruction Base Offense Level | **14** |
|---|---|---|
| U.S.S.G. § 2J1.2(b)(1)(B) | Cause/Threat Injury or Damage | **+8** |
| U.S.S.G. § 2J1.2(b)(2) | Substantial Interference with Justice | **+3** |
| U.S.S.G. § 2J1.2(b)(3) | Extensive Scope, Planning, or Preparation | **+2** |
| U.S.S.G. § 3B1.1(a) | Aggravating Role | **+2** |
| U.S.S.G. § 3C1.1 | Obstruction of Justice | **+2** |
| | Total | **31** |

**Count Three: 18 U.S.C. § 1752(a)(1) & (b)(1)(A)**

| U.S.S.G. § 2B2.3(a) | Trespass Base Offense Level | **4** |
|---|---|---|
| U.S.S.G. § 2B2.3(b)(1)(A)(vii) | Restricted Building or Grounds | **+2** |
| U.S.S.G. § 2B2.3(b)(2) | Dangerous Weapon Possessed | **+2** |
| U.S.S.G. § 2B2.3(c)(1) | To Commit A Felony Cross-Reference | **31** |
| | | **(See Above)** |
| | Total | **31** |

**Count Four: 18 U.S.C. § 1752(a)(2) & (b)(1)(A)**

| U.S.S.G. § 2A2.4(a) | Trespass Base Offense Level | **10** |
|---|---|---|
| U.S.S.G. § 2A2.4(b)(1)(B) | Dangerous Weapon Possessed | **+3** |
| | Total | **13** |

## B. Relevant Conduct

As the Guidelines make clear, specific offense characteristic enhancements shall be applied

---

[6] With the exception of the obstruction of justice enhancement under U.S.S.G. § 3C1.1, and the aggravating role enhancement, these enhancements also match the enhancements that Taylor agreed to in his plea agreement.   Hostetter, of course, did not enter into a plea agreement with the United States and plead guilty.   Neither Hostetter nor the United States are bound by the Guidelines stipulations in Taylor's plea agreement.

on the basis of "all acts and omissions committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused by the defendant" and "all harm that resulted from th[os]e acts and omissions . . . and all harm that was the object of such acts and omissions."   U.S.S.G. § 1B1.3(a)(1)(A) & (a)(3).   Likewise, these enhancements shall also apply, in a conspiracy case, such as this one, on the basis of "all acts and omissions of others that were (i) within the scope of the jointly undertaken criminal activity, (ii) in furtherance of that criminal activity, and (iii) reasonably foreseeable in connection with that criminal activity," and "all harm that resulted from th[os]e acts and omissions . . . and all harm that was the object of such acts and omissions." U.S.S.G. § 1B1.3(a)(1)(B) & (a)(3).   As Hostetter conspired to obstruct the certification of the official proceeding with Taylor, as well as with other members of the DC Brigade Telegram group, the Court should consider not only Hostetter's conduct but also the conduct that he aided and abetted and the conduct of his coconspirators that was within the scope of their conspiracy, in furtherance of their conspiracy, and reasonably foreseeable.

### C. The Enhancement for Causing or Threatening To Cause Physical Injury to a Person or Property Damage Applies

An eight-level increase applies if the offense involved causing or threatening injury to a person or damage to property "in order to obstruct the administration of justice."   U.S.S.G. § 2J1.2(b)(1)(B).   This eight-point enhancement for causing or threatening injury to a person or damage to property "in order to obstruct the administration of justice" applies here.[7]

---

[7] When objections have been raised, the majority of courts in this district have endorsed the application of the two "administration of justice" enhancements to the January 6 context.   *See, e.g.*, *United States v. Rubenacker*, 21-cr-193 (BAH) (D.D.C. May 26, 2022), ECF No. 70; *United States v. Wright*, 21-cr-341 (CKK) (D.D.C. Mar. 4, 2023), ECF No. 76 at 8–11 (collecting cases);

As an initial matter, Hostetter's own statements make clear his violent threats in connection with these crimes.   Hostetter's speeches were frequently focused on themes of violence, and he was clear that his goal was to intimidate members of Congress.   On January 5, 2021, Hostetter spoke a rally about his desire to intimidate members of Congress: "Our voices tomorrow are going to put the fear of God in the cowards and the traitors, the RINOs and the communists of the Democrat Party,   They need to know we as a people, 100 million strong, are coming for them if they do the wrong thing!"   Exhibit 310.

Weeks earlier, Hostetter gave a speech urging the crowd to get to Washington, D.C. for January 6, 2021, so that members of Congress would know "those five million people outside the walls are gonna drag us out by our hair and tie us to a fucking lamp post."   Exhibit 309.   When asked about it on cross-examination, Hostetter's response made the threat clear: "I was wanting to have a big enough response so that the members might themselves think to themselves that that might happen, not that it would actually -- not that we would actually go and do it."   July 12 Trial Tr. 142:2–5.   The threat of physical violence is sufficient to trigger the § 2J1.2(b)(1)(B) enhancement, as the express wording of that provision states, and the trial evidence established numerous examples of Hostetter making threatening statements targeting January 6, 2021.

But the Court need not rely on Hostetter's words alone.   Hostetter followed closely behind as Taylor pushed against a police line on the Inaugural Stage.   *See* July 7 Trial Tr. 192:8–193:11;

---

*United States v. Fairlamb*, 21-cr-120 (RCL) (D.D.C. Nov. 10, 2021), ECF No. 72 (applying the administration of justice enhancements); *see also United States v. Larry Brock*, 23-3045 (D.C. Cir.) (oral argument on September 27 on whether the district court correctly applied enhancements pursuant to this subsection).

*see also* Exhibits 207.01, 313.01, 316.01.   Taylor, with a knife displayed on his chest and, like Hostetter, a hatchet in his bag, pushed against a line of police officers protecting the Capitol building from the mob.   The violence here was obvious and it brought with it a clear threat of physical injury.   As Hostetter joined Taylor in advancing past that police line and onto the Upper West Terrace, it is clear that Taylor's conduct was aided and abetted by Hostetter and was a reasonably foreseeable act in furtherance of and within the scope of their criminal agreement. Likewise, Hostetter stood directly behind Taylor on the Upper West Terrace as Taylor shouted threats at police, such as "This is your last chance, boys!"   Exhibit 326.01.

In planning his obstructive conduct, Hostetter personally threatened violence.   He supported Taylor and other rioters threatening violence against police at the U.S. Capitol.   And he personally carried a hatchet on to Capitol grounds, further underscoring the threat he and his coconspirators posed.   Accordingly, the Court should apply the enhancement.

### D.  The Enhancement for Substantial Interference with Justice Applies

A three-level increase applies if the offense involved substantial interference with the administration of justice.   U.S.S.G.  §  2J1.2(b)(2).   "'Substantial interference with the administration of justice' includes . . . the unnecessary expenditure of substantial government or court resources."   U.S.S.G.  §  2J1.2(b)(2), Application Note 1.   Hostetter's conduct, and the conduct he aided and abetted, led to such unnecessary expenditures.   The riot that Hostetter participated in and has since celebrated resulted in an unprecedented delay in the peaceful transfer of presidential power in this country.   Members of Congress were evacuated, the proceeding was delayed for hours, officers were injured, and over $2.9 million dollars in damage was done to the

Capitol building.

It was a riotous mob that caused this extensive damage and interference with the administration of justice; but a mob is effective through its size.   "'Just as heavy rains cause a flood in a field, each individual raindrop itself contributes to that flood.   Many rioters collectively disrupted Congressional proceedings, and each individual rioter contributed to that disruption.' The same idea applies here.   Many rioters collectively caused the unnecessary expenditure of substantial government resources, and each individual rioter, including [the defendant], contributed to that unnecessary expenditure."   *United States v. Wright*, 21-cr-341 (CKK) (D.D.C. Mar. 4, 2023), ECF No. 76 at 24 (cleaned up) (quoting *United States v. Rivera*, 607 F. Supp. 3d 1, 9 (D.D.C. 2022) (CKK)).

And while Hostetter did not personally enter the Capitol building, the government need not show a direct causal link between Hostetter's personal actions and the substantial interference—beyond his joining a riotous mob with that effect.

> Where, as here, the defendant acted in concert with hundreds of other rioters to obstruct congressional proceedings; no one person in the crowd could have created the same degree of havoc, chaos, and disruption as the collective group did, and the government need not demonstrate a specific defendant as singularly responsible for the unnecessary expense. Instead, the government need only show a direct causal line from all of the participants in the mob, which includes a specific defendant, that collectively resulted in a situation causing the unnecessary expenditure of substantial governmental resources.

*United States v. Rubenacker*, 21-cr-193 (BAH) (D.D.C. June 7, 2022), ECF No. 70 at 78.

Hostetter joined a mob with an unprecedented effect on the administration of justice.   The Court should, accordingly, apply the enhancement.

30

### E.  The Enhancement for Extensive Scope, Planning, or Preparation Applies

A two-level increase applies if the offense was "extensive in scope, planning, or preparation."  U.S.S.G. § 2J1.2(b)(3).   Hostetter and Taylor were no ordinary January 6 rioters. These conspirators did not see the Tweet from then-President Trump and decide to travel to Washington, D.C. for the protest at the Ellipse, and then decide to follow the crowd to the Capitol. Even before then-President Trump's Tweet, Hostetter was focused on January 6 as a day of reckoning and was reaching out to an organizer at Stop the Steal to ensure there would be a massive crowd.  Exhibit 909.05.   Their preparations included Taylor's lead role in organizing multiple Telegram groups, under the watchful eye of Hostetter, to gather a group of fighters prepared for violence on January 6, 2021.   Exhibit 904.03; July 7 Trial Tr. 123:22–25.   Hostetter collected weapons for himself and for Taylor and traveled across the country to get them to Washington, D.C.  Accordingly, the Court should apply the enhancement.

### F.  The Enhancement for Aggravating Role Applies

A two-level increase[8] applies if the defendant was an "organizer, leader, manager, or supervisor" in a criminal activity for which higher enhancements do not apply.  U.S.S.G. § 3B1.1(c).   In this conspiracy case, the Court should recognize Hostetter's leadership role and apply the enhancement.

As the Court found in rendering its verdict, "Mr. Hostetter and Mr. Taylor conspired

---

[8] In its communications with Probation, the United States previously took the position that a four-level enhancement applied.  While a three- or four-level enhancement arguably could apply to these facts, in light of similarly situated conspiracy cases in this context, we seek a two-level adjustment only.

31

together to obstruct and impede the Electoral College Certification."   Verdict at 2.   The Court's findings reflect the leadership role that Hostetter held within their group: "Mr. Hostetter proposed and agreed to transport weapons from California to Washington, D.C., on behalf of Mr. Taylor. Mr. Hostetter actually transported those weapons knowing and intending that Mr. Taylor would carry those weapons on January 6."   *Id.* at 5.   Hostetter was a member of Telegram groups, organized by Taylor, such as the DC Brigade.   *Id.* at 4.   Russell Taylor testified that he "would always communicate with [Hostetter] as far as what was going on and what we were doing as part of organizing and getting ready for going to DC."   July 7 Trial Tr. 123:22–25.

At trial, FBI Special Agent Jessica Salo testified that, beyond Hostetter and Taylor, other members of the "DC Brigade" Telegram group "were on Capitol grounds on January 6th," "entered the U.S. Capitol building," and " engaged in assaultive conduct on Capitol grounds on January 6th."   July 11 Trial Tr. 116:1–15.   Among the members of the DC Brigade were alleged coconspirators and codefendants Erik Scott Warner, Felipe Martinez, Ronald Mele, and Derek Kinnison.   Additionally, Hostetter gave a series of public speeches calling for executions and intimidation of members of Congress on January 6, 2021.   *Id.* at 8.   Hostetter's speeches, which he gave in public and posted publicly online, called for others to go to Washington, D.C. on January 6, 2021 and threaten to "drag [members of Congress] us out by their hair and tie us to a fucking lamp post.   That's their option."   Government Exhibit 309.

Because Hostetter took on a leadership role with respect to Russell Taylor's conduct and the conduct of the DC Brigade, the two-point enhancement for aggravating role is appropriate.

### G. The Enhancement for Obstruction of Justice Applies

Guidelines § 3C1.1 provides for a two-level increase if "[T]he defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction, and the obstructive conduct related to (A) the defendant's offense of conviction and any relevant conduct; or (B) a closely related offense."

Here, the enhancement can be applied on the basis of Hostetter's false and obstructive testimony at trial. *See* U.S.S.G. §3C1.1 n.4(B), (F). On at least three occasions, the Court right noted that it did not find Hostetter's trial testimony credible:

- "I do not credit Mr. Hostetter's testimony that he sought to peaceably sway Congress. GX 909.02, 909.04, and 909.05 demonstrate that Mr. Hostetter intended to occupy the Capitol on January 6 if the election results did not change to favor President Trump." Verdict at 8.

- "I find Mr. Hostetter's testimony that when he discussed executions, he was referring to a lawful process ultimately culminating in the imposition of the death penalty, as wholly incredible in light of the context in which those statements were made and the notes he prepared for several of his speeches. No reasonable citizen of this country--much less one with two decades experience in law enforcement--could believe that it was lawful to use mob violence to obstruct or impede the joint session of Congress." Verdict at 11.

- "I do not credit Mr. Hostetter's testimony that he was not carrying a hatchet because it was stolen out of his truck before January 6. Despite his decades of experience in law enforcement and the nature of the items allegedly stolen, Mr. Hostetter did not report this theft to police. GX 908.11A shows that Mr. Hostetter texted about the hatchets shortly before January 6 in connection with transporting Mr. Taylor's backpack across the country to Washington, D.C. I credit Mr. Taylor's testimony that Mr. Hostetter never told him his hatchet was stolen." Verdict at 14.

On the basis of Hostetter's false testimony at trial, the Court should apply a two-level enhancement for obstruction of justice.

### H.  Criminal History Category

The U.S. Probation Office calculated Hostetter's criminal history as category I, which is not disputed.   PSR at ¶ 93.   Accordingly, based on the government's calculation of Hostetter's total adjusted offense level, at 31, Hostetter's advisory Guidelines imprisonment range is 108 to 135 months' imprisonment.

### I.  Application of 3A1.4 n.4 Upward Departure

A two-level upward departure pursuant to U.S.S.G. § 3A1.4, application note 4, is appropriate here because Hostetter's conduct was "calculated to influence or affect the conduct of government intimidation or coercion, or to retaliate against government conduct."   Such an enhancement would bring the advisory Guidelines range to 135–168 months imprisonment.   This Guidelines range more appropriately reflects the defendants' culpability, and a sentence at the midpoint of that Guidelines range—151 months—is appropriate.[9]

#### a.  Legal Standard

An adjustment for terrorism applies where the offense "involved, or was intended to promote, a federal crime of terrorism," which is defined by statute in 18 U.S.C. § 2332b(g)(5). *See* U.S.S.G. § 3A1.4, cmt. n.1; s*ee United States v. Mandhai*, 375 F.3d 1243 (11th Cir. 2004); *see also United States v. Hale*, 448 F.3d 971, 988 (7th Cir. 2006) (applying adjustment where the offenses themselves were not enumerated but the underlying conduct was meant to promote an

---

[9] In the absence of this upward departure, the United States would submit that a sentence of 151 months is nonetheless appropriate under the Section 3553(a) factors.

enumerated offense).   Here, the United States is not seeking application of the Section 3A1.4(a) adjustment.

Rather, the United States seeks the application of Note 4 to Section 3A1.4, which provides that an upward departure is "warranted" if the defendant's "offense was calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct."   *Id*., cmt. n.4.   When it adopted Note 4, the Sentencing Commission explained that it is "an encouraged, structured upward departure," the purpose of which is to provide courts with "a viable tool to account for the harm involved during the commission of these offenses on a case-by-case basis" and to "make[] it possible to impose punishment equal in severity to that which would have been imposed if the § 3A1.4 adjustment actually applied."   Sentencing Guidelines, App. C, amend. 637 (2002).

A defendant's offense is "calculated to influence or affect the conduct of government by intimidation or coercion," as required by Section 3A1.4, if the offense was specifically intended to have the effect of influencing, affecting, or retaliating against government by force or the threat of force.   *See, e.g.*, *United States v. Mohammed*, 693 F.3d 192, 201 (D.C. Cir. 2012) (defendant's narcoterrorism offense had requisite "calculation" where evidence showed defendant "specifically intend[ed] to use the commission from the drug sales to purchase a car to facilitate attacks against U.S. and foreign forces in Afghanistan").   While they are related, "calculation" for the Section 3A1.4 enhancement is distinct from a defendant's particular "motive" and a defendant need not be "personally motivated by a desire to influence or affect the conduct of government," so long as defendant's crime was "calculated to have such an effect."   *Khatallah*, 314 F. Supp. 3d at 199.

Although "calculation may often serve motive," the enhancement's "calculation" requirement is satisfied if a defendant's offense was "planned—for whatever reason or motive—to achieve the stated object." *United States v. Awan*, 607 F.3d 306, 317 (2d Cir. 2010) (Section 3A1.4 applied to defendant motivated by "prestige and potential influence obtained by associating with" another terrorist, even if defendant did not share the specific political motivation of that terrorist). Moreover, a defendant's intent to influence government conduct or retaliate against the government need not have been his "sole" or "primary" purpose and the "calculation" requirement may be satisfied even if a defendant's relevant conduct sought to "accomplish other goals simultaneously." *United States v. Van Haften*, 881 F.3d 543, 545 (7th Cir. 2018); *see also United States v. Haipe*, 769 F.3d 1189, 1193 (D.C. Cir. 2014) (defendant's "money-raising goals obviously do not preclude a finding of intent to influence government policy," even if raising money was defendant's "primary purpose").

Indeed, Section 3A1.4 is applicable regardless of a defendant's claimed magnanimous intent. *See United States v. Christianson*, 586 F.3d 532, 539 (7th Cir. 2009) (affirming application of the adjustment for defendants who professed to try to "sav[e] our earth," because "the purpose behind defendants' actions was to further [their] political agenda: the end to industrial society"). While Hostetter may claim, despite the absence of any legitimate evidence, that he had a genuine belief that the election was fraudulent, that is irrelevant. "[I]t doesn't matter why the defendants oppose . . . the United States government—if they use violence and intimidation to further their views, they are terrorists." *Id*.

### b.  Hostetter's Conduct and Convictions

The conduct constituting his convictions of Conspiracy To Obstruct an Official Proceeding (Count One), Obstruction of an Official Proceeding (Count Two), Entering and Remaining in a Restricted Building and Grounds with a Deadly or Dangerous Weapon (Count Three), Disorderly and Disruptive Conduct in a Restricted Building and Grounds with a Deadly or Dangerous Weapon (Count Four) are not enumerated under 18 U.S.C. § 2332b(g)(5).  Nevertheless, they were "calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct."  U.S.S.G. § 3A1.4, cmt. n.4(A).  As his convictions and the underlying evidence reflects, Hostetter conspired to, attempted to, and temporarily did prevent Congress from certifying the 2020 Electoral College vote, through threatened and actual use of force.

The convictions on Counts One and Two carry with them the finding that Hostetter intended to and did obstruct or impede the certification proceeding.   The evidence made clear that the threat of violence was an essential component of the crime.   Among his repeated calls for political violence, Hostetter made explicit his desire that members of Congress think, when they saw a riotous mob outside the walls of Congress, that those "five million people outside the walls are gonna drag us out by our hair and tie us to a fucking lamp post."  Exhibit 309.  Hostetter admitted at trial that he wanted members of Congress to "think to themselves that that might happen."  July 12 Trial Tr. 142:2–5.  Hostetter and Taylor, who brought hatchets and other weapons to the U.S. Capitol building, made clear through their planning that they were certainly

prepared for violence.   And when the time came, Taylor used force in pushing past a police line on the Inaugural Stage when police tried to stop him and Hostetter from advancing.

While Hostetter did not personally engage in violence—though he certainly aided and abetted Taylor's push against the police line—violence is not required for the application of the enhancement.   Courts applying Section 3A1.4 have found that engaging in violent conduct may be relevant to a defendant's terroristic "calculation" to affect the conduct of government through "intimidation or coercion," but actual violence is not necessary.   *See, e.g.*, *United States v. Hammoud*, 381 F.3d 316, 325 (4th Cir. 2004) (affirming application of Section 3A1.4 enhancement for defendant convicted of providing money laundering services to Hezbollah); *United States v. Aref*, No. 04-cr-402, 2007 WL 804814, at *4–5 (N.D.N.Y. Mar. 14, 2007) (affirming application of Section 3A1.4 enhancement to defendant's conviction for money laundering); *United States v. Benkahla*, 530 F.3d 300, 313 (4th Cir. 2008) (affirming application of Section 3A1.4 enhancement to defendant convicted of perjury and obstructing justice by lying to investigators and grand jury about terrorist associates); *United States v. Thurston, et al.*, No. 06-cr-60069-01-AA, 2007 WL 1500176, at *12 (D. Or. May 21, 2007) (holding that Section 3A1.4 does not require "substantial risk of injury"), *aff'd sub nom. United States v. Tubbs*, 290 F. App'x 66 (9th Cir. 2008); *see also United States v. Wells*, 163 F.3d 889, 899 (4th Cir. 1998) (rejecting argument by defendant convicted of mail fraud, bank fraud, interference with IRS officials, and transportation of stolen property that "terrorism" label did not apply for purposes of sentencing "[s]ince he did not commit any violent acts").   Indeed, when Congress directed the Sentencing Commission pursuant to the Antiterrorism and Effective Death Penalty Act of 1996 to tether the

Section 3A1.4 enhancement to the statutory definition of "federal crime of terrorism" and the accompanying "calculation" language in 18 U.S.C. § 2332b(g)(5)(A), rather than the separate statutory definitions of "international terrorism" or "domestic terrorism" in 18 U.S.C. § 2331, Congress deliberately omitted language from Section 2331 requiring "violent acts" or "acts dangerous to human life."  *See* 18 U.S.C. § 2331(1), (5) (defining "international terrorism" and "domestic terrorism," respectively).

Regardless of the use of immediate violence, Hostetter's conduct—and the conspiracy he helped form and lead—displayed a clear intent, shared with Taylor and others, to stop Congress from certifying the results of the election, including through the threatened used of force.   That conduct—calculated to stop the peaceful transfer of presidential power for the first time in the nation's history—is a quintessential example of an intent to influence government conduct through intimidation or coercion and warrants an upward departure pursuant to Note 4.   The terrorism enhancement in Section 3A1.4 is meant to "punish[] more harshly than other criminals those whose wrongs served an end more terrible than other crimes."  *Benkahla*, 530 F.3d at 313.   Here, Hostetter's threats of political violence and the threatened and actual use of force on January 6 was all enacted with a single-minded purpose: to stop the peaceful transfer of power.   Hostetter's crimes were those of a terrorist, and the Court should say so.

### c.   Prior Applications of Note 4 in the January 6th Cases

In *United States v. Elmer Stewart Rhodes, et.al.*, 22-cr-15, Judge Mehta found 3A1.4 n. 4 applicable to the eight defendants convicted of seditious conspiracy and/or conspiracy to obstruct

the official proceeding, in varying degrees.[10]

| Defendant | Sentencing Date | U.S.S.G. § 3A1.4, Note 4 Upward Departure |
|---|---|---|
| Rhodes | May 25, 2023 | 6 offense levels |
| Meggs | May 25, 2023 | 3 offense levels |
| Watkins | May 26, 2023 | 3 offense levels |
| Vallejo | June 1, 2023 | 2 offense levels |
| Harrelson | May 26, 2023 | 1 offense level |
| Minuta | June 1, 2023 | 1 offense level |
| Moerschel | June 2, 2023 | 1 offense level |
| Hackett | June 2, 2023 | 1 offense level |

At sentencing, Judge Mehta noted that "Mr. Rhodes and his compatriots' objective was to affect the conduct of government, specifically Congress, and to do so through intimidation and coercion by means of force, both through the stockpiling of weapons in the event that they needed to be brought across the river—there was an agreement as to that—and then, of course, the actual use of force by others who went into the building and applied that force against police officers who were doing their duty that day."   05/25/2023 Sentencing Hearing Tr. 78:19–79:2.   It was no excuse for those defendants—and it should be no excuse for Hostetter—that they were not personally convicted of assaulting a member of law enforcement with a deadly or dangerous weapon.   *See* 05/25/2023 Sentencing Hearing Tr. 111:10–13 ("It is true that neither Mr. Rhodes nor any of one of his conspirators used a weapon against a police officer, maimed a police officer

---

[10] Unlike in the Oath Keepers conspiracy case, in the Proud Boys conspiracy case, *United States v. Nordean, et al.*, 21-cr-175 (TJK), defendants were convicted of violating 18 U.S.C. § 1361—an enumerated offense under 18 U.S.C. § 2332b(g)(5).   Accordingly, the United States sought the enhancement to offense level 32 and Criminal History Category VI provided for by Guidelines 3A1.4(a).   *See id.* ECF No. 855.

that day, and there were those who did worse in terms of physical assaults.").

Judge Mehta further elaborated as to the appropriateness of Note 4 enhancement in the

Oath Keepers case, by saying:

> I think the way I get there is the nature of the conduct, and let me be clear . . . . [I]t's a
> separate and more serious conduct than what's captured by the Guideline.   And I say that
> because the Guideline itself does not necessarily require the level of intimidation and
> calculation and targeting that the terrorism enhancement—what we will call the terrorism
> enhancement in the note requires.

> This is an additional level of calculation.   It is an additional level of planning.   It is an
> additional level of purpose.   It is an additional level of targeting, in this case, an institution
> of American democracy at its most important moment, the transfer of power. That's pretty
> significant.

05/25/2023 Sentencing Hearing Tr. 79:12–25.   The same is true here.   Hostetter spent weeks

rallying others, collecting weapons, and planning an attack on the U.S. Capitol on the day that the

peaceful transfer of power was meant to take place.

The Court also highlighted the particularly insidious nature of a conviction for a count of

conspiracy.   The Court referenced *Callanan v. United States*, 364 U.S. 587 (1961), which states:

> Collective criminal agreement, partnership in crime presents a greater potential threat to
> the public than individual dealings.   Concerted action both increases the likelihood that
> the criminal object will be successfully attained and decreases the probability that the
> individuals involved will depart from their path of criminality.

> Group association for criminal purposes often, if not normally, makes possible the
> attainment of ends more complex than those which one criminal could accomplish.   Nor
> is the danger of a conspiratorial group limited to the particular end toward which it has
> embarked.   Combination in crime makes more likely the commission of crimes unrelated
> to the original purpose for which the group was formed.   In sum, the danger which a
> conspiracy generates is not confined to the substantive offense which is the immediate aim
> of the enterprise.

*Id.* at 593–94; *see also* 05/25/2023 Sentencing Hearing Tr. 111:17–112:7.   Unlike most other

defendants for whom the government had sought this enhancement, but ultimately were denied in that request, the Oath Keepers and Hostetter have been convicted of a conspiracy whose object was to obstruct the normal functioning of the government.   As with the Oath Keepers, this places Hostetter in a different category—one presenting a "greater potential threat to the public," *Callanan*, 364 U.S. at 593.

Here, the United States is seeking an upward departure by two offense levels for Hostetter. This is consistent with what Judge Mehta ruled was applicable in *Rhodes* for those convicted of counts of conspiracy, and who were particularly active in the planning and execution of the events of January 6th—Kelly Meggs[11] and Jessica Watkins[12].   This request is measured, compared to the

---

[11] Defendant Kelly Meggs led the military-style stack of Oath Keepers into the U.S. Capitol building on January 6th.   In advance of that date, he stoked the members of his chapter of the Oath Keepers with violent rhetoric similar to Hostetter, by, for instance, telling a Signal group that it was "easy to chat here" but the "real question is who's willing to DIE[.]"   On January 6th, Meggs wrote to a group chat, "When Trump said those words earlier this week. He wasn't talking to the soccer moms, the rah rah trumpers, or the stop the steal people.   He was talking to US!! The 3%, the PB, and most importantly the Oath Keepers!!!!"   *United States v. Elmer Stewart Rhodes, et. al.,* 22-cr-015 (APM), ECF No. 5656, at 101-104.   Meggs was convicted of Seditious Conspiracy (18 U.S.C. § 2384); Conspiracy to Obstruct an Official Proceeding (18 U.S.C. § 1512(k)); Obstruction of an Official Proceeding (18 U.S.C. § 1512(c)(2)); Conspiracy to Prevent U.S. Officers from Discharging Duties (18 U.S.C. § 372); and Tampering with Documents or Other Objects (18 U.S.C. § 1512(c)(1)).   The United States sought a four-offense-level enhancement under Note 4 for defendant Meggs; and Judge Mehta granted a three-offense-level enhancement.

[12] Defendant Jessica Watkins drove with a group of Oath Keepers from Ohio to attend January 6th, who intended to provide weapons for the quick reaction force in Virginia.   On January 6th, Watkins joined with the other individuals comprising Stack One, forcing her way inside the Capitol, and disrupting the certification proceedings takings place.   Once inside, Watkins led the group that moved north toward the Senate Chamber.   *United States v. Elmer Stewart Rhodes, et. al.*, 22-cr-015 (APM), ECF No. 5656, at 120–26.   Watkins was convicted of Conspiracy to Obstruct an Official Proceeding (18 U.S.C. § 1512(k)); Obstruction of an Official Proceeding (18 U.S.C. § 1512(c)(2)); Conspiracy to Prevent U.S. Officers from Discharging Duties (18 U.S.C. § 372); and Interference with law Enforcement During a Civil Disorder (18 U.S.C. § 231).   The

42

twelve-point enhancement, and Criminal History Category VI, under an application of 3A1.4(A).

The United States believes a sentence of 151 months, in the middle of the elevated Guidelines

range, is an appropriate application of the upward departure in § 3A1.4 Note 4, that aligns more

with the conduct of this defendant than his advisory Guidelines reflect.

### d.  Prior Applications of Note 4 Across the Country

Application of Note 4 to this defendant's conduct is consistent with the application of Note

4 by other courts around the country.   In *United States v. Doggart*, the sentencing court imposed

a Note 4(A) upward departure where the defendant was convicted of soliciting the destruction of

religious property in connection with his plan to burn down buildings in a Muslim community,

seeking to "set[] in motion an armed insurrection against the government of the United States that

would force the government of the United States either to respond to" the defendant's planned

attacks, "or to give in and capitulate."   No. 15-cr-39-CLC-SKL (E.D. Tenn. Sep. 16, 2020), ECF

343 at 6.   The Sixth Circuit recently affirmed the application, agreeing that the defendant's

offense was "calculated to influence or affect government conduct by intimidation or coercion."

*United States v. Doggart*, No. 20-6128, 2021 WL 5111912, at *2–4 (6th Cir. Nov. 3, 2021).

There, the sentencing court upwardly departed from an otherwise applicable Guidelines range that

called for 51 to 63 months of imprisonment (equivalent to offense level 24 at Criminal History

Category I) to a range of 324 to 405 months of imprisonment (equivalent to offense level 41 at

---

United States sought a three-offense-level enhancement under Note 4 for defendant Watkins; and
Judge Mehta granted a three-offense-level enhancement.

Criminal History Category I).   *Id*.   After departing upward, the court sentenced the defendant to the statutory maximum for his sole offense of conviction, ten years of imprisonment.   *Id.* at *1.

In a separate case in the District of Oregon, the sentencing court applied Note 4(A) when sentencing multiple coconspirators convicted of violations under 18 U.S.C. § 372 and related offenses for their roles as part of Ammon Bundy's 2016 armed occupation of the Malheur National Wildlife Refuge, based on their disagreement with federal land management policies.   These coconspirators, some of whom were armed, formed a convoy, entered the Malheur refuge, and then set up a perimeter blocking the entrance of personnel from the Fish and Wildlife Service and other federal agencies.   As they indicated in public statements, the occupiers aimed to "adversely possess" the federal land at the Malheur refuge and to compel the release of two other ranchers who had been convicted of arson on federal land.   Although some defendants involved in the occupation claimed their actions were peaceful, certain defendants carried firearms as they patrolled the refuge, including in a fire watchtower where they stood guard, and one of the defendants was a member of the "Washington III%" militia.   The court applied a Note 4(A) upward departure to eleven of the thirteen defendants who had pled guilty (some of whom had agreed to the application of the departure in their plea agreements), departing upward two offense levels (one defendant), three offense levels (four defendants), five offense levels (three defendants), and ten offense levels (one defendant).   *See United States v. Patrick*, No. 16-cr-51 BR-9 (D. Or. Feb. 18, 2018), Sent. Tr. at 43–45.   The court then applied four- and two-level departures to two defendants convicted at trial.   *Id.* at 46; *United States v. Thorn*, No. 16-cr-51-BR (D. Or. Nov. 21, 2017), Sent. Tr. at 12.

Other sentencing courts have also upwardly departed under Note 4, although under a different subsection, Note 4(B), where defendants' convictions "involved, or were intended to promote" an enumerated offense under 18 U.S.C. § 2332b(g)(5)(B) but the "terrorist motive was to intimidate or coerce a civilian population" rather than to influence or retaliate against government conduct.   *See United States v. Harpham*, 11-cr-42 (E.D. Wash.), applied in *United States v. Harpham*, 2012 WL 220276 (E.D. Wash. Jan. 25, 2012) (three offense-level Note 4(B) departure applied to defendant who placed explosive device along the Martin Luther King, Jr. Day parade targeting parade participants); *United States v. Cottrell*, 04-cr-279 (C.D. Cal.), *aff'd*, *United States v. Cottrell*, 312 F. App'x 979, 981 (9th Cir. 2009) (per curiam), *superseded on other grounds in* 333 F. App'x 213 (9th Cir. 2009) (per curiam) (after application of Note 4(B), defendant sentenced to 100 months of imprisonment for participating in conspiracy to commit vandalism and arson of SUVs in connection with environmental extremist organization); *United States v. Jordi*, 03-cr-60259 (S.D. Fla.), *aff'd*, *United States v. Jordi*, 418 F.3d 1212 (11th Cir. 2005) (after application of Note 4(B), defendant sentenced to 10 years of imprisonment in connection with conviction for planned bombing of abortion clinics meant to dissuade doctors from performing abortions); *see also United States v. Holzer*, 19-cr-488 (D. Colo.), ECF 101 at 1–5 (finding that Note 4(B) applied to defendant convicted of attempted arson of a synagogue, but describing 235-month sentence of imprisonment as the result of an upward "variance").

## V.   SENTENCING FACTORS UNDER 18 U.S.C. § 3553(A)

In this case, sentencing is guided by 18 U.S.C. § 3553(a).   As described below, on balance, the Section 3553(a) factors weigh in favor of a lengthy term of incarceration.

45

### A.    Nature and Circumstances of the Offense

Hostetter's felonious conduct on January 6, 2021 was part of a massive riot that almost succeeded in preventing the certification vote from being carried out, frustrating the peaceful transition of presidential power, and throwing the United States into a Constitutional crisis. Hostetter planned with others for weeks to obstruct the official proceeding, including through the threatened and actual use of force, as described above.   The nature and circumstances of Hostetter's offenses were of the utmost seriousness, and fully support the government's recommended sentence of 151 months' imprisonment.

### B.    Hostetter's History and Characteristics

The Court had the opportunity to get to know the defendant throughout this case—both through his numerous filings as a *pro se* defendant and during his testimony at trial.   The Court saw a defendant who epitomizes disrespect for the law and who believes he can put himself above the law.

Hostetter has shown himself to be a man eager to stoke the fires of revolution, and to assume the role of a leader of the revolution he fantasizes is coming.   Hostetter talked repeatedly in advance of January 6 in the language of "war" and "revolution."   He discussed the "tyrants and traitors" and the need for "executions" of his political enemies.   His delusions of grandeur—to see himself as the main player in a grand conspiracy centered on January 6, 2021—further demonstrate the danger Hostetter poses to the community in the future.

As explained in detail above, at trial, the Court also saw that Hostetter, when backed into a corner, was willing to lie.   For instance, when asked if was "calling for executions in public

speeches," July 12 Trial Tr. 127:8–9, Hostetter responded:

> Calling for a lawful process to take place before they're – I'm not calling for people to go out with a gallows and drag it somewhere, like the staged gallows that just happened to show up on January 6th for a photo op that everybody got shocked about in the Main Street media.   No.   There's a lawful process.   In fact, you, Mr. Prosecutor, if an act of treason were committed, and if you-all were really digging deep into what happened on January 6th, you might find that treason.   You would go to the U.S. Code, find the definition of treason, use that to prosecute those traitors, and my guess is you might even recommend the penalty in that code, which is the death penalty.

July 12 Trial Tr. 127:10–22.   But, of course, Hostetter never, even obliquely, referred to the U.S. Code or pursuit of a formal legal process in his many public remarks calling for revolutionary violence.   That story was cooked up for trial, for the benefit of the Court.   But Hostetter cannot walk away from his own words:

> Choke that city off, fill it with patriots, and then those people behind the walls of the Senate and the House are gonna be listening to us chanting outside those walls. . . .   And they're gonna realize, we have one choice.   We either fix this mess and keep America America, or we become traitors, and those five million people outside the walls are gonna drag us out by our hair and tie us to a fucking lamp post.   That's their option.

Exhibit 309.   Hostetter was never talking about a judicial process.   His intent was to make members of Congress afraid they might be murdered.   Because his preferred candidate lost an election.   Hostetter likes to wrap himself in the American flag and take on the role of freedom fighter, but there is nothing patriotic or American about calling for violence—or threatening violence, to achieve your political aims.   That is not patriotism.   That is terrorism.

Hostetter's character was on full display as he belligerently cross-examined a U.S. Capitol Police Captain about why she had not proposed the erection of "unscalable" fencing around the U.S. Capitol before January 6—to help keep our rioters like him.   His character was further on display in his self-indulgent court filings, where he ignored the issues relevant to the case and

talked about the assassination of President John F. Kennedy, ECF No. 212 at 2; the firing of Tucker Carlson, *id.* at 2, 13, 24; the collapse of 7 World Trade Center on September 11, 2001, *id.* at 2, 24, 26; occult symbols in the Wizard of Oz, *id.* at 8; the secret society Skull and Bones, *id.* at 24; and the censoring of Facebook, Instagram, and Twitter accounts, *id.* at 27.   The seriousness with which he took the proceedings was shown by his bragging that his filings were "as much for public consumption" as they were "for the court."   *Id.* at 2.   It was shown further in his opening statement, when he told the Court his lengthy witness list of government officials, such as Nancy Pelosi and Lindsay Graham, was "submitted I guess more for shock value."   July 6 Trial Tr 18:13–19.   Hostetter has never taken the proceeding seriously.

There are aspects of Hostetter's history and characteristics that are to his credit, but with each the Court must face the evidence that undermines it.   For years, Hostetter was a yoga and meditation teacher.   PSR ¶ 113, 115.   But he collected weapons for January 6 and called for executions of politicians he disagreed with.   He is a gifted and charismatic public speaker.   But he used those gifts to stoke the fires of rebellion and to call for war.   He has decades of service to his community as a member of law enforcement and in service in the United States Army.   But he advanced past police lines, when he knew better, and joined a riotous mob set on disrupting the peaceful transfer of power.   As the Court noted in its verdict, "Mr. Hostetter is a retired police chief with over two decades of experience in law enforcement.   Simply put, there is no doubt in my mind after seeing the evidence that Mr. Hostetter knew that he was part of something unlawful."   Verdict at 10.   But that he knew it was unlawful did not stop Hostetter.

This defendant epitomizes disrespect for the law and disrespect for our constitutional order.

A lengthy sentence is warranted to ensure that he understands he has committed serious crimes that come with consequences, and in order to deter conduct like this again in the future.

### C.   The Need for the Sentence Imposed To Reflect the Seriousness of the Offense and Promote Respect for the Law

As with the nature and circumstances of the offense, this factor supports a lengthy sentence of incarceration.   Hostetter's crime was an attack on not just the Capitol, but the United States and its system of government.   He joined a mob and struck a blow to a central feature of the American system: the peaceful transfer of power.   This is a defendant who rallied others to the cause of war, revolution, and threats of violence against political leaders.   It is the message he took to Washington, D.C. and to the U.S. Capitol building, where he joined others in surrounding the building.   A lengthy term of incarceration is necessary to reflect the seriousness of his crime and to promote respect for the law.

### D.   The Need for the Sentence To Afford Adequate Deterrence

#### *General Deterrence*

A significant sentence is needed "to afford adequate deterrence to criminal conduct" by others.   18 U.S.C.§ 3553(a)(2)(B).   The need to deter others is especially strong in cases involving domestic terrorism, which the breach of the Capitol and Hostetter's conduct in particular certainly was.[13]   The demands of general deterrence weigh strongly in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol.   Where, as here, the defendant has courted public attention to promote his ideology of violent revolution, the need for

---

[13] *See* 18 U.S.C. § 2331(5) (defining "domestic terrorism").

general deterrence is particularly acute, to deter any other individuals who may pick up his mantle in the future

### *Specific Deterrence*

The need for the sentence to provide specific deterrence to this particular defendant also weighs heavily in favor of a lengthy term of incarceration.

Hostetter has never taken responsibility or expressed regret for his conduct on January 6, 2021.   Hostetter has never walked away from his calls for war, revolution, and violence against political leaders.   His continued adherence to the violent and revolutionary ideology that brought him to Washington, D.C. on January 6 is alarming and undermines any last-minute claims of remorse he may offer.   *See United States v. Matthew Mazzocco*, 1:21-cr-00054 (TSC), Tr. 10/4/2021 at 29–30 ("[The defendant's] remorse didn't come when he left that Capitol.   It didn't come when he went home.   It came when he realized he was in trouble.   It came when he realized that large numbers of Americans and people worldwide were horrified at what happened that day. It came when he realized that he could go to jail for what he did.   And that is when he felt remorse, and that is when he took responsibility for his actions.") (statement of Judge Chutkan).   The certification of the Electoral College vote takes place every four years.   Nothing in Hostetter's conduct or statements to date suggest he will not come back for the next certification he disagrees with to engage in the same dangerous and obstructive conduct.   He must be deterred.

### E.     The Importance of the Guidelines

"The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement

community over a long period of time in an effort to fulfill [its] statutory mandate." *Rita v. United States*, 551 U.S. 338, 349 (2007).   As required by Congress, the Commission has "'modif[ied] and adjust[ed] past practice in the interests of greater rationality, avoiding inconsistency, complying with congressional instructions, and the like.'"   *Kimbrough v. United States*, 552 U.S. 85, 96 (2007) (quoting *Rita*, 551 U.S. at 349); 28 U.S.C. § 994(m).   In so doing, the Commission "has the capacity courts lack to base its determinations on empirical data and national experience, guided by professional staff with appropriate expertise," and "to formulate and constantly refine national sentencing standards."   *Kimbrough*, 552 U.S. at 108 (cleaned up).   Accordingly, courts must give "respectful consideration to the Guidelines."   *Id.* at 101.

### F.   Unwarranted Sentencing Disparities

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider . . . the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct."   So long as the sentencing court "correctly calculate[s] and carefully review[s] the Guidelines range, [it] necessarily [gives] significant weight and consideration to the need to avoid unwarranted disparities" because "avoidance of unwarranted disparities was clearly considered by the Sentencing Commission when setting the Guidelines ranges."   *Gall v. United States*, 552 U.S. 38, 54 (2007).   In short, "the Sentencing Guidelines are themselves an anti-disparity formula."   *United States v. Blagojevich*, 854 F.3d 918, 921 (7th Cir. 2017); *accord United States v. Sanchez*, 989 F.3d 523, 540 (7th Cir. 2021).   Consequently, a sentence within the Guidelines range will ordinarily not result in an unwarranted disparity.   *See United States v. Smocks*, D.D.C. 21-cr-198 (TSC), Sent. Hrg. Tr. at 49 ("as far as disparity goes, … I am being

51

asked to give a sentence well within the guideline range, and I intend to give a sentence within the guideline range.") (statement of Judge Chutkan).

Although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences. While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the sentences in the following cases provide suitable comparisons to the relevant sentencing considerations in this case.

As a leader of a conspiracy to obstruct the certification of the Electoral College vote, Hostetter has few peers.   The most comparable cases are those defendants who led or organized conspiracies, have proceeded to trial in a § 1512(k) or § 371 charge, have been found guilty, and have been sentenced.   Those defendants arise from three cases: the Oath Keepers, 1:22-cr-15 (APM), and Proud Boys, 1:21-cr-175 (TJK), conspiracy cases, both of which included 18 U.S.C. § 2384 (Seditious Conspiracy) charges, and a § 371 conspiracy case focused on another group from California, *United States v. Rodriguez, et al.*, 21-cr-246.   Among these cases, the following sentences have been imposed to date[14]:

- Oath Keeper Elmer Stewart Rhodes, 1:22-cr-15 (APM), who was also convicted of violating 18 U.S.C. § 2384, was sentenced to 216 months' incarceration.

- Oath Keeper Kelly Meggs, 1:22-cr-15 (APM), who was also convicted of violating 18 U.S.C. § 2384, was sentenced to 144 months' incarceration.

- Oath Keeper Jessica Watkins, 1:22-cr-15 (APM), was sentenced to 102 months'

---

[14] In addition to these cases, Dominic Pezzola, 1:21-cr-175 (TJK), a defendant in the Proud Boys conspiracy case, was sentenced to 180 months' incarceration for his conviction for 18 U.S.C. §§ 1512(c)(2) and 2.   Pezzola had been charged with § 1512(k) and § 2384 but was convicted of neither.

incarceration.   Watkins, like Hostetter, was convicted of violating 18 U.S.C. §
1512(k) and 18 U.S.C. § 1512(c)(2), as well as 18 U.S.C. § 1361, but was found
not guilty of the § 2384 charge.

- Proud Boy Ethan Nordean, 1:21-cr-175 (TJK), who was also convicted of violating
18 U.S.C. § 2384, was sentenced to 216 months' incarceration.

- Proud Boy Joseph Biggs, 1:21-cr-175 (TJK), who was also convicted of violating
18 U.S.C. § 2384, was sentenced to 204 months' incarceration.

- Proud Boy Zachary Rehl, 1:21-cr-175 (TJK), who was also convicted of violating
18 U.S.C. § 2384, was sentenced to 180 months' incarceration.

- Proud Boy Enrique Tarrio, 1:21-cr-175 (TJK), who was also convicted of violating
18 U.S.C. § 2384, was sentenced to 240 months' incarceration.

- Daniel Rodriguez, 1:21-cr-246 (ABJ), who was convicted of violating, *inter alia*,
18 U.S.C. § 371 and 18 U.S.C. § 1512(c)(2), was sentenced to 151 months'
incarceration.

In light of the leadership role assumed by Hostetter and the efforts to organize others with
calls for violence, these defendants are the most closely analogous to Hostetter.   Notably, for each
of the sentences noted above, the sentencing court imposed the same sentence for the § 1512(k)
conviction as it did for the § 2384 conviction, rather than making a distinction between the two
counts.   Further making these cases analogous to Hostetter's, it is notable that among these
defendants, only two—Dominic Pezzola and Daniel Rodriguez—received a conviction for
assaultive conduct.[15]

Additional cases before this Court provide benchmarks, but are distinguishable in
meaningful ways.

- In *United States v. Craig Bingert*, 1:21-cr-91 (RCL), this Court sentenced Craig

---

[15] Pezzola's sentence for 18 U.S.C. §§ 1512(c)(2) and 2 was 180 months, higher than the 96-month
sentence he received for his 18 U.S.C. § 111(a)(1) conviction.

Bingert to a below-Guidelines sentence of 96 months' imprisonment. While Bingert's ascent to the Upper West Terrace mirrored Hostetter's in many ways—including through the forceful opposition to a police line—Bingert's case lacks the planning, coordination, and conspiracy elements that make Hostetter's case particularly incendiary.

- In *United States v. Daniel Scott*, 1:21-cr-292 (RCL), this Court sentenced Daniel Scott, a member of the Proud Boys, to 60 months' imprisonment. The Court sentenced Scott to a term of imprisonment toward the top of the applicable sentencing Guidelines—51 to 63 months. These sentencing Guidelines, which are substantially lower than those for Hostetter, reflected the Scott's acceptance of responsibility—a mitigating factor, which is wholly absent here.[16]

The defendant is in a rare class. While his conduct on January 6 itself may appear at times tame when compared to some of the heinous acts of violence committed by others near him, it is his role as a leader of a conspiracy, and his months-long promotion of political violence, that make him so uniquely dangerous. In his calls for violence, and his eagerness to organize for it, he has few peers. A sentence of 151 months' imprisonment is appropriate.

## VI.   RESTITUTION

Under 18 U.S.C. § 3556, a sentencing court must determine whether and how to impose restitution in a federal criminal case. Because a federal court possesses no "inherent authority to order restitution," *United States v. Fair*, 699 F.3d 508, 512 (D.C. Cir. 2012), it can impose restitution only when authorized by statute, *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011). First, the Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291

---

[16] Other defendants who pleaded guilty and received substantially lower sentences—such as defendants in *United States v. Scott Fairlamb*, 1:21-cr-120 (41 months), and *United States v. Jacob Chansley*, 1:21-cr-3 (41 months)—are poor comparators to Hostetter, a conspirator defendant who continues to deny responsibility and promotes the offensive and dangerous myth that the attack on the Capitol on January 6 was a false flag operation.

§ 3579, 96 Stat. 1248 (now codified at 18 U.S.C.   § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes."   *Papagno*, 639 F.3d at 1096; *see* 18 U.S.C. § 3663(a)(1)(A) (Title 18 offenses subject to restitution under the VWPA). Second, the Mandatory Victims Restitution Act ("MVRA"), Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA.   *Papagno*, 639 F.3d at 1096.   The MVRA applies to certain offenses including those "in which an identifiable victim or victims has suffered a physical injury or pecuniary loss," 18 U.S.C. § 3663A(c)(1)(B), a "crime of violence," § 3663A(c)(1)(A)(i), or "an offense against property . . . including any offense committed by fraud or deceit," § 3663A(c)(1)(A)(ii).   *See Fair*, 699 F.3d at 512 (citation omitted).   Because Hostetter was convicted of a violation of an offense under Title 18, the VWPA applies.

The applicable procedures for restitution orders issued and enforced under these two statutes is found in 18 U.S.C. § 3664.   *See* 18 U.S.C. § 3556 (directing that sentencing court "shall" impose restitution under the MVRA, "may" impose restitution under the VWPA, and "shall" use the procedures set out in Section 3664).

Both the VWPA and MVRA require identification of a victim, defined in both statutes as a person directly and proximately harmed as a result of the offense of conviction.   *See Hughey v. United States*, 495 U.S. 411, 418 (1990) (interpreting the VWPA).   Both statutes identify similar covered costs, including lost property and certain expenses of recovering from bodily injury.   *See Papagno*, 639 F.3d at 1097-97; 18 U.S.C. §§ 3663(b), 3663A(b).   Finally, under both the statutes, the government bears the burden by a preponderance of the evidence to establish the amount of

loss suffered by the victim.   *United States v. Bikundi*, 926 F.3d 761, 791 (D.C. Cir. 2019).

In deciding whether to impose restitution under the VWPA, the sentencing court must take account of the victim's losses, the defendant's financial resources, and "such other factors as the court deems appropriate."   *United States v. Williams*, 353 F. Supp. 3d 14, 23-24 (D.D.C. 2019) (quoting 18 U.S.C. § 3663(a)(1)(B)(i)).   The MVRA, by contrast, requires imposition of full restitution without respect to a defendant's ability to pay.[17]

Because Hostetter in this case engaged in criminal conduct in tandem with hundreds of other defendants charged in other January 6 cases, and his criminal conduct was a "proximate cause" of the victims' losses if not a "cause in fact," the Court has discretion to apportion restitution and hold Hostetter responsible for [his] individual contribution to the victims' total losses.   *See Paroline v. United States*, 572 U.S. 434, 458 (2014) (holding that in aggregate causation cases, the sentencing court "should order restitution in an amount that comports with the defendant's relative role in the causal process that underlies the victim's general losses"); *see also United States v. Monzel*, 930 F.3d 470, 476-77, 485 (D.C. Cir. 2019) (affirming $7,500 in restitution toward more than a $3 million total loss, against a defendant who possessed a single pornographic image of the child victim; the restitution amount was reasonable even though the "government was unable to offer anything more than 'speculation' as to [the defendant's] individual causal contribution to [the victim's] harm"; the sentencing court was not required to "show[] every step of its homework," or generate a "formulaic computation," but simply make a "reasoned judgment."); *cf.* 18 U.S.C. §

---

[17] Both statutes permit the sentencing court to decline to impose restitution where doing so will "complicat[e]" or "prolong[]" the sentencing process.   *See* 18 U.S.C. §§ 3663(a)(1)(B)(ii), 3663A(c)(3)(B).

3664(h) ("If the court finds that more than 1 defendant has contributed to the loss of a victim, the court … may apportion liability among the defendants to reflect the level of contribution to the victim's loss and economic circumstances of each defendant.").

More specifically, the Court should require Hostetter to pay $2,000 in restitution for his convictions on Counts One, Two, Three, and Four.   This amount fairly reflects Hostetter's role in the offense and the damages resulting from his conduct.   Moreover, in cases where the parties have entered into a guilty plea agreement, $2,000 has consistently been the agreed upon amount of restitution and the amount of restitution imposed by judges of this Court where Hostetter was not directly and personally involved in damaging property.   Accordingly, such a restitution order avoids sentencing disparity.

## VII.   CONCLUSION

For the reasons set forth above, the United States recommends that the Court impose a sentence of 151 months' incarceration, 36 months supervised release, and $2,000 restitution.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY


BY:   */s/ Anthony W. Mariano*
ANTHONY W. MARIANO, MA Bar No. 688559
JASON M. MANNING, NY Bar No. 4578068
Trial Attorney, Detailees
Capitol Siege Section
United States Attorney's Office
for the District of Columbia
601 D Street N.W.

Washington, DC 20530
(202) 476-0319
Anthony.Mariano2@usdoj.gov
(202) 514-6256
Jason.Manning@usdoj.gov